IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA          )
                                  )          CRIMINAL ACTION
          v.                      )
                                  )          NO. 05-10074-PBS
CHARLES CARRINGTON                )


**GOVERNMENT'S CONSOLIDATED OPPOSITION TO DEFENDANT'S MOTIONS**

The United States, by and through United States Attorney
Michael J. Sullivan and Assistant United States Attorney William
H. Connolly, hereby submits this memorandum in opposition to
Defendant Charles Carrington's (1) Motion to Suppress
Identification and (2) Motion To Suppress Statements.

**FACTS**

On December 28, 2004, at approximately 9:20 a.m., a black
male entered the Bank of America at 315 Centre Street, Jamaica
Plain, Massachusetts.  He approached a teller and stated,
"Listen, I know you have a guard with a gun outside.  Give me
your hundreds, fifties, and twenties, and hurry up!"  The teller
opened her drawer but activated the alarm before giving the
suspect any money.  The suspect became angry and accused the
teller of pulling the alarm.  The suspect then reached under the
teller window and grabbed the money that the teller had taken out
and ran out of the bank, with a bank customer, Jose Yurnet, in

pursuit.  Jose Yurnet observed the suspect enter the passenger side of a box truck bearing Massachusetts registration 125949.

Jose Yurnet ("Yurnet") was inside the bank when the robbery occurred.  Yurnet recalls seeing the suspect, whom he described as a black male, 6' to 6'1", heavy, and wearing a black or dark blue coat and a hat with white stripes, standing in a teller's line.  The suspect turned and looked at Yurnet and then faced back towards the teller.  Yurnet recalls that the suspect kept his hands in his pockets the whole time.  When the suspect was exiting the bank, Yurnet saw him running towards the exit with his hands in his pockets.  When Yurnet observed a teller crying, he realized that a robbery had just occurred.  Yurnet chased after the suspect and observed him getting into the passenger side of a box truck with Massachusetts registration 125949.  Yurnet typed the registration into his cell phone so that he would not forget it.  Yurnet then provided the registration number to Boston Police officers who had arrived on the scene shortly after the suspect vehicle departed.  The officers then radioed the plate number and the direction of travel to responding police units.

Responding Boston Police officers Hicks and Fencer spotted the truck driving on Centre Street heading away from the bank, consistent with the direction of travel described by witness Yurnet.  The officers confirmed the registration and noticed that

the truck had the lettering "Norfolk Hardware Inc." on the side.
A motor vehicle stop was conducted and the driver and passenger
were ordered from the truck.  The passenger was identified as
Charles Carrington and the driver was identified as Alex
Hernandez.  Both suspects were placed into custody.  After the
suspects were secured, Officer Hicks looked inside the passenger
compartment and observed a black jacket on the passenger side
seat.  In plain view Officer Hicks could see a stack of cash
inside one of the jacket pockets.  The money was later retrieved
and the total amount was $1,810.

A witness to the robbery, Felizberta Monteiro, Assistant
Bank Manager, was brought to the scene of the motor vehicle stop
for a show-up identification.  At the time of the identification,
police officers uncuffed Carrington and stepped away from him;
Monteiro was able to positively identify Charles Carrington as
the robber.

The owner of Norfolk Hardware Inc., Donald Doucette, was
contacted and confirmed that both suspects worked for him.
Doucette stated that Alex Hernandez normally works by himself but
today Doucette assigned Carrington to work with him.

Both suspect were arrested and transported to a Boston
Police station.  Suspect Alex Hernandez agreed to speak with
detectives.  Hernandez gave a detailed statement and denied any
knowledge of the robbery, explaining that while he and Carrington

-3-

were making deliveries, Carrington had asked him to take him to a
bank so that he could cash a check.  Hernandez stated that he
stayed in the truck while Carrington went into the bank.  A short
time later he looked in his rear view mirror and noticed
Carrington sprinting toward the truck.  When Carrington got into
the truck, Hernandez asked him why he was running.  Carrington
simply stated that he wanted to see how fast he could run.
Hernandez explained that as he drove away he heard sirens.  At
that point he figured that something had happened involving
Carrington.  Just before being pulled over Hernandez saw
Carrington take off his jacket, fold it, and place it in between
the driver's and passenger's seat.

