UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

    v.                                                Criminal No. 1:05-cr-10074-PBS

CHARLES CARRINGTON


**DEFENDANT'S PROPOSED FINDINGS OF FACT AND RULINGS OF LAW**

Based upon the evidentiary hearings held on 3/22/07, 4/6/07, and 5/1/07, the defendant requests that the following findings of fact and rulings of law be made.

**Findings of Fact**

1. In its Indictment, the Grand Jury charged that on or about December 28, 2004, in the District of Massachusetts, Defendant Charles Carrington committed unarmed bank robbery.

2. After his arrest that same day, Defendant made incriminating statements to the Boston police.

3. Defendant, through counsel, moved to suppress statements, on the basis that the defendant was not competent to waive his Miranda rights (Docket # 19).

4. On October 21, 2005, while testifying at the suppression hearing, Defendant's expert witness, Eric Mart, Ph.D., testified that he had evaluated Carrington for competency and found him to be incompetent.

5. Prior to a determination of the suppression motion, the Government filed a motion for a court-ordered psychiatric or psychological examination of Defendant to determine his competency to stand trial (Docket # 30).

6. This Court found that there was reasonable cause to believe that Carrington might be suffering from a mental disease or defect rendering him incompetent to stand trial, and ordered a mental competency evaluation in accordance with 18 U.S.C. § 4241(b).

7. The Court appointed Thomas G. Gutheil, M.D. to evaluate Defendant, who prepared a report wherein he determined that, "Mr. Carrington's capacities fall just below the threshold of competence to stand trial; this state is the result of

a combination of low intelligence, depression and lack of experience in the actual trial setting." Dr. Gutheil recommended that "Mr. Carrington's capacities with relevance to competence to stand trial may well be restored and/or increased by: a) treatment of his depression and its negative effects on thinking b) an educational program about trial personnel, proceedings and the like to remedy an apparent educational or knowledge deficit."

8. On July 19, 2006, after a hearing in accordance with 18 U.S.C. §§ 4241(c) and 4247(d), this Court found Defendant to be incompetent to stand trial, and stayed consideration on the suppression motion.

9. On August 3, 2006, this Court committed Defendant to the custody of the Attorney General in accordance with 18 U.S.C. § 4241(d).

10. Mr. Carrington was not immediately transferred to a federal Psychiatric Referral Center, but instead remained incarcerated at the Plymouth County Correctional Facility, which houses pre-trial federal detainees. Defendant filed a motion to compel the transfer on October 11, 2006, which was allowed the following day.

11. On October 26, 2006, Carrington was received at the U.S. Medical Center for Federal Prisoners ("MCFP") in Springfield, Missouri.

12. Defendant was evaluated from October 26, 2006 through February 23, 2007. A forensic report was prepared on March 9, 2007 by Lee Ann Preston, Ph.D., Clinical Psychologist at MCFP ("the Report").

13. While Mr. Carrington was present at MCFP, he was involved in a disciplinary matter as a result of allegations that he had coerced another inmate into giving him all of his commissary items, and forced him to write a letter to his sister instructing her to send $1,000 to Mr. Carrington's account or else Mr. Carrington would harm him. He was subsequently transferred to a locked unit on January 26, 2007. (Report at 8).

14. Pursuant to MCFP's procedures, on February 2, 2007, a Disciplinary Hearing Officer interviewed Mr. Carrington, who stated that the other inmate had given the commissary items to him voluntarily, and denied the allegation that he had attempted to extort $1,000 from his sister. Mr. Carrington requested that the Hearing Officer ask another inmate about what had happened, who corroborated Mr. Carrington's version of what had occurred. Staff at MCFP also contacted the inmate's sister, who informed them that she had received no such letter. The allegations were not otherwise substantiated, and Mr. Carrington was found guilty only of accepting items that did not belong to him. (Report at 8).

15. During his time at MCFP, Defendant was routinely observed by clinical and correctional staff, and participated in numerous individual clinical interviews with Dr. Preston. He also attended a weekly competency restoration group, "a one-hour didactic designed to educate patients regarding the legal system." (Report at 7).

