# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

**UNITED STATES OF AMERICA**

**vs.**                                            **Docket No. 1:05-cr-10074-PBS**

**CHARLES CARRINGTON**


### Defendant's Motion for Leave to File Sentencing Memorandum Late

Charles Carrington, defendant in the above-captioned case, hereby moves this Court to allow him to file his sentencing memorandum late.  As grounds for this motion, defendant/appellant avers as follows:

1. On December 11, 2007, this Court issued  a procedural order ordering the defendant to file a sentencing memorandum by March 14, 2008.

2. Undersigned counsel was unable to complete the filing in a timely manner due to conflicting professional and personal obligations.  Specifically, I argued a motion for new trial in *Commonwealth v. Carrington*, 9501CR4019, on March 4, 2008; and a motion relative to a habeas petition in *Ross v. United States*, 05-cv-40065-RWZ, on March 11, 2008.  Additionally, I had pretrial conferences on March 4, 5, 6, 11, 13 and 14, 2008 in Boston and Worcester.  I was out of town on vacation from March 7 to 10, 2008, and conducted an investigation in Miami on March 10, 2008 in connection with *United States v. Lawrence*, 1:07-cr-10263-GAO.  Finally, I have been preparing for a two-day suppression hearing in a murder case the

Plymouth Superior Court, scheduled for March 17 and 18, 2008, *Commonwealth v. Silva*, PLCR2007-00138.

WHEREFORE, the defendant requests that this Court allow him to file his sentencing memorandum late.

CHARLES CARRINGTON
By his attorney,

/s/ Mark W. Shea                               Dated:  March 16, 2008
MARK W. SHEA
BBO No. 558319
SHEA and LaROCQUE
47 3rd Street, Suite 201
Cambridge, MA 02141-1265
(617) 577-8722

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on March 16, 2008.

/s/ Mark W. Shea
MARK W. SHEA

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

     v.                                Criminal No. 1:05-cr-10074-PBS

CHARLES CARRINGTON

## DEFENDANT'S SENTENCING MEMORANDUM

### I.      INTRODUCTION

Defendant, Charles Carrington, respectfully moves that this Court impose a sentence of six years, followed by supervised release.  Defendant requests that, upon completion of his incarceration, he be released to a halfway house, to be followed by a three-quarterway house, rather than be released directly to the community.  He further requests that he be assigned to a Residential Drug Abuse Treatment ("RDAP") program in the Bureau of Prisons.  This memorandum will submit reasons why this Court should either decline to apply the career offender guideline enhancement, or, in the alternative, grant a sentence that is below or "in variance" with the advisory Guideline level based on defendant's personal history and the circumstances of this offense.

### II.     ARGUMENT

### A.     The Guideline Calculation

The U.S. Probation Office has prepared a presentence report ("PSR") in this case and found that, under the Sentencing Guidelines currently in effect, the base offense level is 20.  PSR ¶ 21.  Probation has determined that Mr. Carrington's criminal history

category is VI, with 14 criminal history points.  PSR ¶ 46.  Probation has also determined that Mr. Carrington should be granted a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1, PSR ¶ 27, and that the offense level should be increased by two levels under U.S.S.G. § 2B3.1(b)(1) because the property of a financial institution was taken, PSR ¶ 22, resulting in a total offense level of 19.  The advisory sentencing range based upon a total offense level of 19 and a criminal history category of VI is 63 to 78 months.

However, probation has further determined that Carrington is a career offender under U.S.S.G. § 4B1.1, with a corresponding offense level of 32.  PSR ¶¶ 29-30.  After deducting three points for acceptance of responsibility, probation has determined that the total offense level is 29.  PSR ¶ 31.  Probation has calculated the defendant's advisory sentencing range at 151 to 188 months.  PSR ¶ 121.

Defendant argues that the career offender enhancement provisions of the Guidelines (§ 4B1.1) are not applicable in this case, as the particular facts in this case indicate that the bank robbery that Carrington committed should not be considered a crime of violence.  In the alternative, defendant argues his case warrants either a downward departure from a sentence that incorporates a career offender enhancement, or that a variance from the advisory guideline range pursuant to 18 U.S.C. § 3553(a).

**B.    The Bank Robbery Was Not a Crime of Violence**

Section 4B1.2 of the Sentencing Guidelines calls for an enhanced sentence if the defendant is deemed a "career offender."  The Guideline provides, "A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of

conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a). The term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that "(1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or (2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." U.S.S.G. § 4B1.2(a). Defendant maintains that the bank robbery does not count as a "crime of violence," and therefore the career offender enhancement does not apply.