     Carrington initially declined to be interviewed but later
changed his mind and on his own initiative asked to speak to the
detectives.  Carrington, who has a lengthy criminal record, was
provided a written Miranda Warning form, which he read and signed
as understanding his rights.  Carrington then signed a Waiver of
Rights.  Carrington appeared lucid and alert and provided a
detailed statement confessing to the robbery.  Carrington also
stated that Hernandez had nothing to do with the robbery and
corroborated Hernandez's story.  Carrington explained that he
told Hernandez that he needed to go to a bank to cash a check.
Carrington told detectives that he had made some mistakes in his
life but had been doing well until he began smoking crack cocaine

-4-

recently.  Carrington stated that he began smoking crack again because he was bored and was having a difficult time with family responsibilities, including illnesses that his mother has. Carrington stated that he had been borrowing money from his co-workers and his drug dealer to support his drug habit. Carrington stated that he owed his dealer $170 and was worried about paying back all the money that he owed.  He further stated that what he had done was stupid and that he needed help.  He also expressed his remorse for robbing a pregnant teller.

**ARGUMENT**

**I.    CARRINGTON'S WAIVER WAS KNOWING, VOLUNTARY, AND INTELLIGENT**

In his Motion to Suppress Statements, Carrington contends that because he "was not mentally capable of properly understanding the waiver of his rights, he could not have made a knowing, intelligent and voluntary waiver of these rights. [Def. Mem. p. 5].  In support of this position, Carrington relies exclusively on the opinion of psychologist Eric Mart, who opines that Carrington "substantially lacks the ability to comprehend and effectively utilized (sic) the protections provided by Miranda." [Mart report p. 8].  The defendant, however, does not contend that the police in any way coerced him to confess or that the police were somehow aware of a mental defect and took advantage of that defect.  The defendant has simply failed to bring forth competent evidence to dispute the voluntariness of

the confession, and any mental illness or defect he may have has
not been shown to vitiate the voluntariness of his confessions.
United States v. Santos, 131 F.3d 16, 19 (1st Cir. 1997)
(confession voluntary despite defendant's chronic paranoid
schizophrenia because no official coercion); Coe v. Bell, 161
F.3d 320, 340-41 (6th Cir. 1998)(confession voluntary despite
defendant's mental illness and gullibility because no official
coercion), cert. denied, 528 U.S. 842 (1999); United States v.
Palmer, 203 F.3d 55, 60-61 (1st Cir.)(confession voluntary
despite defendant's heroin withdrawal and antidepressant use
because he appeared clearheaded), cert. denied, 530 U.S. 1281
(2000).

        As noted above, at the time of the defendant's arrest and
interview, he had a lengthy criminal record.  (To be offered at
suppression motion).  His criminal record reveals that he had
been charged as an adult on seven prior occasions (6/21/83,
5/30/85, 9/30/85, 1/24/96, 3/29/96, 4/8/96, and 4/29/97).
Included among these charges are a 1983 assault to rape and
robbery charge, prosecuted in the Suffolk Superior Court, for
which Carrington was sentenced to 6-10 years MCI; a 1996 armed
robbery charge, prosecuted in the Suffolk Superior Court, for
which he was sentenced to 6 years and 1 day MCI; and a 1997
criminal contempt charge, prosecuted in this court, for which he
was sentenced to 33 months imprisonment, with five years of

supervised release.  His record also reveals that at the time of
the instant robbery, Carrington was on supervised release for his
federal contempt conviction.

It can be inferred from this record, and the fact that he
was on supervised release at the time of the bank robbery, that
the defendant was well-versed in police procedures and was keenly
aware of his <u>Miranda</u> rights and the consequences of waiving them.

As outlined in detail below, in keeping with the United
States Supreme Court's decision in <u>Colorado v. Connelly</u>, 479 U.S.
157 (1986), this Court must deny the defendant's motion because
his confession and waiver of Miranda rights were not the product
of police coercion.  Suppression of evidence is only appropriate
in those cases where police coercive conduct caused the
confession; <u>Connelly</u> and its progeny have made clear that the
prophylaxis of suppression is not applicable in those cases where
a defendant merely asserts that he was mentally incapable of
making a voluntary statement or waiving his rights because of the
influence of medication or an organic mental defect.  Because the
defendant has failed to allege, and will be otherwise unable to
establish, any coercive police conduct which caused his
confession, his statements should not be suppressed.