16. The evaluation also included a physical examination, a review of legal documentation pertaining to Defendant's case, medical and academic records, Drs. Mart's and Gutheil's reports, as well as observation of Defendant during the time that he was housed at MCFP in Springfield.

17. In addition, a neuropsychological consultation, which included an interview and the administration of several psychological and neuropsychological assessment measures, was completed by Robert L. Denney, Psy.D, a Staff Psychologist at MCFP, and Wendy McCoy, M.A., a Psychology Intern. (Report at 1, 10).

18. Dr. Denney concluded, "Definite Malingered Neurocognitive Dysfunction, and Probable Verbal Learning Disability." (Report at 16). Under cross-examination, Dr. Denney acknowledged that on numerous tests Mr. Carrington had passed the validity test scales. Dr. Denney further acknowledged that Mr. Carrington had passed a test designed specifically to capture malingering, the Test of Malingered Memory ("TOMM").

19. Dr. Preston and Robert Sarrazin, M.D., Chief of psychiatry at MCFP, assessed Mr. Carrington's need for anti-depressant medication, concluding that he was not suffering from depression, but "given the possibility of an adjustment disorder, with a depressed mood, he was offered anti-depressant medication." Mr. Carrington refused, saying that he did not want to be medicated like the other inmates there. (Report at 7). Many of the inmates at MCFP are on anti-psychotic medication.

20. Dr. Preston opined in her report that Carrington is competent to proceed, and that he "does not have a genuine mental disease or defect which would hinder his ability to understand the nature and potential consequences of the proceedings against him nor his ability to assist properly in his defense." (Report at 19).

21. Dr. Preston further prognosticated that, "Given that Mr. Carrington does not have a severe mental disease or defect, he is expected to remain competent for the foreseeable future." (Report at 19).

22. A status conference was held on February 14, 2007, at which counsel for the defendant orally moved for his release. No report or determination from MCFP regarding the competency of the defendant had been filed by that date. Additionally, no motion or request to permit the defendant's continued

hospitalization pursuant to 18 U.S.C. § 4241(d)(2)[1] was filed within four months of August 3, 2006. The Defendant maintained that the delay of over eighty days in transporting the Defendant in this case was in effect a punitive sanction, and the delay otherwise violated Mr. Carrington's due process rights. This Court denied Defendant's request.

23. On February 21, 2007, Defendant filed a motion to dismiss, based on a violation the commitment procedures outlined in 18 U.S.C. § 4241(d). (Docket # 42). Specifically, Defendant argued that the statute permits a commitment for up to four months, at the end of which time a report or determination regarding competency must be filed. Upon motion or request within that four-month period, the hospital may file a motion or request an additional reasonable period of time in which to bring a defendant to competence. Mr. Carrington was held from August 3, 2006 to at least February 27, 2007.[2] This Court denied Defendant's motion.

24. At the competency hearing held March 22, 2007, April 6, 2007, and May 1, 2007, the United States supported its contention that Mr. Carrington is competent with Dr. Preston's report, and called Drs. Preston and Denney as witnesses. The Defendant called Dr. Mart as a witness.

25. The Government witnesses agreed that the IQ testing results were close to Dr. Mart's findings, and that Carrington fell in the mildly retarded range.

26. Dr. Denney acknowledged that the test from which he attempted to extrapolate Mr. Carrington's IQ was a "blunt instrument" for doing so.

27. Dr. Preston testified that she concluded that Mr. Carrington was competent on February 2, 2007, after she learned that he had represented himself at the disciplinary interview, where his defense consisted of telling staff to ask another inmate what had happened. (*See* Report at 8).

28. Dr. Preston did not report to this Court that she had found Mr. Carrington competent until on or about March 9, 2007.