Defendant concedes that the guidelines, in commentary, list robbery as an example of a crime of violence for purposes of applying the career offender provision. *See* U.S.S.G. § 4B1.2, comment (n. 1). Nonetheless, defendant maintains that when making a determination whether a crime is one of violence within the meaning of § 4B1.2, this Court must also analyze the facts of the particular case in order to determine whether of offense is in fact a crime of violence, cf. United States v. Baskin, 886 F.2d 383, 389 (D.C.Cir. 1989) (suggesting that a sentencing judge may examine actual facts even of a listed crime). *See also* United States v. McVicar, 907 F.2d 1, 2 (1st Cir. 1990) (holding that the guidelines, in commentary, list robbery as a crime of violence, but going on to analyze individual facts of the case).

In the case at bar, the bank teller who was the victim of the robbery informed the police that the robber had approached her and stated, "I know you have an armed guard outside. Give me all your hundreds, fifties, and twenties, and hurry up!" A bank

customer stated that he overheard the robber say, "Hurry up!  Hurry up!"  Although the

PSR states that, "the robber became angry and accused the teller of pulling the alarm,"

PSR ¶ 8, Mr. Carrington adamantly denies that he became angry or that he said anything

about an alarm.  *See* PSR Addendum, defendant's objection #2; change of plea transcript

at 19, 21.  Carrington was unarmed, and did not pretend that he had a weapon, nor did he

threaten the teller or anyone else.  The facts show that Carrington's conduct did not

involve a "serious potential risk of physical injury," and thus the bank robbery does not

qualify as a "crime of violence."  As such, the second prerequisite under § 4B1.1(a) is not

met, and the Career Offender enhancement does not apply.

## C.   The Court Should Depart Downward from the Career Offender Enhanced Sentence

Assuming *arguendo* that the career offender enhancement is applicable in this

case, defendant argues that this Court should, in the interests of justice, depart downward

from a sentence that incorporates a career offender enhancement. A sentencing court may

reduce or eliminate an incarcerative sentence under the federal sentencing guidelines

upon a finding "that there exists … [a] mitigating circumstance of a kind, or to a degree,

not adequately taken into consideration by the Sentencing Commission in formulating the

guidelines that should result in a sentence different from that described."  18 U.S.C. §

3553(b); U.S.S.G. § 5K2.0.

### 1.   Carrington's Diminished Capacity Under U.S.S.G. § 5K2.13

The Guidelines allow for a downward departure due to the diminished capacity of

the defendant.  The Guidelines' approach to taking into account a defendant's diminished

capacity in sentencing began with the Sentencing Reform Act in which Congress directed

the Commission to consider the relevance of certain offender characteristics, including a

defendant's "mental and emotional condition to the extent that such condition mitigates

the defendant's culpability." 28 U.S.C. § 944(d)(4) (1994). The Commission followed

through on this direction in its preliminary draft of the sentencing guidelines, noting that

a "mitigating factor might be the presence of a serious mental disability that did not rise

to the level of a successful defense." Preliminary Draft of Sentencing Guidelines for

United States Courts, 51 Fed. Reg. 35,080, 35,131 (Oct. 1, 1986). A year later, the

Commission noted in its proposed guidelines that an offense level could be decreased for

"Diminished Capacity" if "the defendant committed a non-violent offense while suffering

from significantly reduced mental capacity not resulting from voluntary use of drugs or

other intoxicants, … provided that the defendant's criminal history does not indicate a

need for incarceration to protect the public." Proposed Sentencing Guidelines for Untied

States Courts, 52 Fed. Reg. 3920, 3970 § Y218 (Feb. 6, 1987).

The concept of diminished capacity was eventually codified and placed in

Chapter 5, Part K (Departures) of the guidelines. The Commission identified a

defendant's reduced mental capacity as one circumstance in which a departure would be

encouraged, noting that such an impairment would normally constitute grounds for

departure. *See* U.S.S.G. § 5K2.13; U.S.S.G. ch. 1, Pt. A(b), Departures. The original

version of the Diminished Capacity departure read as follows:

> If the defendant committed a non-violent offense while suffering from
> significantly reduced mental capacity not resulting from voluntary use of
> drugs or other intoxicants, a lower sentence may be warranted to reflect
> the extent to which reduced mental capacity contributed to the
> commission of the offense, provided that the defendant's criminal
> history does not indicate a need for incarceration to protect the public.

§ 5K2.13 (1987). Thereupon followed much litigation over the proper interpretation of

the phrase "non-violent offense."  *See, e.g.*, <u>United States v. Nunez-Rodriguez</u>, 92 F.3d 14, 24-25 (1st Cir. 1996); <u>United States v. Weddle</u>, 30 F.3d 532, 537-40 (4th Cir. 1994); <u>United States v. Cantu</u>, 12 F.3d 1506, 1513 (9th Cir. 1993); <u>United States v. Poff</u>, 926 F.2d 588, 591 (7th Cir. 1991) (*en banc*); <u>United States v. Russell</u>, 917 F.2d 512, 517 (11th Cir. 1990); <u>United States v. Askari</u>, 140 F.3d 536 (3d Cir. 1998) (*en banc*); <u>United States v. Maddalena</u>, 893 F.2d 815, 819 (6th Cir. 1989); <u>United States v. Chatman</u>, 986 F.2d 1446, 1451-52 (D.C. Cir. 1993).