**A.    General Principles of Law:  Compelled Confessions**

The Due Process Clause of the Fifth Amendment provides that
"no person shall . . . be deprived of life, liberty, or property,

without due process of law."   It protects against compelled
confessions by means of a voluntariness test.  Dickerson v.
United States, 530 U.S. 428, 432-33 (2000); Miller v. Fenton, 474
U.S. 104, 109 (1985) (certain interrogation techniques are so
offensive to a civilized system of justice that they must be
condemned).  "[C]ases refined the [voluntariness] test into an
inquiry that examines 'whether a defendant's will was overborne'
by the circumstances surrounding the giving of a confession."
Dickerson v. United States, 530 U.S. at 432-33, quoting
Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).  "The due
process voluntariness test takes into consideration 'the totality
of all the surrounding circumstances – both the characteristics
of the accused and the details of the interrogation.'"   Id.; see
also United States v. Jackson, 918 F.2d 236, 241 (1st Cir. 1990)
("The voluntariness of an admission depends on 'whether the will
of the defendant [was] overborne so that the statement was not
his free and voluntary act, and that question [is] to be resolved
in light of the totality of the circumstances.'"); United States
v. Byram, 145 F.3d 405, 407-408 (1st Cir. 1998)("the Supreme
Court has confined the voluntariness concept by holding that only
confessions procured by coercive official tactics should be
excluded as involuntary.")  The government bears the burden of
establishing the voluntariness of a confession by a preponderance
of the evidence.  Lego v. Twomey, 404 U.S. 477, 489 (1972);

Jackson, 918 F.2d at 241.

As made clear in the Supreme Court's decision in Colorado v. Connelly, the due process voluntariness inquiry does not focus on the defendant's mental condition, but rather, it focuses on the governmental activity giving rise to the confession, and in particular, on whether there was any coercive police conduct. As stated by the Court: "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." Connelly, 479 U.S. at 164. In fact, the relevancy of a defendant's mental condition does not stand alone, "by itself and apart from its relation to official coercion." Id. at 164. "While mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." Id. at 165. Accordingly, the Court held that: "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause (of the Fourteenth Amendment)." Id. at 167.

**B.    General Principles of Law:  Waiver of Miranda Rights**

In Miranda v. Arizona, 384 U.S. 436 (1966), the Court concluded that in the context of 'custodial interrogation' certain procedural safeguards are necessary to protect a defendant's Fifth Amendment privilege against self-incrimination.

-9-

More specifically, "the Court held that 'the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self incrimination.'" <u>Rhode Island v. Innis</u>, 446 U.S. 291, 297 (1980), quoting <u>Miranda</u>, 384 U.S. at 444.

A suspect like Carrington who has been advised of his rights can "waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently." <u>Miranda</u>, 384 U.S. at 444; <u>Connelly</u>, 479 U.S. at 169 ("Of course, a waiver must at a minimum be "voluntary' to be effective against an accused."); <u>United States v. Palmer</u>, 203 F.3d 55, 60 (1st Cir. 2000).

Following a recitation of <u>Miranda</u> rights, an express statement that a suspect is willing to make a statement, followed closely by a statement can constitute a waiver. <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979). "An express written or oral statement or waiver by a defendant of his right to remain silent or of the right to legal assistance of counsel, though not conclusive, is 'usually strong proof of validity of that waiver.'" <u>United States v. Hack</u>, 782 F.2d 862, 866 (10th Cir. 1986), quoting <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979).

"To determine the voluntariness of a waiver, it is necessary

to look at the totality of the circumstances, see <u>Arizona v. Fulminante</u>, 499 U.S. 279, 285 (1991), including 'the tactics used by the police, the details of the interrogation, and any characteristics of the accused that might cause his will easily to be overborne.'" <u>Palmer</u>, 203 F.3d at 60, quoting <u>United States v. Rohrbach</u>, 813 F.2d 142, 144 (8th Cir. 1987).  "Though courts must presume that a defendant did not waive his rights, <u>see Jackson</u>, 918 F.2d at 241, the government may prove a waiver by a preponderance of the evidence." <u>Palmer</u>, 203 F.3d at 60; <u>Connelly</u>, 479 U.S. at 168.