29. Drs. Preston and Mart testified that there was no assessment of Defendant's decisional competence at MCFP.

30. Drs. Denney and Preston conceded that they did not conduct a single test specifically designed to measure IQ. Both federal doctors acknowledged the

---

[1] The statute provides that a defendant may be hospitalized for an additional reasonable period of time, beyond four months, until "his mental condition is so improved that trial may proceed, if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the trial to proceed. 18 U.S.C. § 4241(d)(2)(A).
[2] This Court ordered the defendant's immediate release to the custody of the U.S. Marshal Service on February 27, 2007 (docket # 48). Mr. Carrington did not arrive at the Wyatt Detention Facility in Rhode Island until on or about March 14, 2007

4

existence of peer-reviewed IQ tests, and Dr. Preston acknowledged that the Federal Bureau of Prisons Clinical Practice Guidelines for Forensic Evaluations states that, "for inmates being evaluated for competency to stand trial, it is common for standard tools, such as the Competency Screening Test, to be administered."

31. The bulk of Dr. Denney's work and publications appears to be in identifying malingering and not in assessing IQ.

32. Dr. Mart did accept that the results of some of Dr. Denney's tests indicated malingering on the part of Mr. Carrington.

33. However, Dr. Mart also pointed to tests that had been conducted at MCFP on Mr. Carrington, which fell within validity scales. Specifically, Mr. Carrington fell within the validity scales on the Minnesota Multiphasic Personality Inventory ("MMPI"). The results of this critical test revealed that Mr. Carrington had heightened scales on Depression, Paranoia and Neuroses.

34. Drs. Denney and Preston failed to acknowledge and account for these results.

35. Given the findings of Dr. Gutheil, who pointed to Mr. Carrington's depression as a primary issue standing in the way of his competence, the failure to acknowledge this aspect of Mr. Carrington's test results is particularly troubling.

36. Furthermore, although no assessment of Defendant's decisional competence was conducted at MCFP, I find that his inability to distinguish anti-depressive medications, as opposed to anti-psychotic medications taken by other inmates at MCFP, shows that he is not competent to engage in the decision-making process required of criminal defendants.

### Rulings of Law

1. The Due Process Clause of the Fifth Amendment prohibits courts from trying and convicting mentally incompetent defendants. Drope v. Missouri, 420 U.S. 162, 171-72 (1975; Pate v. Robinson, 383 U.S. 375, 384-86 (1966); Johnson v. Norton, 151 F.Supp.2d 130, 135 (D. Ma. 2000).

2. The test for determining competency is whether a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding … and whether he has a rational as well as a factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 403 (1960); United States v. Wiggin, 429 F.3d 31, 37 (1st Cir. 2005).

3. The determination of whether a defendant is mentally competent to stand trial is a question left to the sound discretion of the district court, with the advice of psychiatrists. Dusky, 362 U.S. at 403; Newfield v. Untied States, 565 F.2d 203, 206 (2d Cir. 1977).

4. The medical opinion of experts as to the competency of a defendant to stand trial is not binding on the court, since the law imposes the duty and responsibility for making the ultimate decision of such a legal question on the court and not upon medical experts.

5. Neither likelihood of recovery nor dangerousness is to be considered by the district court. United States v. Shawar, 865 F.2d 856 (7th Cir. 1989).

6. Although there was some evidence of malingering, this Court concludes that the evidence did not conclusively show that the results of the tests of Mr. Carrington's intellectual abilities were not valid.

7. The Court therefore finds that it is more likely than not that Mr. Carrington is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. 18 U.S.C. § 4241.

8. Because the procedures under 18 U.S.C. § 4241(d)(2)(A) were not followed, and because Mr. Carrington was hospitalized beyond the four-month time period allowed by statute, I find that Mr. Carrington's due process rights were violated.

9. Consequently, I find that dismissal is a reasonable and appropriate remedy

Respectfully submitted,
CHARLES CARRINGTON
By his attorney

/s/ MARK W. SHEA                           Dated:  July 23, 2007
Mark W. Shea
Shea, LaRocque & Wood, LLP
47 Third Street, Suite 201
Cambridge MA  02141-1265
617.577.8722

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on July 23, 2007.
/s/ Mark W. Shea
MARK W. SHEA