Consequently, effective November 1, 1998, the Sentencing Commission amended the section, providing the language that exists today:

> A sentence below the applicable guideline range may be warranted if the defendant committed the offense while suffering from a significantly reduced mental capacity.  However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; or (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public.  If a departure is warranted, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

The application note for this section illustrates that the departure is intended to address both cognitive and volitional impairments, stating that a "significantly reduced mental capacity" means "the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrong." U.S.S.G. § 5K2.13, commentary, n.1.

The defendant requests that he be given a departure under § 5K2.13 on the basis

of his diminished capacity.

### 2. Carrington's Extraordinary Mental and Emotional Condition Under U.S.S.G. § 5H1.3

Should this Court disagree with defendant and hold that it cannot grant a departure under § 5K2.13, Carrington submits that § 5H1.3 allows the Court to grant a departure on the basis of his mental or emotional condition. Ordinarily § 5H1.3 would not be an available departure for a defendant, because § 5K2.13 encompasses the issue of a defendant's mental condition. However, in an extraordinary case, a mental or emotional condition may warrant a lighter sentence even if it does not fit the express exception in § 5K2.13, the diminished capacity departure. U.S.S.G. § 5H1.3 (policy statement) provides:

> Mental and emotional conditions are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range, except as provided in Chapter Five, Part K, Subpart 2 (Other Grounds for Departure).

"*Both* U.S.S.G. §§ 5K2.0 and 5K2.13 satisfy that requirement." United States v. Hines, 26 F.3d 1469, 1478 n.6 (9th Cir. 1994) (emphasis in original), cited in United States v. Carvell, 74 F.3d 8, 12 n.5 (1st Cir. 1996) (district court had authority to depart based on defendant's mental health condition under § 5K2.11, the "lesser harms" provision).

§§ 5K2.0 and 5K2.13 set forth two distinct bases for downward departure where a defendant suffers from an impaired mental or emotional condition. As such, this Court has authority to depart downward under § 5H1.3 and § 5K2.0 based on Carrington's extraordinary mental and emotional condition, even though he may not satisfy the requirements of § 5K2.13.

§ 5H1.3 allows the court to consider a defendant's mental and emotional conditions, if it determines it to be an extraordinary case. §5K2.0, in turn, authorizes a district court to depart from the applicable guideline range if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."

The decision as to what extraordinary circumstances render mental and emotional conditions relevant under the Guidelines is fact-bound. United States v. Shore, 143 F.Supp.2d 74, 79 (D. Mass. 2001). Mr. Carrington has significant intellectual and information processing deficiencies. From an early age he witnessed his mother's boyfriend abusing alcohol and physically abusing his mother, and suffered physical abuse himself. Mr. Carrington's resultant mental and emotional condition is outside the norm, and this Court should take it into consideration in its sentencing decision. The fact that Mr. Carrington has significant intellectual deficiencies, as well as his inability to self-monitor and plan clearly contributed to his actions in this case.

### 3. Mr. Carrington Showed Extreme Remorse

From the moment of his arrest by the police, Carrington has shown extreme remorse for his crime. During the police interview after his arrest, Carrington was clearly distraught and tearful, repeatedly apologized, and begged for help with his drug problem. He also expressed his concern for his co-worker, Alex Hernandez, who was arrested with him, impressing on the police that Mr. Hernandez was not involved in any way. Carrington instructed his lawyers to convey his apology to the employees of the bank. PSR ¶ 16a. At his change of plea, Carrington repeatedly expressed his remorse to the

Court.  Tr. 12-13, 20.

When an offender expresses extreme remorse and contrition to an exceptional degree, the court may depart downward, in addition to an adjustment for acceptance of responsibility.  *See* United States v. Fagan, 162 F.3d 128, 1284-85 (10th Cir. 1998) (because guidelines do not expressly forbid the departure, court may downward depart where defendant showed great remorse "to an exceptional degree" even though he had already received an adjustment for acceptance of responsibility); United States v. Carter, 122 F.3d 469, 475-76 (7th Cir. 1997) (finding no error in district court's ruling that, although defendant's remorse had been recognized when his sentence was reduced for acceptance of responsibility, it could have departed further if it had found his remorse to be exceptional). Given the exceptional nature of Mr. Carrington's remorse, it is appropriate to grant a downward departure.

### 4.  Mr. Carrington Was A Victim of Extraordinary Child Abuse

Even before the Booker decision, a sentence below the applicable Guideline sentencing range by way of a downward departure was available in cases where a defendant suffered extraordinary abuse during childhood.