    <u>Connelly</u> and its progeny made clear that in order to find that a <u>Miranda</u> waiver was involuntary, the Court must conclude that the waiver was the product of police coercion.  <u>Connelly</u>, 479 U.S. at 170 ("Miranda protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that.").  "The voluntariness of a waiver of [the Fifth Amendment] privilege always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." <u>Id.</u>; <u>Palmer</u>, 203 F.3d at 62 (quoting <u>Connelly</u>, 479 U.S. at 170).  Thus, while a waiver must be "knowing" and "intelligent" as well as voluntary, the inquiry by the Court is not to determine whether a defendant's waiver was "totally rational and properly motivated." <u>Connelly</u>, 479 U.S. at 166.  It is only that the defendant have, "full awareness of both

the nature of the right being abandoned and the consequences of the decision to abandon it." Colorado v. Spring, 479 U.S. 564, 573 (1987).  That inquiry is not a complex one:

> The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege. The Fifth Amendment's guarantee is both simpler and more fundamental: A defendant may not be compelled to be a witness against himself in any respect. The Miranda warnings protect this privilege by ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time. The Miranda warnings ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully advised of this constitutional privilege, including the critical advice that whatever he chooses to say may be used as evidence against him.

> . . . Once Miranda warnings are given, it is difficult to see how official silence could cause a suspect to misunderstand the nature of his constitutional right--"his right to refuse to answer any question which might incriminate him."

Id. at 574-75 (citations omitted).  The Supreme Court has also noted that, "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare."   Dickerson v. United States, 530 U.S. at 444, quoting Berkemer v. McCarty, 468 U.S. 420, 433 (1984).

### C.   Post-Connelly Mental Condition Cases

Numerous courts since Connelly have had occasion to address the significance of intoxication, drug use, and medications in

confession/Miranda waiver cases.  In so doing they have closely adhered to the Supreme Court's directive that only in cases of governmental coercion should confessions be suppressed.

In <u>United States v. Cristobal</u>, 293 F.3d 134 (4th Cir. 2002), the Fourth Circuit concluded that a defendant's confession was voluntary under <u>Connelly</u> and its progeny, despite the fact that the defendant was hospitalized at the time for gunshot wounds suffered the day before the interview and was under the influence of morphine and other pain killers while being questioned by officers.  The court in <u>Cristobal</u>, relying on the requirements of <u>Connelly</u>, found no coercive police conduct, and concluded that since the confession was not the product of such conduct it should not be suppressed, despite the defendant's weakened condition. <u>United States v. Cristobal</u>, 293 F.3d at 140-143. While the <u>Cristobal</u> court cautioned that police not take advantage of a defendant who is hospitalized and medicated at the time of the interview, it noted that such interviews are both common and necessary in order to rapidly obtain "valuable crime-solving or further crime-preventing information," and confessions will not be suppressed absent coercive police conduct.  <u>Id</u>.

In <u>Andersen v. Thieret</u>, 903 F.2d 526 (7th Cir. 1990), the Seventh Circuit addressed the claim of a habeas petitioner that he was convicted based on an involuntary confession.  Among other

claims of coercion, the petitioner claimed that he was
intoxicated when he confessed.  In rejecting the petitioner's
claim, the Seventh Circuit noted that post-<u>Connelly</u>, "Andersen's
intoxication by itself could not support a finding of
involuntariness and is relevant only to the extent it made him
more susceptible to mentally coercive police tactics."  <u>Id</u>. at
530, n.1.