Mr. Carrington was physically abused throughout his childhood at the hands of his stepfather.  He also suffered emotional abuse and witnessed the physical abuse of others in his family.    Courts have recognized that, notwithstanding the sentencing guidelines' discouragement of departure based on a defendant's childhood history, (U.S.S.G. § 5H1.12 (policy statement)), departure may be warranted if a defendant has suffered extraordinary abuse during childhood.  United States v. Pullen, 89 F.3d 368, 371 (7th Cir. 1996); United States v. Brown, 985 F.2d 478, 481 (9th Cir. 1993).  It is

reasonable to lower Mr. Carrington's sentence based upon his youthful exposure to an abusive environment.

### 5. Mr. Carrington Was The Victim Of A Violent Sexual Assault and a Witness to His Mother Being Raped

When he was twelve, a stranger sexually assaulted Mr. Carrington at knifepoint. PSR ¶¶ 68, 66a. Clearly, being the victim of a violent sexual assault, after years of abuse as a child, is an unusual circumstance not contemplated by the Guidelines. Mr. Carrington's reaction to this incident is indicative of the abnormal circumstances regarding his exposure to abuse: he never sought counseling, and never spoke of it to anyone until his neuropsychological evaluation at MCFP-Springfield in 2006. PSR ¶ 68. He was further traumatized when he witnessed his mother being raped at knifepoint by a stranger, while she begged him not to harm her children. PSR ¶ 67.

In <u>United States v. Rivera</u>, 994 F.2d 942 (1993), the First Circuit noted that the Sentencing Commission,

> has explicitly stated that (with a few exceptions) it did not "adequately" take unusual cases "into consideration." Of course, deciding whether a case is "unusual" will sometimes prove a difficult matter (in respect to which particular facts, general experience, the Guidelines themselves, related statutes, and the general objectives of sentencing al may be relevant). But, once the court ... has properly determined that a case is, indeed, "unusual," the case becomes a candidate for departure....

<u>Rivera</u>, 994 F.2d at 947.

Mr. Carrington has suffered the dual traumas of being witness to his mother's rape, and he has been suffered the actual trauma of being sexual assaulted himself. These are substantial grounds to sentence below the guidelines.

6. **The Defendant Has Experienced Hardship Based on Substandard Conditions of Pretrial Confinement**

The Defendant seeks a variance due to substandard conditions of pretrial confinement, the case law supports such a motion. In <u>United States v. Hernandez-Santiago</u>, 92 F.3d 97 (2d Cir. 1996), the trial court department departed downward, in the sentencing of a defendant convicted of dealing crack and possessing a firearm, because of harsh pretrial confinement. According to the Second Circuit, the trial court "decided to depart downward three levels because the defendant had been incarcerated for 22 months – since the day of his arrest in September 1993 to the time of sentencing – in a state facility, in the district court's view a 'harsher incarceration' than federal imprisonment because of its lack of educational and therapeutic programs." *Id*. at 101, n.2. The government did not contest the basis of this downward departure on appeal.

Mr. Carrington has been held from the day of his arrest to the present. He has been held at the Suffolk County Jail and the Plymouth County Correctional Facility ("Plymouth"). The pretrial detention conditions at Plymouth are clearly substandard, offering "harsher incarceration" than federal imprisonment. Pretrial detainees are excluded from all academic and programmatic activities at Plymouth. There is no yard at Plymouth and so all inmates are restricted to the interior of the building. In terms of visitation, no contact visits are allowed. State pretrial detainees at the same facility are allowed programmatic and academic activities.

In contrast to the conditions at Plymouth, inmates in federal facilities enjoy substantially more privileges and freedoms. Federal inmates generally receive a *minimum* of four hours of visitation each week. ("Each Warden shall establish visiting hours at the institution on Saturdays, Sundays, and holidays. The restriction of visiting to

these days may be a hardship for some families and arrangements for other suitable hours shall be made to the extent practicable. Where staff resources permit, the Warden may establish evening visitation hours." BOP Program Statement, 5267.06 at 540.43). Contact visits are standard. ("Staff shall permit limited physical contact, such as handshaking, embracing and kissing, between an inmate and visitor, unless there is clear and convincing evidence that such contact would jeopardize the safety ... of the institution." *Id*. at 540.51(g)(2)). Furthermore, BOP encourages the "constructive use of leisure time and offers movies, games, sports, social activities, arts and hobbycrafts, wellness and other group and individual activities." BOP Program Statement 5370.08 at 544.30. BOP also offers numerous educational and therapeutic programs as well as extensive vocational training. *See* BOP Program Statements 5300.17 and 5300.18.

Unfortunately, Mr. Carrington has been denied these opportunities. Therefore, based on the nature of his pretrial confinement, a sentence below the guideline range is both appropriate and warranted on this basis.