The Seventh Circuit addressed the same issue in <u>United
States v. Chrismon</u>, 965 F.2d 1465 (7th Cir. 1992), where the
defendant argued that his intoxication and low intelligence,
coupled with a claimed beating, rendered his confession
involuntary.  Again, the court, in rejecting the due process
challenge, stated: "A diminished mental state is only relevant to
the voluntariness inquiry if it made mental or physical coercion
by the police more effective."  <u>Id</u>. at 1469.  More recently,
Seventh Circuit rejected an involuntary confession claim of a
defendant who claimed to have confessed while under the influence
of crack cocaine.  <u>United States v. Montgomery</u>, 14 F.3d 1189,
1192 (7th Cir. 1994).  The court noted: "[e]ven if we were to
assume that Montgomery was a cocaine addict who may have been
incapacitated, we would not necessarily conclude that the
statement was involuntary because there still must be some
showing of official coercion."  <u>Id</u>. at 1195, citing <u>Connelly</u>, 479
U.S. at 167.  <u>See</u> <u>also</u> <u>United States v. Martin</u>, 781 F.2d 671,

-14-

673-74 (9th Cir. 1985) (pre-Connelly case in which defendant was questioned while in hospital recovering from injuries suffered in explosion--court found that "the type, dosage, and schedule of painkilling narcotic administered to [defendant] was not sufficient to overbear his will to resist the questioning or impair his rational faculties").

The same analysis has been used by courts when considering the validity of a Miranda waiver.  In United States v. Palmer, 203 F.3d 55, 60 (1st Cir. 2000), the First Circuit rejected the defendant's claim that his drug withdrawal and use of anti-depressants rendered his Miranda wavier involuntary.  The court noted: "Even if Palmer, arguendo, was in a weakened condition because of his withdrawal symptoms, it does not necessarily follow that his post-arrest statements were involuntary." Id. at 61.  In upholding the Miranda waiver, the court cited Connelly for the proposition: "The voluntariness of a waiver of this [privilege against self-incrimination] has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." Id. at 62, quoting Connelly, 479 U.S. at 170; see also United States v. Santos, 131 F.3d 16, 19 (1st Cir. 1997) (confession voluntary despite defendant's chronic paranoid schizophrenia because no official coercion).

**D. Carrington's Confession and Miranda Waiver Were Voluntary**

This Court must reject the defendant's motion to suppress

because there is no evidence that FBI agents or Boston police officers coerced Carrington's confession.  Without evidence that officers acted improperly, through coercive tactics, or through taking advantage of a credible allegation that the defendant was suffering from some weakened state, the defendant's confession cannot be found to be involuntary.

As noted above, Carrington was lucid and appeared to fully understand his rights.  In confessing to the bank robbery, Carrington gave a detailed statement, which included an explanation for his criminal behavior as well as an expression of remorse for robbing a pregnant bank teller.  Further indicating his lucidity and awareness of the situation, Carrington made certain to exonerate his co-worker, who was riding in the work truck with Carrington but had no knowledge of Carrington's intention to rob a bank.  At no point during the interview did Carrington tell officers he was confused or without his full faculties, nor did officers independently conclude that he was. All of this conduct was consistent with a voluntary confession and waiver of rights.

The credible evidence will establish that Carrington was clear-headed and lucid at the time of the interview, and that the information he ultimately provided to officers regarding the robbery was detailed and reliable.  He was <u>Mirandized</u> at the beginning of the interview, and signed a written waiver of his

rights.  There was no prolonged interrogation.  No physical abuse or sensory deprivation occurred before or during the interview, and no trickery, deception, or intimidation was involved.  Nor were any threats against him or family members made.  See Byram, 145 F.3d at 408 (finding voluntariness in part on lack of threats or serious retaliation if defendant refused to speak and on the shortness of interview).  As was the case in Palmer, 203 F.3d at 62, the officers were professional and there was no indication that they were rude, abrasive, or forceful, and the defendant does not so allege.