### 7. The Aggregation of the Above-Referenced Factors

A downward departure or variance may be granted based on an aggregation of factors each of which may individually be insufficient to justify a departure or variance. In the case of Mr. Carrington, the cumulative factors are his diminished mental capacity, his tragic personal history and sexual abuse, *see* United States v. Lopez, 938 F.2d 1293, 1297-99 (D.C. Cir. 1991) (district court to consider departure because defendant exposed to domestic violence, the murder of his mother by his step-father, his need to leave town because of threats, and his growing up in disadvantaged neighborhoods); his lack of personal guidance as a youth, *see* United States v. Floyd, 945 F.2d 1096 (9th Cir. 1991)

(fifty percent downward departure from guideline range appropriate because of defendant's abandonment by his parents and lack of guidance as a youth), extraordinary rehabilitation, and extreme remorse. These factors individually are sufficient grounds for a downward departure. However, should the Court disagree with that analysis, defendant is asking that they be aggregated and together form the basis for departure.

The guidelines explicitly acknowledge that a combination or aggregation of factors could distinguish a case from the "heartland." This possibility has been addressed in the comments to the guidelines, and has been supported by the Sixth Circuit sitting *en banc* in <u>United States v. Coleman</u>, 188 F.3d 354 (6th Cir. 1999). The comment to U.S.S.G. § 5K2.0 recognizes:

> The possibility of an extraordinary case that, because of a combination of such characteristics or circumstances [not ordinarily relevant to a departure], differs significantly from the "heartland" cases covered by the guidelines in a way that is important to the statutory purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case. However, the Commission believes that such cases will be extremely rare.

U.S.S.G. § 5K2.0, Commentary.

This Court should similarly consider whether Mr. Carrington's case has sufficient extraordinary factors to take it out of the heartland of similar cases. The defendant requests a sentence of 72 months. The facts and circumstances of this case provide solid reasons for the Court to impose such a sentence. Tragically, three things set Mr. Carrington back: drug abuse, limited intellectual functioning and attendant social skills, and the self-destructive behaviors that are the outgrowth of a troubled childhood, and substance abuse. Mr. Carrington knows that he needs to address his drug problem, as well as his history of abuse. He is anxious and willing to do that while incarcerated and

with the probation department after his release.  To that end, he requests that he be placed

in the BOP's RDAP, even though he is ineligible to receive a reduction in his release

date.  He also requests that he be released not directly to the community, but to a

structured halfway house, so that he can learn the coping skills that will be necessary for

him to function successfully.  The building of self-esteem to avoid the return of self-

destructive behaviors is hard to start in prison. A shorter sentence would allow Mr.

Carrington to begin this process sooner.

At the time of his arrest and before this Court, Mr. Carrington has accepted

responsibility and acknowledged his wrongdoing.  These are all signs of a man who has

learned a lesson and wishes to change. We urge this court to impose a sentence of 72

months so that Mr. Carrington can return to the community, find employment and begin

to again meet his obligations to his family and to himself.

### D.    18 U.S.C. § 3553 Factors

Assuming *arguendo* that the career offender enhancement is applicable in this

case, and should the Court find that the downward departures described above are

unavailable, defendant argues that a sentence within the guidelines range of 151 to 181

months is greater than necessary to satisfy the purposes of sentencing, and that a sentence

of 72 months is appropriate.

In light of United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621

(2005), it is no longer necessary for a case to be "atypical" or "not ordinary" in order for

a sentencing judge to impose a sentence *below* the guideline sentencing range, as the

sentencing range is just one factor on par with other sentencing factors.  In Booker, the

Court held that the United States Sentencing Guidelines are no longer mandatory and

must function as merely one factor among others set forth more generally in 18 U.S.C. § 3553(a). Although the Courts must consider the guideline range, they also must "tailor the sentence in light of other statutory concerns, see 18 U.S.C. § 3553(a)." Booker, 125 S.Ct. at 757.

Section 3553(a) directs the sentencing court to consider seven factors:

(1) the nature and circumstances of the offense and the history and character of the defendant;

(2) the need for the sentence imposed

(a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(b) to afford adequate deterrence to criminal conduct;

(c) to protect the public from further crimes of the defendant; and

(d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the advisory guideline range;

(5) any pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid unwarranted disparities; and

(7) the need to provide for restitution to any victims of the offense.

After considering these factors, the statute directs the court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." 18 U.S.C. § 3553(a).

District courts have substantial discretion to impose sentences outside the applicable guideline range. See United States v. Kimbrough, 128 S.Ct. 558 (2007); United States v. Gall, 128 S.Ct. 586 (2007), a district court judge "may not presume that

the Guidelines range is reasonable.  He must make an individualized assessment based on the facts presented."  *Id.*, 128 S.Ct. at 596-97 (citation omitted).