Finally in determining whether the defendant's will was overborne by police conduct, the Court should take into consideration Carrington's extensive experience with police officers and the criminal justice system.  It can readily be inferred from the defendant's prior arrests, convictions, and lengthy jail sentences, that he was keenly aware not only of his rights but of the consequences of confessing to the crime. Courts have relied on just such experience in determining that a waiver of Miranda rights was voluntary.  See e.g. United States v. Jackson, 918 F.2d at 242 (1st Cir. 1990) (confession voluntary in part because of defendant's prior experience with judicial system); United States v. Ruggles, 70 F.3d 262, 265 (2nd Cir. 1995)(evidence of extensive criminal record basis for concluding that defendant was familiar with police questioning and had

-17-

sufficient knowledge to understand <u>Miranda</u> rights); <u>Alston v.</u>
<u>Redman</u>, 34 F.3d 1237, 1254 (3d Cir. 1994) (confession voluntary
in part due to defendant's prior experience with the criminal
justice system); <u>United States v. Collins</u>, 40 F.3d 95, 98 (5th
Cir. 1994) (confession voluntary because defendant had extensive
criminal history and was familiar with criminal justice system);
<u>United States v. Morris</u>, 247 F.3d 1080, 1090 (10th Cir. 2001)
(confession voluntary in part because defendant had 5 prior
arrests).

**II.  THE ONE-ON-ONE SHOW-UP IDENTIFICATION PROCEDURE WAS NOT
IMPERMISSIBLY SUGGESTIVE**

The defendant contends that the show-up identification
procedure employed in this case was unnecessarily suggestive.
This contention is without merit.

In deciding whether to suppress testimony regarding
an out-of-court identification and in-court identification,
courts must conduct a two-step inquiry.  <u>United States v. de</u>
<u>Jesus-Rios</u>, 990 F.2d 672, 677 (1st Cir. 1993), <u>Neil v. Biggers</u>,
409 U.S. 188 (1972), <u>Manson v. Brathwaite</u>, 432 U.S. 98 (1977).
First, the court must determine whether the identification
procedure was impermissibly suggestive.  <u>de Jesus-Rios</u>, 990 F.2d
at 677.  If the defendant fails to demonstrate that the procedure
was impermissibly suggestive, no further inquiry is required.
<u>See</u> <u>id.</u>  If, however, the court determines that the procedure was
impermissibly suggestive, it must then decide whether the

identification itself was reliable under the totality of the circumstances.  de Jesus-Rios, 990 F.2d at 677.  "Furthermore, before suppressing identification evidence, a court must be persuaded that there was a very substantial likelihood of irreparable misidentification, and only in extraordinary circumstances should identification evidence be withheld from the jury."  United States v. Watson, 76 F.3d 4,6 (1st Cir. 1996).

    Here, the Court need not consider the reliability of the identification because the defendant cannot meet his burden of establishing that the identification procedure was impermissible.

     The question of whether an identification procedure was "unnecessarily" or "impermissibly" suggestive naturally requires a showing that the procedure used was unnecessary or impermissible under the circumstances.  See United States v. Maguire 918 F.2d 254, 264 (1st Cir.1990); United States v. Simmons, 390 U.S. 377, 385 (1968); Stoval v. Denno, 388 U.S. 293, 302 (1967); United States v. Stevens, 935 F.2d 1380, 1389 (3rd Cir.1991).  Indeed, show-ups that occur immediately after the offense has been committed are often necessary to avoid the mistaken apprehension of the wrong person.  United States v. Watson, 76 F.3d 4, 6 (1st Cir. 1996).  In Watson, the First Circuit upheld the district court's finding that a one-on-one, show-up identification, done withing twenty minutes of the commission of the crime, was not unnecessarily suggestive. Id.

The court noted that the identification was done when the crime was fresh, the police were not suggestive, and if Watson was not the assailant, the witness could easily have said so. Id. at 7. Applying the First Circuit's analysis in Watson to the instant case yields the same result. Like Watson, the identification procedure here was done shortly after the commission of the crime--within minutes--and the police were not suggestive in their actions during the procedure. Had Carrington not been the robber, the witness could have easily said so and Carrington would have been free to go. Under the circumstances, the identification procedure was indeed necessary to ensure that Carrington was the right person and to protect against any unwarranted detention of the wrong person.

Under these circumstances, the defendant cannot demonstrate that the one-on-one show-up identification procedure was impermissible or unnecessary under the circumstances. Indeed, the identification procedure was the prudent course of action. Accordingly, the defendant's motion to suppress identification must be denied.

## Conclusion

For the reasons set forth above, the government respectfully requests that the defendant's motions to suppress be denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  /s/ William H. Connolly
WILLIAM H. CONNOLLY
Assistant U.S. Attorney

Date: October 4, 2005