For the reasons expressed below, and upon considering the factors under §3553(a), a sentence within the guideline range is not necessary to accomplish the goals under §3553(a).

**a.   The Nature and Circumstances of the Offense**

On December 28, 2004, at approximately 9:17 a.m., Boston Police Officers Kelly-Chalas and Lamb responded to a report of a bank robbery in progress at the Bank of America located at 315 Centre Street in Jamaica Plain, Massachusetts.  A witness at the scene, Jose A. Yurnet, gave Lamb a description of the suspect, describing a bald black male with a husky build.  He also described the vehicle that the suspect left in as a truck with Massachusetts registration number 125949, heading toward Hyde Square in Jamaica Plain.  Officer Lamb broadcast the description via police radio.  Officers Hicks and Fencer, who were on their way to the bank, spotted a white box truck with that registration number heading outbound on Centre Street coming from the direction of Hyde Square.  The police pulled over the truck and ordered the driver[1] and passenger out at gunpoint, who were then placed into custody and handcuffed.

Officer Hicks observed a black jacket with a stack of money inside an open pocket on the passenger seat.  Sergeant Gifford and Detective Paul Coffey then responded to where the truck had been stopped and organized a show-up identification for a witness, the bank's assistant manager Felizberta C. Monteiro, who positively Carrington as the man who had robbed the bank.  Carrington was arrested and transported

---

[1] The defendant was the passenger in the truck.  The driver, Alex Hernandez, was originally arrested and brought to the police station and booked.  Upon further investigation he was released and not charged.

to Boston Police District E-13 for booking and interrogation.

The bank teller who was the victim of the robbery, Rosalynd Medina, informed the police that the robber had approached her and stated, "I know you have an armed guard outside.  Give me all you hundreds, fifties, and twenties, and hurry up!"  A bank customer, Edward Thimas, stated that he overheard the robber say, "Hurry up!  Hurry up!"  Mr. Yurnet, who had given the description to the police, had given chase to the robber and was able to punch the truck registration into his cell phone before it left the scene.

Carrington was interviewed by the Boston Police and an FBI agent, to whom he gave an account of what happened and admitted to the bank robbery.  He also indicated that he had been using crack cocaine for about three weeks.  During the interview Carrington was clearly distraught and tearful, repeatedly apologized, and begged for help with his drug problem.  He also expressed his concern for Mr. Hernandez, impressing on the police that Mr. Hernandez was not involved in any way.  Carrington was subsequently indicted in federal court in a single-count indictment with bank robbery in violation of 18 U.S.C. § 2113(a), and on December 11, 2007, he pled guilty as charged. He does not minimize the seriousness of this offense, which is carries a maximum 20-year sentence.

### a.   The History and Characteristics of Charles Carrington

Charles Carrington is a 41-year-old man with severe cognitive impairments that were exaggerated by exposure to serious violence and abuse throughout his life. Prior to the offense, which brings him before this Court, Mr. Carrington had begun to make progress in rising above these circumstances. Tragically, his struggles in adjusting to life

on the outside led him back to a learned coping skill, substance abuse.

As a child, Mr. Carrington was raised with several half-siblings in a physically and mentally abusive household. PSR ¶ 66.  As a young child, Mr. Carrington witnessed his mother being forcibly raped at knifepoint. PSR ¶ 67.  As a boy, he witnessed his mother being physically and verbally abused, and was himself beaten by his mother's boyfriend, Mr. Struthers. PSR ¶ 66.  When he was 12, Mr. Carrington was sexually assaulted at knifepoint and was never treated for the resulting trauma. PSR ¶ 66a.

Shortly after the death of Mr. Struthers, who beat both Mr. Carrington and his mother, his half-sister Shirley died after her struggle with cerebral palsy.  PSR ¶ 66a.  Mr. Carrington's youth was marked by rape, violence, sickness and death.

As if these circumstances were not extreme enough in their perverse cruelty, Charles was saddled with significant cognitive deficits. The extent of Charles academic struggles is made clear by his placement in Chapter 766 programming and in the Department of Corrections adult assessment of Charles having a third grade reading level.  Further documentation of his academic struggles is limited by the fact that the Boston School Department had only two pages of records.  Significantly, these records show Charles to have always been enrolled in special education classes.

Despite having a significantly impaired intellectual ability, there does not appear to have been much assistance offered to Charles in his youth.  His school records show that he withdrew from Dorchester High School on November 17, 1982.  Interestingly, a January 28, 1983 transcript for the fall semester shows that he attended seven classes and was absent for 34 classes. Nonetheless, despite having dropped out, seven of his eight teachers gave him passing grades. The shop teacher was the only academic authority to

hold Charles to the rigors of actually being enrolled in and attending school.

At 21 years old, Mr. Carrington, while incarcerated, was sent to Bridgewater State Hospital for "care and treatment for his mental disease (paranoia)…there would be a likelihood of serious harm to himself and others by reason of his mental disease."  PSR ¶ 78.  A similar referral was made to McClean Hospital earlier in his life.  *See* PSR ¶ 77. Both institutions found that Mr. Carrington did not suffer from mental illness. Unfortunately, Mr. Carrington's true problems, borderline mental retardation and learning disabilities, went untreated.

In July 2005, Dr. Eric G. Mart diagnosed Mr. Carrington as having "significant difficulties in cognitive functioning with the possibility of neuropsychological dysfunction and/or language-based learning disability. PSR ¶ 84.  Dr. Mart further concluded that the defendant was not competent to stand trial in the instant matter, and opined that Mr. Carrington would remain incompetent due his low cognitive ability and information processing deficits. PSR ¶ 85.  In 2006, Dr. Thomas Gutheil, a psychiatrist employed by the government, further evaluated Mr. Carrington, and determined the defendant suffered from "depression, substance abuse history, antisocial personality disorder, and mild mental retardation history." PSR ¶ 86.  On August 3, 2006, this Court found the defendant incompetent.

Sometime early in his youth, Mr. Carrington began using drugs and alcohol and became involved with the criminal justice system.  From that point forward, Mr. Carrington spent most of his life incarcerated where his mental disabilities where neither understood nor treated, and where his social disorders were magnified.  As an adult, Mr. Carrington became addicted to crack-cocaine and much of his criminal history has been

linked to this addiction.  PSR ¶¶ 97-100.  Upon release from his last federal incarceration, where for the first time he was receiving close supervision by a probation office, Carrington was doing well.  He was living with his mother, obtained his drivers license, got a job, and was dating someone who did not herself have substance abuse issues. Carrington went to the hospital on October 7, 2004, suffering from pneumonia, and remained hospitalized for a week.  Unfortunately, while hospitalized Carrington was given codeine and Vicodin.  Not long after his release from the hospital, Carrington relapsed and began using crack cocaine.  His life quickly spun out of control, and unable to cope with normal stresses, he was using crack cocaine daily and hardly sleeping.  It was in this state that he committed the bank robbery.  Upon his arrest he begged the police for help with his drug problem.  When he was arraigned in state court, he was sent to the Bridgewater drug addiction program, which he completed.  When he was indicted in federal court, he qualified for pre-trial release to a drug treatment program. Unfortunately, due to his past criminal record, no program would accept him.  When he was at MCFP-Springfield, he sought out and attended drug abuse counseling.  While at Plymouth, he has been desirous of substance abuse treatment but, because of his status as a pretrial detainee, he is not allowed to attend.

Mr. Carrington is an addict who was struggling for the first time to overcome his addiction while on federal probation.  Unfortunately, treatment for his addiction and urinalysis was not a part of his probation, and when a medical condition led to a relapse, it was not caught until after he had committed the bank robbery.  Mr. Carrington has made every effort to continue his progress despite his incarceration.  This is a marked change and a new maturity for the Charles.

### b.  **The Purposes of Sentencing**

Defendant maintains that a 72-month sentence adequately reflects the seriousness of the offense, promotes respect for the law, and provides for just punishment.  A sentence of six years will also serve as an adequate deterrence to others.

Charles Carrington does acknowledge that he presents some risk of recidivism, given his record. He also has substance abuse issues, as well as a need for special educational and vocational training.  For this reason he seeks placement in the 500-hour RDAP, and release to a halfway house, then to a three-quarterway house, rather than directly to the community.  Treatment, training and close supervision will serve to protect the public from further crimes of the defendant, rather than several more years of harsh confinement, which has not served Carrington well in the past.

### c.  **The Guidelines**

 The guidelines call for a term of at 151 to 188 months.  For two reasons, a sentence within the range is greater than necessary to satisfy the purposes of sentencing.

### 1.  **Career Offender**

The guideline range is so high because of the career offender enhancement under U.S.S.G. § 4B1.1.  Absent that designation, Carrington's range would be 63 to 78 months.  Courts have, in both pre- and post-<u>Booker</u> cases, recognized that the career offender guideline can produce a penalty greater than necessary to satisfy the purposes of sentencing.  *See, e.g.*, <u>United States v. Mishoe</u>, 241 F.3d 214, 220 (2d Cir. 2001) ("In some circumstances, a large disparity [between the length of the prior sentences and the sentence produced by the guideline] might indicate that the career offender sentence provides a deterrent effect so in excess of what is required … as to constitute a mitigating

circumstances present 'to a degree' not adequately considered by the Commission.");

United States v. Rivers, 50 F.3d 1126, 1131 (2d Cir. 1995) (stating that the district court

can depart where the range created by the career offender provision overstates the

seriousness of the defendant's record). As noted above, a sentence in the 151 to 188

month range is greater than necessary to satisfy the purposes of sentencing in

Carrington's case.

### 2. Carrington's Positive Character Traits

The guidelines also did not adequately account for Carrington's positive personal

characteristics. As noted above, from the point of his arrest, Carrington expressed

extreme remorse for his crime, acknowledged that he needed help with his drug addiction

and manifested "super" acceptance of responsibility. United States v. Rogers, 972 F.2d

489, 494 (2d Cir. 1992) (district court empowered to depart downward[2] where defendant

emerged from a drug-induced state, realized his wrongdoing and turned himself in and

confessed).

A review of Carrington's history shows that he has never received the treatment

or support that he needed. Upon his release from his most recent federal incarceration,

on June 16, 2004, at the suggestion of his federal probation officer, he obtained a drivers

license and was able to secure employment. He began dating Karen Mucci, who his

mother described as a "good girl." PSR ¶¶ 69-71. In short, he was turning his life

around. Unfortunately for Charles, he did not receive support for his drug addiction or

for his limited intellectual functioning. As Ms. Mucci noted in a letter to the Court (Ex.

A):

---

[2] Although the guidelines eliminated this as a grounds for departure for crimes committed
on or after October 27, 2003, U.S.S.G. § 5K2.0(d)(2), the factor is grounds for a variance
under Booker.

"I also believe after having spent so many years incarcerated, the court/jail system could have better prepared Charles by some sort of pre-release counseling. Charles was thrown into a very different world than the one he departed from years back. It is also my belief that perhaps giving him mandatory periodic urine tests would have prevented him from using drugs."

Clearly the system repeatedly failed Charles Carrington. Despite that, he does not blame others for his fate. He understood the trauma that his actions must have caused the bank teller, and had his attorneys express his regret to her. He was insistent to the police that his co-worker was innocent and should not have been arrested with him. He accepts that he committed a serious crime, and understands that he will be punished. He just asks this Court that the sentence reflect his personal struggles and his concrete efforts to change.

## <u>CONCLUSION</u>

For the foregoing reasons, this court should determine that the base offense level is 20, increased by 2 levels because the property of a financial institution was taken, and reduced by 3 levels for acceptance of responsibility, resulting in total offense level of 19, with a criminal history category of VI, and a guideline range of 63 to 78 months.

In the alternative, defendant seeks a downward departure or a variance from the guideline range that includes a career offender enhancement, based on his personal history and characteristics. Defendant seeks a sentence of 72 months, followed by supervised release.


Respectfully submitted,
CHARLES CARRINGTON
By his attorney

/s/ MARK W. SHEA
Mark W. Shea

47 Third Street, Suite 201
Cambridge MA  02141-1265
617.577.8722

Dated:  March 16, 2008

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on March 16, 2008.

/s/ Mark W. Shea
MARK W. SHEA

To Whom It May Concern:

I am writing this letter on behalf of Charles Carrington to convey facts I know and believe led to Charles' failure after his release from prison. Almost immediately following his release, Charles and I met and began dating. Despite his past, I found Charles to be a caring, loving, open and honest individual and despite being total opposites, we "hit it off" wonderfully and our relationship grew stronger. He demonstrated such great enthusiasm for getting on with his life and making up for lost time. In short order, he got his driver's license and with great perseverance found employment which he took quite seriously despite receiving low hourly pay for such hard labor.

In a nutshell, we had a quarrel and I refused to see him for several weeks. One of the things Charles possesses is poor coping skills. He panicked and his world shattered when he made the dire mistake of engaging in smoking crack cocaine. Although we didn't see each other for a period of time, we did, however, speak with each other daily. In conversing with him, it became more and more apparent things were steadily worsening for him. I never imagined

he would "pick up" and still to this day can't believe he fell prey to the evils of crack cocaine. I just thought he was becoming more and more irrational on his own accord. His actions became more of a "turn off" than ever and it was obvious we weren't going to make it as a couple at that point in time.

It is my belief that Charles would have continued on an "upswing" and achieved all his goals had it not been for using drugs. I also believe after having spent so many years incarcerated, the Court\Jail System could ha better prepared Charles by some sort of pre-release counseling. Charles was thrown int a very different world than the one he departed from years back. It is also my belief that perhaps giving him mandatory periodic urine tests would have prevented him from using drugs. Despite his physical strength, he, like all human beings, has personal weaknesses. I am of the opinion that with a bit of guidance, coupled with hi strong desire to do right, given a chance, Charles will definitely succeed and prove himse I speak with him almost daily and can promise you he has a great remorse for his wrongdoing and can't wait to get back into the game of life.

I respectfully ask that you weigh these facts in determining the fate of Charles Carrington.

Respectfully yours,

Karen Mucci