Page 1

                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,     )
                              )
               Plaintiff      )
                              )
        -VS-                  ) Criminal No. 05-10074-PBS
                              ) Pages 1 - 73
CHARLES CARRINGTON,           )
                              )
               Defendant      )


                       COMPETENCY HEARING

            BEFORE THE HONORABLE PATTI B. SARIS
                UNITED STATES DISTRICT JUDGE



A P P E A R A N C E S:

     WILLIAM H. CONNOLLY, ESQ., Assistant United States
Attorney, Office of the United States Attorney, 1 Courthouse
Way, Boston, Massachusetts, 02210, for the Plaintiff.

     MARK W. SHEA, ESQ., Shea, Laroque & Wood, LLP,
47 Third Street, Suite 201, Cambridge, Massachusetts,
02141-1265, for the Defendant.


                         United States District Court
                         1 Courthouse Way, Courtroom 19
                         Boston, Massachusetts
                         March 22, 2007, 3:20 p.m.




                    LEE A. MARZILLI
                OFFICIAL COURT REPORTER
              United States District Court
              1 Courthouse Way, Room 3205
                  Boston, MA  02210
                   (617)345-6787

1                         I N D E X

2    WITNESS                    DIRECT    CROSS    REDIRECT    RECROSS

3    Robert Denney                 8        40

4    EXHIBITS                   PAGE

5    Plaintiff's
     1-4                           8
6

     Defendant's
7
     5                            8
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1             P R O C E E D I N G S

2         THE CLERK:  The case of the United States V.

3    Charles Carrington, Criminal Action No. 05-10074, will now be

4    heard before this Court.  Will counsel please identify

5    themselves for the record.

6         MR. CONNOLLY:  Good afternoon, your Honor.  William

7    Connolly for the government.

8         MR. SHEA:  Mark Shea for Mr. Carrington.  Good

9    afternoon.

10        THE COURT:  Now, let's make sure I have everything

11   because a bunch of things have come in.  I've been in trial

12   all day today and I've had hearings all afternoon, so I can't

13   promise I've read everything.  Let me tell you what I've read

14   and I've not read so you have some sense of things.  I read

15   the government's Medical Center for Prisoner Report.  I read

16   Mr. Shea's expert's Confidential Psychological Report dated

17   September -- well, a while ago, actually, that you

18   resubmitted.  Is that right?

19        MR. SHEA:  I believe so, yes.

20        THE COURT:  Okay.  I received a memo today which I

21   have not read other than skimmed.  I have a general sense of

22   it, but I don't think it's worth taking the time right now to

23   argue, which is the Memorandum of Law in Support of

24   Defendant's Motion to Strike Competency Determination.

25   That's now been file.  We're not going to argue it.  I have

Page 4

1    three witnesses here.

2             MR. SHEA:  I was just going to say I'll rest on the

3    papers.

4             THE COURT:  Okay.  And then, Mr. Connolly, you may

5    want to respond to it, but we're not going to take that

6    today.

7             I received another thing, which is U.S. Medical

8    Center for Federal Prisoners, Springfield, Missouri.  Is that

9    another evaluation?

10            MR. CONNOLLY:  It is, your Honor.  The original

11   report was prepared by Dr. Preston who did a competency

12   evaluation.  Contained within her report is the tests and the

13   findings of neuropsychologists who did neuropsychological, if

14   I'm saying right, evaluations.

15            THE COURT:  That's Dr. Robert Denney?

16            MR. CONNOLLY:  Yes, who will be the first witness.

17   When I spoke to those two witnesses today --

18            THE COURT:  Didn't that just come in today?

19            MR. CONNOLLY:  Yes.

20            THE COURT:  One of them I got several days ago and

21   I read, but one of them I think I, at least, just received

22   today.

23            MR. CONNOLLY:  Yes, and that's because when I met

24   with the witnesses today, I found out from Dr. Denney that in

25   fact he had a separate report.  It had never been forwarded.

1    There's not a competency opinion in there, but he wanted to

2    make sure we all had a copy of his report.  I think it's

3    contained within --

4              THE COURT:  Had you seen it before?  Are you

5    prepared to cross on it today?

6              MR. SHEA:  No.  I mean, I hadn't seen it before.  I

7    can do my best.

8              THE COURT:  See what you can.  If worse comes to

9    worst, we'll bring him back.

10             MR. CONNOLLY:  If we have to do that, that's fine,

11    your Honor.  I think, again, the vast majority of -- his

12    findings are contained within Dr. Preston's report.

13             THE COURT:  Sure.  Now, let me ask you this,

14    Mr. Shea:  Do you have an expert here today?

15             MR. SHEA:  Yes.

16             THE COURT:  And is he the guy who prepared the

17    report, now a year ago?

18             MR. SHEA:  Yes.

19             THE COURT:  I should remember him, but -- there you

20    are, okay.

21             MR. SHEA:  I'll remember that in an ID case.

22             THE COURT:  That's right, that's right, I might not

23    be your best.  Do you have another report, or is it just the

24    old one?

25             MR. SHEA:  It's just the old one, though he did

1    just meet with Mr. Carrington between 2:00 and 3:00 o'clock

2    today.

3              THE COURT:  So there may be something supplemental?

4              MR. SHEA:  There may be.

5              THE COURT:  Where are these folks coming in from?

6              MR. CONNOLLY:  Missouri.

7              THE COURT:  Okay, so how long do you think you're

8    going to need?

9              MR. CONNOLLY:  We may, based on both my own

10   analysis and the doctor's analysis of what typically occurs

11   in their contested competency hearings, we all agree that it

12   would be surprising if both of them complete their direct and

13   their cross today because --

14             THE COURT:  Let's get going because I didn't know

15   this, so, I mean, I didn't have tomorrow for you tomorrow.

16   I'm on trial.

17             MR. CONNOLLY:  I understand.  We're fine with them

18   coming back.  Just so that your Honor knows, when I did find

19   out there were two witnesses, I notified the Court.  They're

20   fine coming back, your Honor.  If they have to come back,

21   they'll come back.  They understand it's part of the job.

22             THE COURT:  And I just think, as a practical

23   matter, it's highly unlikely that your expert will get on

24   today.  If you want him to sit through it, I'm happy to pay

25   for it.  If you want him to leave, I'm happy to do that.

1          MR. SHEA:  I'd ask, if it's all right, if he could

2     sit through it because he's helpful for just seeing things

3     that I don't pick up on that they're talking about.

4          THE COURT:  Sure.

5          MR. CONNOLLY:  And of course I have no objection as

6     long as it works both ways, our experts can stay for

7     Dr. Mart, if in fact they're here.

8          MR. SHEA:  Yes, that's fine.

9          THE COURT:  Typically the sequestration rule

10    doesn't apply to experts, though there are exceptions.  Let's

11    go.

12         MR. CONNOLLY:  And I understand the documents that

13    you have.  Could I offer them as actual exhibits?  I have

14    copies here.

15         THE COURT:  Yes, let's mark them.  Do you want to

16    mark yours too while we're at it?

17         MR. SHEA:  Sure.

18         THE COURT:  Okay.  Do you have a copy?

19         MR. CONNOLLY:  I have an extra copy.

20         MR. SHEA:  You do?

21         MR. CONNOLLY:  Yes.

22         THE COURT:  Let's just mark them and get the three

23    reports in.

24         MR. CONNOLLY:  That's Mart's.  That will be No. 5.

25         THE CLERK:  All right.  That's your 1?

1      MR. CONNOLLY:  It's the CV of the first witness,

2  his report; CV of the second witness, his report.  And, your

3  Honor, just so the Court is aware, I've offered the two CVs

4  for the witnesses so I don't have to completely go through

5  all their qualifications.

6      (Plaintiff Exhibits 1-4 received in evidence.)

7      (Defendant Exhibit 5 received in evidence.)

8      MR. CONNOLLY:  The first witness is Robert Denney.

9      ROBERT L. DENNEY

10  having been first duly sworn, was examined and testified as

11  follows:

12      THE CLERK:  Would you please state your name and

13  spell it for the record.

14      THE WITNESS:  My name is Robert L. Denney,

15  D-e-n-n-e-y.

16  DIRECT EXAMINATION BY MR. CONNOLLY:

17  Q.   Good afternoon, Mr. Denney.  What is your occupation?

18  A.   I'm a forensic neuropsychologist at the U.S. Medical

19  Center for Federal Prisoners in Springfield, Missouri, and I

20  am also an assistant professor and director of

21  neuropsychology at Forest Institute of Professional

22  Psychology.

23  Q.   What do you do at the U.S. Medical Center in

24  Springfield, Missouri?

25  A.   My job is actually to -- for the most part twofold:  One

Page 9

1  major part of my job is to provide mental health services for

2  all of those federal inmates and detainees that are sent to

3  the U.S. Medical Center for surgical and medical needs.  Our

4  hospital is a medical-surgical psychiatric hospital, and I am

5  the psychologist in charge of the medical and surgical

6  people.

7          In addition to that job, I am -- as a

8  neuropsychologist, I provide neuropsychological services to

9  the medical and surgical services, as well as the mental

10  health treatment and forensic services of the hospital.

11  Q.   Before your current duties, was there something else

12  that you did at the medical facility in Springfield,

13  Missouri?

14  A.   Yes.  I started the work in the medical and surgical

15  side of the hospital in 2000, but from 1992 -- actually from,

16  yes, January of 1992 up through 2000, I was doing full-time

17  forensic studies for the U.S. District Courts.

18  Q.   Your qualifications are laid out in the resume' that's

19  been submitted to the Court?

20  A.   Yes, they are.

21  Q.   Do you have any board certifications?

22  A.   Yes, I do.

23  Q.   What are they?

24  A.   I'm board-certified in forensic psychology.  I'm also

25  board-certified in neuropsychology by two different boards.

Page 10

1    Q.    Okay.  And just very quickly, what are the boards that

2    have certified you?

3    A.    The American Board of Professional Psychology, ABPP for

4    short, has certified me in the area of forensic psychology

5    and neuropsychology.

6    Q.    Let me ask you this:  Is there anything unique about

7    those two certifications from the same certifying body?

8    A.    Well, unique in the sense that not very many people have

9    both of them.

10   Q.    How many people have both of them?

11   A.    Three.

12   Q.    Three.  Where?  Three in Missouri, three in the United

13   States?  Three where have the same two certifications?

14   A.    Oh, three, three anywhere.

15   Q.    Anywhere.  And, very quickly, in what areas have you

16   published articles and/or books and/or chapters?

17   A.    Most of the publications you'll see on my vitae deal

18   with the application of neuropsychology in the criminal

19   forensic setting, really the blending of forensic psychology

20   and neuropsychology.  But I also have several chapters and

21   papers dealing with the detection -- and a book -- dealing

22   with the detection of deception and identifying malingering.

23   Q.    And do you consider those areas you've just identified

24   as your areas of specialty?

25   A.    Yes.

1    Q.    Any other areas of specialty?

2    A.    Well, beyond general forensic and neuropsychology, no.

3    Q.    What does the medical facility in Springfield, Missouri,

4    do?

5    A.    Well, we provide medical and surgical services for all

6    of the detainees, so to speak, of the Attorney General in the

7    Bureau of Prisons.  We are one of four or five medical

8    centers around the system, so prisoners, inmates who are

9    sentenced will be referred to us for medical, psychiatric, or

10   surgical treatment.  And then we also provide mental health

11   evaluations and mental health treatment to restore people to

12   competency, specifically for the U.S. District Courts.

13   Q.    How many neuropsychologists are employed at the

14   facility?

15   A.    One.

16   Q.    That's you?

17   A.    Yes.

18   Q.    During the course of your employment at the medical

19   facility, how many competency evaluations have you performed?

20   A.    Not including the consultations I've performed, just the

21   ones that I've actually directed myself, approximately 400

22   competency.

23   Q.    In this particular case, did you do a competency

24   evaluation?

25   A.    Not per se, no.  I was asked as a consultant to provide

1    neuropsychological services.

2    Q.    You know Charles Carrington?

3    A.    Yes, I do.

4    Q.    How do you know him?

5    A.    He was referred to me by Dr. Preston for

6    neuropsychological assessment.

7    Q.    Do you know why he was referred to you?

8    A.    My understanding is that she referred him to me because

9    during prior reports, I believe it was Dr. Mart's report,

10   discusses the fact that he was concerned there may be some

11   concern there may be some neurocognitive deficits.

12   Q.    During your evaluation of Charles Carrington, did you

13   find any neurocognitive dysfunction?

14   A.    Well, it was impossible to say for sure because it was

15   clear that he was attempting to present himself much worse

16   than he truly is regarding neurocognitive functioning.  So I

17   can't say that I could find neurocognitive functioning

18   because it was covered by a very poor effort.

19   Q.    And we'll get to that.  Tell us what it means to be

20   classified as mentally retarded or mildly mentally retarded.

21   A.    Well, when we talk about mental retardation as a

22   classification, a person has to meet certain requirements

23   that somewhat vary, but they're basically this; that a

24   person's IQ score is down near the 70 range or below, and

25   that they also at the same time have significant deficits in

1    their functional living skills.  And so when those two come

2    together, if they are both low enough, then a person can be

3    considered classified as mental retardation.  That's to be

4    contrasted to the notion that somebody's just a little bit

5    retarded or a little bit slow or the like.

6    Q.   Based on your evaluation, do you have an opinion as to

7    whether Charles Carrington is mildly mentally retarded?

8    A.   Yes, I do.

9    Q.   What's that opinion?

10         MR. SHEA:  Objection.  I just don't feel like

11   there's been enough groundwork of where this would come

12   from.  I mean, he was asked if --

13         THE COURT:  Overruled.  You can cross him on it and

14   move to strike it if. . .

15   Q.   What is that opinion?

16   A.   It's my opinion that Mr. Carrington does not meet what I

17   would consider the classification or the requirements to be

18   considered mentally retarded.

19   Q.   You identified two requirements, correct?

20   A.   Yes.

21   Q.   In your opinion, did he meet either of those

22   requirements?

23   A.   Not based on the information I had available to me, no.

24   Q.   Do you have an opinion as to what range of intellectual

25   ability Mr. Carrington falls into?

1    A.    Yes.

2    Q.    What range?

3    A.    In my professional opinion, I believe that his

4    intellectual ability falls within what would be called the

5    below-average range, which is a range below normal.  There's

6    a normal range and then there's the below-average range -- or

7    I should say average range, and below that there is the

8    below-average range, and then there is a range called

9    borderline range, and then there's the mild mental

10   retardation range.  I believe he falls in the below-average

11   range, which is below average but above borderline and

12   certainly above mental retardation.

13          Now, I would concede it's probably the lower

14   portion of that range, yes, but in that range.

15   Q.    What were you evaluating Mr. Carrington for?

16          THE COURT:  Well, how do you know that?

17          THE WITNESS:  Two basic areas come together to help

18   me understand this or to come to this conclusion.

19          MR. CONNOLLY:  We are getting there.

20          THE COURT:  All right, I'm sorry.

21          MR. CONNOLLY:  No, I'm starting with the general

22   and, of course, am going to get to, I think, the answers

23   you're asking for, your Honor.

24          THE COURT:  All right.

25   Q.    What were you evaluating Mr. Carrington for?

1    A.    I was evaluating him for, first of all, the presence of

2    neurocognitive deficits in general, which could include the

3    effects of mental retardation or the effects of brain injury

4    or other learning disabilities.  All of that falls under the

5    general notion of neurocognitive deficits.

6    Q.    You performed various tests to evaluate these issues?

7    A.    Yes, a wide number of tests.

8    Q.    Do you know approximately how many tests you gave?

9    A.    Twenty-three, depending on how you classify the tests,

10   but, yes, I would say twenty-three.

11   Q.    Did you identify those in your report?

12   A.    Yes, I did.

13   Q.    In general terms, what were those tests designed to do?

14   A.    There were tests in there designed, number one, to

15   identify poor effort.  All of the psychological tests are

16   plagued, I guess you could say, with the difficulty that they

17   require the person to perform effort, to apply themselves.

18   Unlike sitting in a CT scanner where somebody just needs to

19   be still or even is unconscious, psychological tests require

20   the person being tested to put forth effort.  So some of the

21   tests I use are called effort tests to measure whether or not

22   the person is indeed putting forth adequate effort.

23          Then there is a cluster of tests geared more

24   towards general intellectual functioning, and then there is a

25   group of tests geared more towards attention concentration

1    and memory, the more pure neuropsychological type of tests.

2    Q.   In the tests to identify effort or poor effort, do you

3    have a term you use to refer to those tests?

4    A.   Validity tests or effort tests.

5    Q.   Are those tests, the validity tests or the effort tests,

6    are they all stand-alone tests where you give a test, and the

7    test alone simply identifies only whether or not there's

8    effort?  Are they all stand-alone tests, or are some of them

9    mixed in with the actual neuropsychological evaluations?

10   A.   Actually, in that regard, they may be better termed

11   indices or measures.  There are some freestanding tests of

12   effort that I incorporated.  That would be six different

13   tests that are designed for that particular purpose.  And

14   then there are indices built within the other standard

15   psychological and neuropsychological tests which you can also

16   look at to see whether or not the results suggest the person

17   was putting forth adequate effort.

18   Q.   And based on those validity tests or effort tests, what

19   did you find?

20   A.   That clearly Mr. Carrington was not putting forth

21   adequate effort in the tests as far as effort to appear his

22   best.  There's actually signs of him putting forth effort to

23   appear impaired.

24   Q.   On how many of the tests did you find that the defendant

25   did not apply himself or gave a poor effort?

1  A.   Of the fourteen different indices in the entire battery,

2  seven of them were positive.  Of the six freestanding effort

3  tests, five of them were positive, suggesting a poor effort.

4  Q.   And of those tests, were any of more significance to

5  your evaluation than others, of particular significance?

6  A.   Yes.  There were two of them that were particularly

7  meaningful for me.

8  Q.   Which ones?

9  A.   The Word Memory Test and the Validity Indicator Profile,

10  or VIP.

11  Q.   The first test you identified, you also referred to that

12  as the WMT?

13  A.   Yes.

14  Q.   Word Memory Test?  In general terms, tell us what the

15  WMT test is, what it tests for and what the significance is

16  of that test.

17  A.   Well, number one, it's an effort test.  It's a validity

18  test.  It's designed to identify when people are not putting

19  forth their adequate effort.  But it's designed in such a way

20  that it actually also includes real live verbal memory

21  indices in it, so you get an image of both their effort and

22  their potential real verbal memory skills, and it looks like

23  a general verbal memory test.

24  Q.   What were the results?

25        THE COURT:  Well, like, give me an example of how

1    you can tell whether someone is not putting forth effort as

2    opposed to just doesn't know.

3         THE WITNESS:  Very good.  The test is designed such

4    that it's not open-ended.  They have to choose between

5    alternatives.  We'll talk about the effort indices first of

6    all, and those are designed where somebody has to respond and

7    even guess, if they have to.  And those indices -- there's

8    three of them as part of this test -- are actually -- they

9    look difficult, but in fact they're not sensitive to real

10   brain injury, except in the most extreme cases.

11        THE COURT:  Like what?  Give me an example.

12        THE WITNESS:  Okay.  I can explain the test.  So

13   it's computer administered, and it presents --

14        THE COURT:  So somebody sits at a computer screen?

15        THE WITNESS:  Exactly right.  And I describe --

16   they're actually on the screen, it says the directions, and

17   then I also say the directions or verify that the defendant

18   can read the directions.  And then it presents word pairs on

19   the screen, first word and then another word paired with it.

20   And then the person looks at it for a minute.  Then they go

21   away.

22        THE COURT:  Like "blue sky."

23        THE WITNESS:  Yes, yes, just like that.  So let's

24   say "blue sky" or "man woman," something like that.  And he's

25   asked to watch this carefully and remember them.  And so it

Page 19

1    goes through the list of words once.

2          THE COURT:  How many at a time?

3          THE WITNESS:  There are forty words total.

4          THE COURT:  So there are pairs of, like, twenty

5    pairs?

6          THE WITNESS:  Correct.

7          THE COURT:  So "blue sky, man woman, boy girl,

8    Republican and Democrat," whatever it is, you have twenty

9    pairs, and he has to read all twenty pairs at once?

10          THE WITNESS:  Well, they are presented one after

11    the other.

12          THE COURT:  So it isn't as if you say "boy girl,"

13    and then the screen goes blank, and you say, "What goes with

14    boy?"

15          THE WITNESS:  No.  You go through the whole list

16    once.  You go through the whole list again, same words, so

17    they go through them once.  And then immediately afterwards

18    they are faced with two words on the screen.  One of them was

19    from that list.  One of them was not.  It's a foil.  And the

20    person has to choose between one of the two.  And if they

21    don't know, they make their best guess.

22          Do you understand so far?

23          THE COURT:  Yes.

24          THE WITNESS:  So after they go through all forty of

25    those, then there's a half an hour delay.  And then you give

Page 20

1   the same test again without the presentation at the

2   beginning, just the memory live test where they have to

3   choose between the two words.  So that's an immediate

4   recognition test and a delayed recognition test.  Those

5   aspects of this test are really more the effort-related

6   aspects of the test.  Then after that there's a multiple

7   choice.

8            THE COURT:  All right, so how do you know?  Let's

9   say you go through all these and somebody just doesn't

10  remember that Republican was mentioned or Democrat was

11  mentioned or whatever, just doesn't remember.  How do you

12  know that's because the guy is retarded as opposed to the guy

13  isn't trying?

14           THE WITNESS:  Because there are more than

15  fifty-four different reference groups called "norms" that we

16  can compare this person's score versus these other groups.

17           THE COURT:  You mean similar IQ levels?

18           THE WITNESS:  Similar IQ level, different ages,

19  different educational levels, different types of brain

20  damage, different issues, dementia, mental retardation,

21  children, all sorts of different clinical groups.  And, first

22  of all, what research has shown about those tests is, those

23  three indices are not sensitive to genuine brain impairment,

24  with the exception of the extreme, somebody who's moderately

25  or severely demented and not living on their own, or somebody

1    who is severely -- well, even severely brain injured doesn't

2    necessarily impact these indices.  They will impact the other

3    part of it, here the multiple choice, free recall things,

4    because those really do tap into functions that are

5    difficult.  But these look hard, but they're really rather

6    easy.

7              So, for example, in Mr. Carrington's situation, I

8    can compare his performance with other groups such as

9    simulators, people who are faking, to see what they look like

10   on the test.  I can compare him to mentally retarded adults,

11   and I did actually in that instance.  And you can see that

12   his pattern of scores -- well, you can't probably see this

13   from here, but --

14             THE COURT:  You're giving me more credit than --

15             THE WITNESS:  You've got tremendously good eyes.

16   But the scores -- and not only his scores fall below the

17   cutoff that you would see for malingerers, for people who are

18   not putting forth the best effort, but also his profile is

19   consistent with those people who are actually simulating,

20   trying to look impaired.  And yet compared to up here, these

21   are people -- they're the scores of the people who are honest

22   to goodness mentally retarded -- are in the normal range

23   because these are not difficult.  They look difficult, but

24   they're really not.

25             THE COURT:  So you'll take people who -- not you

Page 22

1    personally, but you'll have a set of metrics of people who

2    you know are mentally retarded and you know are putting in a

3    good effort, and you can see in general what they'll get?

4            THE WITNESS:  Exactly right.

5            THE COURT:  So when you say somebody who you know

6    is mentally retarded, what IQ range is that?

7            THE WITNESS:  The range on that -- boy, off the top

8    of my head --

9            THE COURT:  Is that just below 70, or do you

10   distinguish?

11           THE WITNESS:  Well, they are predominantly in the

12   mildly mentally retarded range, but definitely below 70, yes.

13           THE COURT:  And he's at what, 79, right?  Something

14   like that, right?

15           MR. CONNOLLY:  Well, that's what Dr. Mart said.  I

16   don't think that's the opinion of this expert, your Honor.

17           THE WITNESS:  I don't recall 79 coming out, except

18   maybe --

19   Q.   Does this test spit out the person's IQ?

20   A.   No.  No, the reason this test is important for me is

21   because I can compare his performance to genuine mentally

22   retarded people, and they performed much better than he did.

23   So either he's a simulator, or he's got very, very severe

24   cognitive problems, such as consistent with somebody who

25   would be in a nursing home.  There's another test like the

Page 23

1   WMT which --

2   Q.   Can I ask a question before you get to the next test?

3   A.   Yes.  Actually, I was going to bring up a different

4   test, but go ahead.

5   Q.   Yes, before you do, the words that come out during the

6   first part of the test, are any of those complex words?

7   A.   No.  They all have a reading level of about second

8   grade.

9   Q.   I'm sorry, continue.

10          THE COURT:  A simulator I'm assuming means someone

11   who's trying to manipulate it?

12          THE WITNESS:  Yes, somebody who is intentionally

13   trying to manipulate the test, trying to look impaired.

14          THE COURT:  So you hire people.

15          THE WITNESS:  I didn't, but Dr. Green did.

16          THE COURT:  Yes, they hire people to try to fake

17   out the test?

18          THE WITNESS:  Yes.

19          THE COURT:  All right, so you have two sets of

20   metrics, those you know were intentionally trying to

21   manipulate and those you know are severely retarded or of

22   nursing home level, and those are the guideposts you measured

23   him against?

24          THE WITNESS:  Yes, on that particular test, I

25   measured him against mentally retarded people and

1    simulators.

2              There is another test that works the same way as

3    the WMT.  It's kind of like the little brother to the WMT.

4    It's called the MSVT, Medical Symptom Validity Test.

5              THE COURT:  Medical?

6              THE WITNESS:  Symptom Validity Test, or MSVT, and

7    it works the exact same way, except instead of forty words,

8    there's only twenty words, there are ten pairs.  And they are

9    simpler words that have even stronger associations to them,

10   like "ice cream, pizza topping, soccer ball," those type of

11   things.  And when somebody fails this one, I will inevitably

12   give them this test because I want to verify that they're not

13   failing because of true, genuine cognitive problems.  I want

14   to make sure I'm not making a mistake here, so I'll give them

15   this test.  And Mr. Carrington passed the first two scales

16   immediately, and then recognition and the delayed

17   recognition, but the consistency between the two of them,

18   which is the third index of that, he failed.  And looking

19   at --

20             THE COURT:  You just lost me.  What do you mean,

21   the consistency between what, the one immediately and the one

22   in a half an hour?

23             THE WITNESS:  Yes.  This one actually has only a

24   ten-minute delay because this is much, much simpler.

25             THE COURT:  So he remembered things when, right

8b9f5f1d-e7b7-44fe-b017-717d03084 77f

1    away but not later on?

2            THE WITNESS:  Yes, he remembered different items,

3    which doesn't make a lot of sense because if you remember

4    certain items during the initial presentation, then ten

5    minutes later you remember different items, okay, so -- and

6    yet both of those he remembered enough, but the consistency

7    wasn't there.  So it's a very sophisticated measure of their

8    ability, suggesting poor effort.

9    Q.   Can I make sure I understand that?

10           THE COURT:  Let's see how your cognitive memory is.

11   Q.   You show the ten-word pairs, and he's asked to associate

12   one with the other; is that correct?

13   A.   No.  He's just simply asked to recognize them from two

14   words on a screen.  One was correct; one was not.

15   Q.   Okay.  And you're saying that ten minutes later, it was

16   kind of like he got different ones correct than he did the

17   first time around?

18   A.   Exactly, that's exactly right.  That inconsistency

19   doesn't make a lot of sense.  And with this one, I was able

20   to compare his performance to people with very early

21   dementia.  He actually performed a little better than they

22   did but not nearly as well as -- and he did better than

23   severely demented individuals, but much less than

24   learning-disabled children, much poorer than twelve-year-old

25   learning-disabled children.  And that was very interesting to

1   me because of the concerns about him having a learning

2   disability, and his scores were much lower on measures that

3   are not truly measures of function for that group.  So I got

4   a comparison of --

5           THE COURT:  Doesn't it matter what kind of learning

6   disability?

7           THE WITNESS:  Well, these were -- that could

8   potentially make a difference because they are -- most of the

9   learning disabilities focus in the same part of the brain.

10  The reading, writing, arithmetic all cluster together in the

11  same location, and they are in general terms considered

12  verbal learning disabilities, although one could argue a

13  mathematics learning disability is different.  But these

14  would all be verbal learning disability individuals.  And

15  actually the mathematics part for the most part is in the

16  same part of the brain.  It's the left angular gyrus part of

17  the brain back here by the temporal lobe.  But there are

18  nonverbal learning disabilities as well, a very different

19  situation and coming from the right side of the brain, but,

20  no, these would all be left hemisphere.

21  Q.   Tell us what the VIP test is.

22  A.   The Validity Indicator Profile was the other test that

23  was significant for me, and actually I think it was more

24  significant.  The Validity Indicator Profile is also an

25  effort test, but it's a test that was designed out of an

1    intelligence test.  So rather than a memory-based type of

2    paradigm like the WMT and the MSVT are, this is an

3    intellectual abilities paradigm.  Like the other test, it is

4    a two-alternative forced choice test, which means you have

5    to -- forced choice meaning you have to choose one answer or

6    the other, and it's two alternatives.  Okay, so even if you

7    don't know the answer, you have to guess at one of them all

8    the way through.  Actually, the test is divided into a verbal

9    subtest and a nonverbal, but --

10         THE COURT:  Like what?

11         THE WITNESS:  Well, the verbal part of it is where

12   a person has to define a word -- well, there's one word

13   there, and then there's two other words over here.  And you

14   look at the first word and you decide, okay, what does that

15   word mean, and which of these two words best means the same

16   thing?  And they have to choose between those two words.

17         THE COURT:  So "night" and "evening"?

18         THE WITNESS:  Yes.  Let's say the word is "night,"

19   like you say, and over here we would have "evening" and

20   "breakfast."  Well, "breakfast" is clearly wrong.  It has no

21   relationship to "night" at all, but "evening" would be right,

22   so you can choose that.  And they are clearly right and

23   clearly wrong.  And the words vary in their difficulty.  Some

24   are very, very simple because, again, these words come out of

25   an IQ type of a testing.  Some are very, very simple, but

1    some are very, very difficult.  That's the verbal part of the

2    test.

3              THE COURT:  And what level of difficulty will it go

4    to?  Like what?  Can you give me an example?  Like the SAT

5    level or --

6              THE WITNESS:  Yes, oh, yes, very difficult.

7    There's words on there that I don't know the answer to.  I

8    could look in the manual, but as far as, yes, it's very

9    difficult.  That's the verbal part, which doesn't concern me

10   quite as much right now.  The nonverbal I think is the part

11   of the test that really tells us something significant here.

12   It is also two-alternative forced choice, but instead of a

13   verbal paradigm, it's a nonverbal paradigm.  They are

14   patterns.  Like, maybe there's a pattern of -- and I'm making

15   this up, but maybe a pattern of forward/forward/forward/blank.

16   And then there's two patterns up here; one is a forward slash

17   and another is a backwards slash.  One is clearly right, one

18   is clearly wrong, and they have to choose which one of these

19   best fits the pattern.  The whole test is like that.  And it

20   actually comes out of the Test of Nonverbal Intelligence, so

21   it was originally an intelligence test, but then it was

22   created into an effort test by making it two alternatives

23   instead of four alternatives, and forced choice, and mixing

24   up all of the items in random order.  So some of the items

25   are extremely easy, simple, because they're designed for

1   people with significant mental retardation to get right; and

2   yet some of the items are so difficult that, honestly, I look

3   at them and I still can't figure out what the pattern is

4   supposed to be, okay.  But there is a right and a wrong, and

5   people who are exceptionally bright understand that.  So it's

6   got a gradient of difficulty, but it's a two-alternative

7   forced choice test.

8        So if somebody was blindfolded and came in to take

9   this test blindfolded, okay, they weren't even looking at the

10  images but they had to answer, some they're completely

11  guessing, their scores should fall within an approximate

12  random range, like flipping a coin.  If you flip a coin many,

13  many times, and every time it's a head you give it a 1, and

14  every time it's a tail you give it a zero, if you flip it

15  multiple times, it's going to approximate .50, 50 percent.

16  That's the way this test works.

17       And so if somebody is not blindfolded but they're

18  putting forth a good effort, their score is going to fall

19  above the random range, right?  But if they're not putting

20  forth effort, it could fall in the random range.  Or if we're

21  talking just items are too difficult, it could be in the

22  random range.  But if their score falls below the random

23  range, that also tells us that they were getting it right

24  because they knew the right answer, but they intentionally

25  chose the wrong answer.  And that's exactly what

Page 30

1    Mr. Carrington did.

2              THE COURT:  Well, how far below random did he

3    fall?

4              THE WITNESS:  Well, if he had been blindfolded, his

5    score was so poor -- now, some of these people that are

6    blindfolded will score below the random range or above the

7    random range by dumb luck, but the odds of that happening --

8    so, in other words, if Mr. Carrington actually was

9    blindfolded and had no ability whatsoever, the odds of that

10   actually happening would be only four out of one million

11   times.

12             THE COURT:  Say that again.

13             THE WITNESS:  If I were to take somebody in off the

14   street, and they had no ability whatsoever, okay, somebody

15   who is grossly mentally retarded to the point where they have

16   no ability whatsoever, and I gave it to one million people,

17   four of those people would produce a score as badly as

18   Mr. Carrington.  That's an extremely low statistical

19   probability.  It's virtually impossible.  And that's assuming

20   no ability whatsoever, and clearly Mr. Carrington has ability

21   because he was able to walk and talk and understand the

22   directions of the test and those sort of things.  So that

23   performance was indicative of not only poor effort, as far as

24   trying to look their best on the test, but actually they

25   applied effort to appear impaired, and that's what

1    Mr. Carrington did.

2            The other thing that is significant for me

3    regarding that -- and again it goes back to the fact that

4    this was originally an IQ test -- you can also take those

5    scores and figure an approximate intellectual ability, okay,

6    because, remember, if they suppress below random, that means

7    they knew the right answer in order to get the wrong answer.

8    So let's flip that over, and assuming that they know those

9    answers, what type of an IQ would that be?  And doing that,

10   his score came out to fall within the at least as good as the

11   below-average range, clearly above mental retardation, and,

12   in my opinion, above borderline range even.

13   Q.   Your finding concerning Mr. Carrington's intellectual

14   ability, that's obviously inconsistent with the finding of

15   Dr. Mart, correct?

16   A.   Yes.

17   Q.   You've reviewed Dr. Mart's report, correct?

18   A.   Yes, I did.

19   Q.   Is there a reason you didn't just rely on the results of

20   Dr. Mart's testing?

21   A.   Dr. Mart administered good tests as far as intellectual

22   functioning and such.  My concern there, though, is that he

23   only administered one test designed to measure effort, and

24   that test is notoriously known for its insensitivity.  It's

25   not a very sensitive test.  It doesn't tend to pick up

1    malingering in many of the cases.

2    Q.   What test is that?

3    A.   That's the Rey 15-Item Memory Test.

4         THE COURT:  Is there any peer-reviewed literature

5    that would say that?

6         THE WITNESS:  Yes, there is.  There's a lot of it

7    actually, several reviews.  I can think of a review from 2002

8    out of the Journal of Forensic Neuropsychology by Richard

9    Frederick reviews that, and also points out that -- doesn't

10   recommend using that test as a freestanding test of effort,

11   and in fact it probably wouldn't meet a Daubert challenge.

12   Then there are other reviews talking about various

13   malingering tests, including the Rey 15, that suggest it's

14   not very sensitive.  Kyle Boone in --

15        THE COURT:  Have your tests been peer reviewed?

16   The VIP, the Medical Symptom Validity Test, and there was one

17   other, have they all been peer reviewed?

18        THE WITNESS:  Yes, they have, yes.  And the

19   research shows that the WMT is probably one of the most

20   sensitive tests to detect real effort.

21        THE COURT:  The baby brother test?

22        THE WITNESS:  No.  That was actually the big

23   brother test.

24        THE COURT:  The big one, the big one.

25        THE WITNESS:  However, the baby brother test looks

Page 33

1  like it's probably more sensitive than many others,

2  particularly for the amount of time it takes.  It's a very

3  good test.

4  Q.  Does your facility ever use that Rey 15 test?

5  A.  Oh, I use it all the time, but I do some things with

6  it.  I also include Dr. Boone's recognition test that goes

7  with it.  She's a neuropsychologist out of Harborview in LA

8  that developed a recognition test for it, and it's actually

9  some of her literature that shows that it's not very

10  sensitive by itself.  If you use the recognition test, that

11  increases its sensitivity from somewhere in the 50 percent up

12  to the 60 to 70 percent, but still I wouldn't rely on that

13  test as a sole measure of effort.

14  Q.  You wouldn't rely on it alone?

15  A.  Correct.

16  Q.  To a reasonable degree of psychological certainty, do

17  you have an opinion as to whether Charles Carrington suffers

18  from a mental disease or defect?

19  A.  Yes, I do have an opinion.

20  Q.  What's that opinion?

21  A.  It's my opinion that Mr. Carrington does not suffer from

22  a mental disease or defect.

23      MR. CONNOLLY:  Robert, could I see Exhibit 5.

24      May I approach the witness, your Honor?

25  Q.  Showing you what's been marked as Defendant's Exhibit 5,

8b9f5f1d-e7b7-44fe-b017-717d03084 77f

1   at the bottom of Page 6 -- this is Dr. Mart's report --

2   you've reviewed that portion of the report?

3   A.   Yes, I have.

4   Q.   Okay.  And do you see a chart there at the bottom that

5   gives some scores?

6   A.   Yes.

7   Q.   Okay.  And what do those scores pertain to, according to

8   Dr. Mart?

9   A.   These scores relate to Mr. Carrington's performance on

10   the Reynolds Intellectual Assessment Scales.  It's a type of

11   IQ test.

12   Q.   Are you familiar with that test?

13   A.   Yes.

14   Q.   Is it a reliable test?

15   A.   Yes, I believe it is.

16   Q.   Is there anything about the results you see there --

17              THE COURT:  What are the results?

18              MR. CONNOLLY:  I apologize.  You know what, I

19   should --

20              THE COURT:  What am I looking at?  Who's Mart?  Is

21   that marked?

22              THE CLERK:  Yes.

23              MR. CONNOLLY:  I'll pass up an extra copy, your

24   Honor.

25              THE COURT:  That's the defendant --

1          MR. CONNOLLY:  Yes, your Honor.

2          THE COURT:  That's the one I have.

3          THE CLERK:  Yes.

4          THE COURT:  All right.

5     Q.   Anything about those results that would or anything

6     about that test that would render the results less reliable?

7     A.   Well, as Dr. Mart correctly pointed out here, there is a

8     20-point difference between Mr. Carrington's verbal

9     intelligent index of 58 and his nonverbal intelligence index

10    of 78.  And this 20-point difference between the verbal and

11    nonverbal skills suggests that his functional abilities are

12    likely to fall in the borderline range.  What that tells us

13    and me is that big splits suggest that the composite score is

14    probably less accurate.  Whenever you have a large split

15    between two major indexes like that inside a composite

16    battery test, the composite from those two indices is less

17    valid.  It's less valid, meaning it's less accurate.  And his

18    composite of 59 probably does not reflect accurate level of

19    intelligence.

20         THE COURT:  Well, why wouldn't you take the highest

21    one then?  In other words, you don't -- when I mentioned 79,

22    I think that's where I actually got that figure from, which

23    is the highest of the scores.  You think it's not even that

24    low, right?

25         THE WITNESS:  Correct.  I think it's slightly

1    higher, and I think it's in the low 80s, but 79, I wouldn't

2    quibble too terribly much about it.  And some people could

3    argue that or would argue to take the highest, but these

4    tests have some error in them, and that error goes two ways.

5    It can go above and below a little bit.  So just taking the

6    high one isn't necessarily the right thing to do.  But when

7    the two indices are so split, you can't just take the average

8    between the two of them either.  And Dr. Mart notes right

9    here, "The discrepancy between his scores in these areas

10    suggest he may suffer from a language-based learning

11    disability."  Well, if that's the case, that's what would

12    suppress the language IQ score.  So if we took that out and

13    it bumped up, then the composite would probably be closer to

14    79, 80, something like that.  And in that sense, it might be

15    a better reflection of his general intellectual ability.

16    Again, that's assuming he's providing his best effort on this

17    test, and I have no way to verify that.  I don't know that

18    that's true, and I don't think that enough tests were used to

19    for sure determine that.

20    Q.    Aside from clinical testing, is there anything about

21    your interaction with Mr. Carrington that helped confirm for

22    you your belief of where his intellectual ability falls?

23    A.    That's the other side of this coin, or there's two

24    issues.  You asked earlier, what was it that suggested to me

25    that his intellectual ability is higher?  One of them were

Page 37

1   the VIP test results that empirically demonstrate a level of

2   intellectual functioning that is higher than -- well above

3   mental retardation range.

4          The other thing which strikes me as indicative of

5   his intelligence being higher than the mental retardation

6   range is simply his demeanor, his behavior, his

7   verbalizations.  Interacting with him during the testing

8   sessions, interviewing him, he often used elegant rationales

9   for making an argument.  For example, he would say that he's

10  got learning a disability; he's only got, say, a third-grade

11  reading level; he would often repeat, and he would say that

12  he can't spell.  But in the midst of that argument he was

13  making to me, he looked in my file cabinet and said, "Like

14  that word up there, 'unclassified,' now, I wouldn't be able

15  to spell that word," in quotes.  Well, that's a pretty

16  difficult word for somebody who's mentally retarded to read

17  "unclassified."  And many times he --

18          THE COURT:  Is that an actual example?

19          THE WITNESS:  Yes, it is an actual example, yes,

20  ma'am.  Oftentimes he would make arguments for himself being

21  not competent, or that I should follow the opinions of the

22  prior evaluators, and in the midst of making that argument,

23  he actually demonstrated a level of ability which went far

24  beyond his claim of inability.

25          THE COURT:  Well, if you assumed that his ability

Page 38

1   was in the 78-79 range, would you be able to tell from the

2   VIP that the scores were significantly below that.  In other

3   words, if you assume that this is correct, this IQ range that

4   Dr. Mart put together --

5            THE WITNESS:  Yes.  The composite score?

6            THE COURT:  -- would the number of false answers

7   that he gave show malingering?  In other words, would another

8   person of that equivalent IQ range have answered more things

9   correctly?

10           THE WITNESS:  No.  There's two different concepts

11   there.  He created a malingering profile on the VIP.

12           THE COURT:  Right.

13           THE WITNESS:  That would have occurred based on the

14   fact that he was intentionally choosing wrong answers,

15   irrespective of his ability, although it's related to his

16   ability.  This is a graph of the VIP running means.  It's not

17   the exact items, but it's the running means of every ten

18   items overlapping, with the easiest items over here and the

19   most difficult items over here.  If a person is scoring along

20   here, that means they're getting all of them right.  If they

21   score in the middle, that means they're getting half of them

22   right.  If they're scoring down here, they're getting all of

23   them wrong.  His scores down here show that he was choosing

24   all wrong answers.

25           THE COURT:  All right, so that's the VIP.

Page 39

1    Remember, in the earlier tests you said to me, "Well, I can

2    tell.  I can look at the metric of someone who's really

3    mentally retarded and the metric of someone who's in a

4    nursing home," and you can tell that essentially his level of

5    response was not in the mentally retarded range.  Remember

6    the original, the list of words.

7              THE WITNESS:  Yes, ma'am.

8              THE COURT:  And that he was answering at a level

9    that even someone who's mentally retarded would have answered

10   at.  Wasn't that what you said?

11             THE WITNESS:  Correct, and that is consistent with

12   this because he scored up high enough to where it's beyond

13   the range of mental retardation.  People who score up to this

14   range would fall in the below-average range, borderline to

15   below-average range.  So that's consistent with the fact of

16   the other tests showing that he doesn't fall in the same

17   range as somebody who is mentally retarded, again, supporting

18   that his IQ is higher than what he is attempting to present.

19             MR. CONNOLLY:  I don't have anything further, your

20   Honor.

21             THE COURT:  Do you have access, Mr. Shea, to all

22   this underlying data?

23             MR. SHEA:  No.

24             THE COURT:  I think at some point he'll need to get

25   that.

Page 40

1          MR. CONNOLLY:  He's welcome to it all, your Honor.

2          MR. SHEA:  I want it, yes.  I mean, to effectively

3     cross-examine, I'm going to need it.

4          THE COURT:  Why don't you just start, and then

5     you'll provide copies.

6          MR. CONNOLLY:  Not a problem.  And I would likewise

7     ask for the same from Dr. Mart.  I never received that with

8     the initial disclosure before his testimony the last time, so

9     I'd ask for the same stuff.

10          THE COURT:  Sure.

11    CROSS-EXAMINATION BY MR. SHEA:

12    Q.   Good afternoon.  I know you're testifying somewhat from

13    your report, but I'm more familiar with Dr. Preston, so bear

14    with me a little bit.  How many of the tests in --

15    Dr. Preston lists sixteen tests, but the Halstead-Reitan

16    Neuropsychology Test Battery is listed as one series, but

17    there's a whole subset of tests.  Did you give all of the

18    same tests or different ones?

19    A.   The tests that she's referring to are the tests that I

20    administered.

21    Q.   They are?

22    A.   Yes.  The Halstead-Reitan Battery is a conglomerate of a

23    large number of independent tests.

24    Q.   Okay, all right.  Now, well, let me take you then to the

25    Minnesota Multiphasic Personality Inventory Test.  You gave

1    that test?

2    A.    Yes.

3    Q.    And that test has a validity indices built into it;

4    isn't that correct?

5    A.    Yes, it does.

6    Q.    And when I say "validity indices," that's to check for

7    malingering, right?

8    A.    That's one of the things it's designed to check for.

9    It's designed to check for a wide number of possible flaws in

10   its -- I don't know how to say -- not just malingering but

11   inconsistencies, inability to read, a wide variety of things,

12   not just malingering but any sort of invalidity.

13   Q.    Okay.  And how did Mr. Carrington do on the validity

14   indices in the Minnesota Multiphasic?

15   A.    Let me pull that test out.  And I need to say that --

16   explain a little bit, if I may, explain that that particular

17   test is a series of 567 statements that the test taker reads

18   and then responds either "true" or "false" for themselves.

19   And Mr. Carrington insisted that he read the test.  It has

20   supposedly from a sixth- to an eighth-grade reading level in

21   it.  And the validity scales for the most part are within

22   normal limits.  The VRIN scale is a bit high with a raw score

23   of ten, but that would suggest some subtle inconsistency, but

24   a minor amount, but for the most part it would be

25   interpretable.  It would be considered valid.

Page 42

1   Q.   Okay.  And so he fell within acceptable validity range

2   in that test, correct?

3   A.   Yes.  This is a general psychiatric difficulties test,

4   which uncovers things such as suicidal intention, auditory

5   hallucinations, visual hallucinations, paranoia.  And the

6   validity scales here suggest that he was not trying to

7   overendorse that type of psychopathology.  Likewise, it did

8   not appear that he was trying to underendorse that kind of

9   psychopathology.

10  Q.   And how many questions are involved in that?

11  A.   567.

12  Q.   567.

13  A.   Yes.

14  Q.   And the tests that you mentioned, say the MSVT test, how

15  many questions are involved in that test?

16  A.   How many questions?

17  Q.   Yes.

18  A.   It's a series of twenty words paired up, so there's ten

19  different word pairs.

20  Q.   Ten different word pairs?

21  A.   Yes.

22  Q.   Is that ten questions then or twenty questions?

23  A.   Well, it depends.  There's twenty questions one time,

24  twenty questions another time.  And then there is a paired

25  associate part of the test which would be ten more

1    questions.  Then there is a free recall test which basically

2    says, "Tell me all the words you can remember."  And then

3    there's a question at the end asking if they performed their

4    best or not.

5    Q.   And so what's the total number of questions?

6    A.   Well, twenty and twenty is forty, fifty.  Fifty plus a

7    free recall question asking them to come up with as many of

8    those words that they can remember, and then one little

9    question at the end asking about their effort, so fifty-five

10   or so.

11   Q.   And there's a question at the end that asks them about

12   their efforts?

13   A.   Oh, yes, yes.

14   Q.   Now, you had mentioned how the Rey 15 test was the one

15   malingering test or validity test used by Dr. Mart, right?

16   A.   Yes.

17   Q.   And you had said that that was one that wasn't well

18   respected in the literature for testing for that.  Is that a

19   fair recapitulation of your statement?

20   A.   Yes.

21   Q.   Now, you reviewed Dr. Mart's report, correct?

22   A.   Yes, I did.

23   Q.   Okay.  And on the Rey 15 memory test, it did not show

24   malingering, correct?

25   A.   He did not.  The results were not positive for

1    malingering, that is correct.

2    Q.   Now, you gave the very same test, didn't you, the

3    Rey 15?

4    A.   Yes, I did.

5    Q.   And when you gave that test, what did you find?

6    A.   I found that he performed below that which one would

7    expect and would be considered positive for what's

8    technically called "negative response bias," but something

9    akin to malingering.

10           THE COURT:  Say that again?

11           THE WITNESS:  Negative response bias.  We're

12   tossing this word "malingering" around a lot, and it's

13   somewhat unfair.  Malingering is a clinical determination.

14   Each of these tests, with one exception, do not necessarily

15   indicate malingering.  They indicate negative response bias,

16   that a person is not responding appropriately, or as good as

17   they ought to, and it's for reasons other than neurocognitive

18   problems.  So it's really more precise.

19           THE COURT:  Simply being tired?

20           THE WITNESS:  Theoretically, although they would

21   have to be really tired to where they're not even attending

22   to the task, with the exception of the VIP.  When you

23   suppress something below random, then that really indicates,

24   yes, malingering there.  So I hate to toss the word

25   "malingering" around, but, yes, I mean, I think the spirit

1    of your question is, yes, when I gave the Rey 15-Item Memory

2    Test, he didn't do well on it, or he didn't do as well on it

3    as he did when he took it with Dr. Mart.

4    Q.   And he did it in a way that you felt was what?  How

5    would you describe it?

6    A.   Positive for not applying his best effort to the task.

7    Q.   Okay.  So if one takes that, that variance between the

8    Rey 15 scores, meaning not performing at his best effort, and

9    no indication that he's not performing at his best effort,

10   doesn't that lend credibility to the analysis, to the tests

11   given by Dr. Mart?

12   A.   Possibly, but I'm afraid that if we go too far down the

13   road, we do a classic error of judgment.  Absence of evidence

14   is not evidence of absence, but it does raise --

15            THE COURT:  It's too late in the afternoon.  Wait a

16   minute, what did you say?  Say that again.

17            THE WITNESS:  Absence of evidence --

18            THE COURT:  Of malingering.

19            THE WITNESS:   -- is not evidence of absence.  Just

20   because somebody performs within the normal range on

21   something doesn't logically eliminate the possibility that

22   they could still be feigning scores.  And that goes back to

23   the sensitivity of the test.  If the test is not very

24   sensitive, it doesn't pick it up.  You can't be real

25   confident about the test result when it's negative.  However,

1    if a test is very specific, it only comes up positive under

2    one condition, and it comes up positive, you can feel

3    confident about that.

4    Q.    Excuse me.  But it's the same test you gave?

5    A.    Yes, it is.

6    Q.    And when you gave it, you got a dramatically different

7    score than when Dr. Mart gave it, correct?

8    A.    Yes.

9    Q.    And so you take from that that he's performing at

10   different levels at that point, correct?

11   A.    On that particular test, yes.

12   Q.    Right.  And if one has dramatically different results on

13   a test designed to check effort, don't you think that that

14   can be read into whether one's providing that effort at those

15   different times, the levels of effort at those different

16   times?

17   A.    As I said, yes, it can, but we have to be careful of a

18   potential error in reasoning by assuming that simply because

19   there's no -- the evidence is absent, you know.  But you can

20   surmise that, and it makes you wonder that maybe he was, but

21   I don't know if I can feel real clinically confident that he

22   was.

23           THE COURT:  So you're saying he might have been

24   putting in his best efforts for Dr. Mart but wasn't for you?

25           THE WITNESS:  He might have been, but given the

1    other evidence I have in this testing suggesting that his

2    true intellectual abilities are actually higher, and my own

3    interaction with him which suggests to me clinically that his

4    intellectual abilities is higher, I think that those scores

5    were somewhat underrepresentative of his abilities.  Maybe

6    not by much.  If you take out the verbal learning disability

7    portion of it, then it's not much different, but it's above

8    the mental retardation range when you do that.

9                THE COURT:  Well, that may be, but --

10               THE WITNESS:  But isn't significantly higher.

11   Q.   Isn't your interaction with him and your determination

12   of his intellectual ability from your personal interaction

13   with him subjective?

14   A.   Well, it's subjective in the sense that it's a personal

15   interaction, but it's based on my interactions with hundreds

16   and even thousands of individuals in a clinical setting.

17   Q.   But, I mean, that's no different than my having

18   interactions with thousands of individuals.  That's not from

19   a specialized knowledge.  What I'm saying is, when you're

20   giving the tests, these tests are set up to try and be

21   objective, correct?

22   A.   Yes, that's true.

23   Q.   And not in ways that can be affected from our own

24   subjective beliefs, meaning that when you give a test to

25   Mr. Carrington, if you subjectively believe that he is --

1  where do you place him, borderline or above borderline?

2  A.    Below average.

3  Q.    Below average, so you subjectively believe he's below

4  average.  When you give the tests, the tests are supposed to

5  be objective and removed from any belief that you may carry

6  into the testing process, correct?

7  A.    Yes.

8  Q.    Okay.  And so the tests are made to kind of attempt to

9  eliminate any subjective bias that the test giver might have,

10  right?

11  A.    Yes, that's true.

12  Q.    Right, as opposed to your human interaction with

13  Mr. Carrington is exactly subjective and what those tests are

14  designed to eliminate, correct?

15  A.    Well, they are a more empirical way of looking at it,

16  but, as you said, we can all get a sense for whether

17  somebody's a little bit dull or a lot dull or not as dull.

18  Q.    Right, but that's very subjective and based on the

19  individual, right?

20  A.    And their clinical expertise, yes.

21  Q.    Well, I mean, but when you're speaking to someone,

22  you're not necessarily using your clinical expertise, right?

23  You're speaking to them just as I am speaking to you?

24  A.    And when they are speaking back to me, I am listening

25  with a clinical ear.  For example, when Mr. Carrington talks

1    to me about when he was in Bridgewater and if they had forced

2    medication on him, that would be a civil commitment under

3    Rogers court, I step back and go, oh, that's an abstract

4    concept, Rogers court.  These are legal terms.  Is he

5    familiar with the Rogers cases?  That's not something I would

6    expect from somebody who is in the mental retardation range.

7    It just suggests that it was higher to me.

8    Q.   Well, let me take that on.  What would you expect from

9    someone who is institutionalized for most of their life, had

10   been sent to someplace where that was concern of theirs, and

11   when they sit in jail cells with people and talk about things

12   like particular case names -- for instance, my subjective

13   feeling on Booker or Fanfan as a federal attorney is that my

14   most severely retarded clients to my most intellectual

15   clients have heard of the fact that the Sentencing Guidelines

16   have been eliminated.

17          MR. CONNOLLY:  Objection to that, your Honor.  He's

18   just saying his opinion for the Court.  It's not a question.

19   Q.   No, but what I'm saying is that --

20          MR. CONNOLLY:  He's saying that his clients who are

21   mildly retarded, you know, I just don't think that's

22   appropriate for questioning, him expressing his belief to the

23   Court with prior clients.

24          THE COURT:  He can ask a question.  We're going to

25   try and finish this exam by 5:00, so --

1   Q.   Well, what I'm getting at is that the intellectual

2   functioning, like knowing what a Rogers hearing is, is far

3   different than having been exposed to prisoners repeatedly

4   mentioning a named hearing, correct?

5   A.    If -- I mean, I think I understand what you're saying,

6   and yet that's correct in its simplest term.  But when

7   somebody is using it appropriately, that suggests there's at

8   least a little bit more understanding there, and I haven't

9   heard that kind of -- again, from my clinical perspective, I

10  haven't heard that kind of discussion coming out of people

11  who are bona fide mentally retarded.

12  Q.   So people at your institution who know that if they're

13  committed there, they may face -- well, that they may face

14  commitment there, right?

15  A.    Yes.

16  Q.   Retarded people are capable of knowing that they may

17  face commitment there, correct?

18  A.    Yes, they are capable of that.  Again, it depends on how

19  they talk about it, whether it would be real sophisticated in

20  their understanding.

21  Q.   Right, but what you describe, Mr. Carrington didn't go

22  into detail about what a Rogers hearing involved, correct?

23  A.    He understood it to indicate potential forced medication

24  against the individual's will.

25  Q.   Right, but were you in a hospital where people were

1   medicated?

2   A.   Yes.

3   Q.   Okay, were you in a hospital where people were medicated

4   against their will?

5   A.   Yes.

6   Q.   Was Mr. Carrington offered medication while he was

7   there?

8   A.   I believe so, but I'm not a hundred percent positive of

9   that.

10  Q.   So if a retarded person is in a hospital where people

11  are forcefully being medicated and they've been offered

12  medication, is it so strange that they may be aware of the

13  idea of forced medication?

14  A.   Again, that they're aware of it?  No, I don't find that

15  strange at all.  How they talk about it or how they reference

16  it in conversation may or may not be sophisticated.

17  Q.   But referencing a Rogers hearing is similar to

18  referencing, say, Miranda rights, right?  I mean, it's a

19  title, isn't it?

20  A.   Yes.

21  Q.   And so when I reference Miranda rights, that's something

22  that retarded people who watch a lot of TV might be aware of

23  that phrase, right?

24  A.   Yes, they might be.

25  Q.   And that sounds like a complicated phrase, right?  "My

Page 52

1    Miranda rights," right?  I mean, it certainly is as

2    complicated a phrase as "Rogers hearing," isn't it?

3    A.    As far as a phrase goes, yes.

4    Q.    Okay.  But saying the phrase "Miranda rights" does not

5    imply a knowledge of what those rights involve, does it?

6    A.    I mean, correct, other than the general sense that this

7    has to do with involuntary commitment and medication.

8    Q.    No, but in terms of Miranda rights, it would mean right

9    to not talk to the police, right?  That's the implication?

10   A.    Yes.

11   Q.    But you can't necessarily take the implication from the

12   statement of the phrase, correct?

13   A.    That would be true, although I don't know if it's fair

14   to compare Rogers court type of commitment reference to

15   Miranda, which is so ubiquitous.

16   Q.    Well, let's put it this way:  In your history, you saw

17   that Mr. Carrington had been at Bridgewater Hospital, right?

18   A.    Yes.

19   Q.    That's a place that people get committed to, right?

20   A.    Yes, related to Rogers courts, yes.

21   Q.    Yes, related to Rogers court, right, and where people

22   are forced medication, correct?

23   A.    Yes.

24   Q.    And so now you know that he has a history in two

25   locations with forced medication, correct?

1    A.    You mean, the other one's U.S. Medical Center?

2    Q.    Yes.

3    A.    Where Rogers court is never used.

4    Q.    I know, but the forced medication, yes?

5    A.    Yes.

6    Q.    Okay.  And so it's your subjective analysis that that

7    means that he is functioning at a higher intellectual level

8    because he uses that phrase "Rogers court," right?

9    A.    I wouldn't say that it is just that particular phrase.

10   There is much more to my clinical opinion than just his

11   reference to Rogers court, but that was consistent with the

12   other findings in my mind to suggest that he's more

13   intellectually capable than mental retardation.

14   Q.    Well, let's get to that.  Please point out to me the IQ

15   tests you gave that showed that he had a score in the range

16   of -- what was it, moderate?

17   A.    The VIP suggested --

18   Q.    Not the VIP because the -- I've heard you on the VIP,

19   but the VIP is not directly an IQ test, is it?

20   A.    It's not directly an IQ test, correct.

21   Q.    Tell me of an IQ test that backs up your objective

22   assessment of his intellectual capability.

23   A.    The IQ tests that I administered to him, scores were

24   much lower than that.

25   Q.    What were his IQ test scores?

1           (Witness examining documents.)

2    A.   Again, these IQ scores were a part of a battery that

3    also included effort measures, suggesting he was not giving

4    his best effort; but the scores, the verbal IQ score of 67,

5    performance IQ of 68, and a full-scale score of 65.

6    Q.   And where do those scores fall --

7              THE COURT:  Where did you just point to?

8              THE WITNESS:  These are IQ scores from an IQ

9    battery that was administered.

10             THE COURT:  What page?  Do I have them or not?

11             THE WITNESS:  No.

12             THE COURT:  Oh, I'm sorry.

13             THE WITNESS:  I did not list them in my report

14   because it was my clinical judgment that these results were

15   not valid and will be simply used to just confuse the Court.

16             MR. SHEA:  Well, I'd ask that that be stricken.

17   Q.   What I'm trying to get at here is, you have made an

18   assessment of my client's intellectual range, right?

19   A.   Yes.

20   Q.   Okay.  And what is that?

21   A.   Okay, the results are not valid, in my opinion.

22   Q.   No, no, but what did you say that his intellectual

23   capability was?  He was above borderline, right?

24   A.   Yes.

25   Q.   You said he's not mildly retarded, he's above

1    borderline, right?

2    A.    Yes.

3    Q.    Do you have any IQ test, objective IQ test which

4    supports your finding?

5    A.    As I have explained, no, I do not have a full IQ test

6    for that.

7    Q.    That's the answer, isn't it, "no"?

8    A.    If you disregard the VIP results, yes.

9    Q.    And let's go to the VIP results.  The VIP test is not an

10   IQ test, is it?  What is the central point of giving the VIP

11   test?

12   A.    The central purpose of the test was to -- is to identify

13   whether somebody is putting forth their adequate effort

14   regarding intellectual functioning.

15   Q.    Right.  And so not to go back to that nasty word

16   "malingering," but really getting to the bone of it, right

17   of contention, what you're really looking for in the VIP test

18   is effort and malingering, right?

19   A.    Yes.

20             THE COURT:  So let me just say, if you were to take

21   Dr. Mart's score of 79, what does that put him in?  Is that

22   still not retarded?

23             THE WITNESS:  Correct.

24             THE COURT:  So that puts him in a borderline?

25             THE WITNESS:  The high edge of the borderline

1   range.

2        THE COURT:  Looking at his scores as you would

3   interpret them, you would put him -- let's assume for a

4   minute I accepted, which I don't know what I'm going to do,

5   his scores, that would, in your view, put him at borderline?

6        THE WITNESS:  If you remove the verbal learning

7   disability component, that score of 79 is in the high range

8   of the borderline range.  It's right below the cutoff where

9   the below-average range is, so, yes.

10       THE COURT:  And if you were to include them all,

11  how would I think about a composite score?

12       THE WITNESS:  Well, I believe that composite score

13  fell into the 50s, which is in the --

14       THE COURT:  All right, 59.  So what does that put

15  him at?

16       THE WITNESS:  Yes, it's in the lower portion of the

17  mildly mental retardation.  It's actually getting closer to

18  moderately mentally retarded.  I mean, it's a very poor

19  score.

20       THE COURT:  So it's a dramatic difference between

21  all these different scores, is that it?  How do you get to

22  the composite?  I don't understand why the verbal

23  intelligence index and the nonverbal intelligence index, how

24  that ends up with a composite intelligence index that's not

25  an average of the two.

1          MR. SHEA:  Well, if I might your Honor, I think

2     that's a question better posed to Dr. Mart.

3          THE COURT:  I will, but I'm just saying, do you

4     understand how that could end up that way?

5          THE WITNESS:  Not precisely beyond I know that it's

6     not just an average of the two.  I mean, there are different

7     subtests that go into the verbal intelligence index and

8     different subtests that go into the nonverbal intelligence,

9     and they both create their indexes independently, and then

10    the overall battery of tests creates the global composite.

11    I'm not familiar enough with the Reynolds test to tell you

12    exactly how that's derived.

13    Q.   So the IQ test result that you find invalid, which is

14    67, 68, and 65, are all within the range of where Dr. Mart

15    found Mr. Carrington to be in terms of IQ, correct?  It's

16    certainly between the mid-50s and 79, right?

17    A.   Well, certainly, yes, because his scores range from 58

18    to 79, and these scores fall within that range.

19    Q.   Right.  And those are tests of IQ, right?

20    A.   Yes, they are.

21         THE COURT:  Have you ever had access to any of this

22    IQ testing in schools where none of this would be an issue?

23         THE WITNESS:  No.

24         MR. SHEA:  Well, I can bring us to that.

25    Q.   Which is, you were given access, weren't you, at least

Page 58

1    it's reported in Dr. Preston's -- let me just approach

2    Mr. Connolly first.

3            Let me show you what I believe to be Boston School

4    Department records regarding Mr. Carrington, and were you

5    shown those at any point?

6    A.    Yes.

7    Q.    Okay.  And two of the pages there are his grades from

8    when he was at Dorchester High School, and one of the more

9    straight down the page printout is of Mr. Carrington at

10   middle school and Dorchester High School, correct?

11   A.    I believe so.

12   Q.    And in that it shows that he was in special education

13   classes throughout that entire time, doesn't it?

14   A.    There appears to be an SPED, which stands for special

15   education, and I assume it does.

16   Q.    Yes, and that starts with him being in which school, if

17   you can read it off there?

18   A.    Well, this starts down in 1978 at Irving Middle School.

19   Well, no, I'm sorry.  Lewenberg Middle School.

20   Q.    The Lewenberg Middle School.  And you know

21   Mr. Carrington's date of birth to be 1966, right?

22   A.    Yes.

23   Q.    So that would roughly place him in the Lewenberg Middle

24   School at the age of twelve, right?

25   A.    Yes.

Page 59

1  Q.   And so he would be, from the age of twelve till the age

2  he dropped out of high school in the tenth grade, he would be

3  in special education classes, correct?

4  A.   Yes.

5  Q.   Now, you have his grades there from his special

6  education classes in the high school, and what were his

7  special education grades?

8  A.   Well, his grades at Grade 9 were C minuses almost all

9  the way across the board, although in psychology he made

10  a C.  And then this next one, which is really rather

11  difficult for me to read, I assume it's the next year

12  higher, probably tenth grade, and they're predominantly Ds

13  with one F.  However, notice that he was only present seven

14  out of -- he was only there seven days; he was absent

15  thirty-four.

16  Q.   And that was for special education classes, right?

17  A.   Presumably, yes, if this is accurate here, yes.

18  Q.   And Mr. Carrington had told you in your subjective

19  verbal discussions with him that he was in special education

20  classes, and he was just passed through, right?

21  A.   Yes.

22  Q.   And the fact that he attended seven out of forty-one

23  days of class and actually received passing grades in

24  everything except for wood shop, would that seem to back up

25  his theory that he did just get passed through the class?

Page 60

1   A.    Certainly.

2   Q.   Now, so --

3            THE COURT:  So do you have IQ tests that were given

4   to him in school?

5            MR. SHEA:  I don't yet.  I mean, we've tried to get

6   the education records, and it's not easy, but we will go back

7   and try to get further ones.

8            THE COURT:  Was he designated mentally retarded in

9   school?

10           MR. SHEA:  That I can't honestly speak to, your

11  Honor.

12  Q.   Now, I think in the report you mentioned that

13  Mr. Carrington mentioned being a 766 kid.  Do you remember

14  that?

15  A.    Yes.

16  Q.    Are you familiar with that, what that means?

17  A.    No, beyond his references saying that it has to do, he

18  was a special education learner.

19  Q.    Okay.  And special education classes, generally

20  speaking, are for people of limited intellectual functioning;

21  isn't that so?

22  A.    Actually, I would disagree with that and say "no."

23  There are individuals in there that are certainly limited

24  intellectually.  It's also designed for any type of special

25  education requirements for anyone that falls under the

8b9f5f1d-e7b7-44fe-b017-717d03084771

1    Federal Education Act, and that would include mental

2    retardation.  It would include learning disabilities.  It

3    would also potentially include people who have behavioral

4    problems in the classroom.  So we don't know exactly why he

5    was -- at least I don't know why he was specifically put in

6    there.  It could have been any one of those or multiple of

7    those.

8    Q.   Well, if Chapter 766 was the mainstreaming of mentally

9    retarded students in the classroom, would that be an insight

10   as to --

11             THE COURT:  No, I -- he doesn't know.

12             MR. SHEA:  Okay.

13             THE COURT:  I'm not even sure you're right, but he

14   doesn't know, in any event.

15   Q.   Now, you mentioned three test scores as to IQ.  Were

16   there other IQ tests given to Mr. Carrington?

17   A.   I don't believe so, but let me double-check on my list

18   of tests that. . .

19             (Witness examining document.)

20   A.   Not that I'm aware of under my direction, no.

21   Q.   Okay.  And was that one test, or was that three tests?

22   You gave us three scores.

23   A.   It's one test, but it's an IQ battery.  So it's like the

24   Reynolds test.  It's made up of smaller subtests that come

25   together and create composite index scores, nonverbal,

Page 62

1   verbal, and a global IQ.

2   Q.   How many subtests?

3   A.   Oh, ten, I believe, off the top of my head, or about

4   that.

5   Q.   And what was the name of it?  I'm sorry.

6   A.   The Wechsler Adult Intelligence Scale-III.

7   Q.   So it's the one listed as number one in the --

8   A.   Yes.  I'm sorry, there's more than ten.

9          (Witness examining document.)

10  A.   Thirteen, there are thirteen subtests in that battery.

11  Q.   Okay.  Now, so that means out of the sixteen tests given

12  to Mr. Carrington, one test was an IQ test specifically; is

13  that right?

14  A.   Yes, again, with an IQ battery, yes.

15  Q.   Well, I mean, are any others from 2 to 16 IQ tests

16  specifically?

17  A.   No.

18  Q.   Okay.  Now, Test No. 13, Test of Memory Malingering, the

19  TOMM test, how did Mr. Carrington do on that?

20  A.   He performed well on it.  I believe he made two errors

21  on the first trial and no errors on the second and no errors

22  on the third.

23  Q.   And what is that test meant to test?

24  A.   The Test of Memory Malingering is a validity test.  It's

25  designed to detect negative response bias like malingering.

1    Q.    And how did he do on it?

2    A.    He did well on it.

3    Q.    And could you tell us about how that test is performed,

4    kind of like you went through with the Judge on how the

5    other --

6    A.    Sure.  It's a nonverbal test.  It's a pictorial test

7    where a person is shown fifty different line drawings.  It's

8    on a card stock, and they flip over, so you see fifty

9    different line drawings of simple line drawings.

10              THE COURT:  Like a house, the outlines of a house?

11              THE WITNESS:  Something like that, or a pen, or an

12   elephant head or something, very simple basic things that

13   everybody would recognize, and there are fifty of them.  And

14   so they are told to pay attention and look at each of these,

15   and we flip them over.  And after we present all fifty of

16   them, then we present all fifty again.  And then we ask for

17   him to -- a similar thing, forced choice, two alternatives,

18   choose between a picture that was in the list and a picture

19   that was not, it's a new novel picture.  And they look

20   through that once.  Then there is a fifteen-minute delay.

21   They actually go through it twice, and then there is a

22   fifteen-minute delay.  And then they are not shown the

23   stimuli again, but then they're asked to recognize the items,

24   two-alternative forced choice again from memory.

25              THE COURT:  How much longer do you think you have?

1          MR. SHEA:  Me?  I have a little while longer.  Do

2   you want to stop?

3          THE COURT:  Do you think you could wrap up this

4   portion by 5:00?

5          MR. SHEA:  I'm not sure.  I mean --

6          THE COURT:  Understanding that you have to look

7   through the stuff and will have to come back.

8          MR. SHEA:  Yes, I'll probably have to have this

9   witness back.  I can't claim to wrap up this witness because

10  I haven't even really read his report.

11         THE COURT:  I certainly understand that.  Can you

12  finish everything you could do based on what you've done so

13  far by 5:00?

14         MR. SHEA:  Oh, sure.  I'm happy to keep going till

15  5:00 and then stop.

16  Q.   That test, can you tell me the date that that test was

17  given?

18         THE COURT:  Which test, the TOMM?

19         MR. SHEA:  I'm sorry, the TOMM test, yes.

20  A.   Yes, I can.  The TOMM was given on November 28.

21  Q.   What other tests were given that day?

22         (Witness examining document.)

23  A.   The Booklet Category Test, the Tactual Performance Test,

24  the Sensory Perceptual Examination, the Rey Complex Figure.

25  Q.   What number is the Booklet Category Test?

8b9f5f1d-e7b7-44fe-b017-717d03084770

1    A.    That's one of the Halstead-Reitan tests.

2    Q.    Could you tell me about that one?

3    A.    Sure.  The Booklet Category Test is a booklet version of

4    a visual task where -- it's an abstract reasoning and

5    judgment test where a person is presented with visual

6    figures, and they have to figure out what number that picture

7    suggests to them between 1 and 4, and then they choose a

8    number of 1, 2, 3, or 4, and then they're told whether

9    they're right or wrong.  And their job is to figure out what

10   the principle is in the pictures, and once they learn that

11   principle, then they use that principle to get a right answer

12   each time.  And there are seven different subtests in that;

13   that overall the test is considered a rather difficult test

14   of complex nonverbal abstract reasoning and judgment.

15            THE COURT:  So like what?  Give me an example.

16            THE WITNESS:  Well, the very first subtest -- the

17   first two subtests are really very, very easy, and they help

18   train a person into the process, and I can explain those.

19   For example, the very first one is very simple.  It's got a

20   picture of the letter I, one big letter I in the middle of

21   the screen, and what number does that suggest to you?  Well,

22   1.  So they would put their finger on 1, and I would say

23   "correct."  Then in the next screen would be two IIs side by

24   side, ostensibly a Roman Numeral II.  Those are very, very

25   simple.  Then it progressively gets more complex.  The

1    concepts get more complex dealing with abstract reasoning,

2    what would be the right answer given this particular image?

3    It gets complicated, especially without the stimulus.

4            THE COURT:  So complicated, one would be a what, a

5    complex Roman numeral?

6            THE WITNESS:  No, no, no.  They vary to designs

7    based on different concepts.  They're not just numbers.  Some

8    may be numbers.  Some may be figures of people.  It kind of

9    is hard for me to explain in that much detail without the

10   stimulator to show you.  If I had the test here to show you,

11   I think you would catch on right away, but it's difficult for

12   me to explain because it's deals with abstract reasoning

13   based on a nonverbal visual stimulus.  It's a very widely

14   used neuropsychological test to measure executive functioning

15   skills.

16   Q.   And that test showed Mr. Carrington to have difficulty

17   with abstract reasoning, didn't it?

18   A.   Well, the results were very, very poor.  As a matter of

19   fact, this is one of those tests that has embedded indices

20   within it to give you a heads-up as to whether the person is

21   actually applying themselves; and his performance on those

22   suggested, again, that this test result was not a valid

23   indication of his true effort.

24   Q.   Well, you say that, but what I find interesting is, on

25   that particular day you gave him the TOMM test, which

1    literally has "malingering" right in its title, and it found

2    that he wasn't malingering that day, right?

3    A.    On that test, yes.

4    Q.    Okay.  And then you go on to give him this Booklet

5    Category Test, which is about abstract reasoning and

6    judgment, and he does very, very poorly, correct?

7    A.    Yes.

8    Q.    And the thing that had been pointed out by Dr. Mart in

9    his report was that Mr. Carrington may be aware of concepts,

10   but that the thing he seemed to have difficulty with was that

11   very thing, the abstract reasoning part, right?

12   A.    Okay.

13   Q.    And this very test confirms that; isn't that right?

14   A.    Well, but the test results are much worse than one would

15   expect, given Mr. Carrington's functional abilities.  He

16   scored so poorly on that test to be consistent with someone

17   who would be, frankly, significantly impaired and in a

18   nursing home.  It's just grossly impaired results that do not

19   make clinical sense.

20   Q.    Well, that's an interesting finding, but at what point

21   did he do the TOMM test in that day?  Do you have a

22   progression of when these tests were given on that day?

23   A.    He would have -- well, I'm not sure exactly which time.

24   It's listed that same day, so I honestly can't tell you which

25   tests came first, second, or third.  Normally I try to start

1    out -- each of these tests -- I mean, these are tests that

2    were given over five different sessions, and I try to have

3    some embedded indices and some freestanding tests that

4    measure effort in each of these different blocks.  And I

5    usually try to start out with a test somewhat like the TOMM.

6    So the odds are I would have started with the TOMM and then

7    later came back with the other tests on the list there.

8    Q.    So, I mean, that's your best guess?

9    A.    Yes, exactly.

10   Q.    But your best guess is, you start out with a test that

11   shows he's not malingering, right?

12   A.    Yes.

13   Q.    All right.  And --

14   A.    Well, on that one result.  There's issues with that.  I

15   mean, one can't jump to that conclusion necessarily based on

16   that one test.

17   Q.    Well, I mean, that's why you do the test, right?

18   A.    Yes.  Each of these tests have got varying levels of

19   sensitivity, and the research clearly shows, for example,

20   that the TOMM is not as sensitive of a malingering test as,

21   say, the WMT or the MSVT even.  And just because somebody is

22   not putting forth their best effort doesn't mean they're

23   going to do this consistently all the way across the board.

24   There's variability in it.

25   Q.    Well, there's variability in how people test too, isn't

8b9f5f1d-e7b7-44fe-b017-717d03084 77f

1    there?

2    A.   Well, there's a difference between the variability of

3    their skills, yes, certainly, but there shouldn't be much

4    variability in their effort.  If they start to feel like they

5    can't do the test very well, they need to stop and say, "I

6    need a break."  And we always encourage them to stop and take

7    a break if they don't feel like they can do their best.

8    Q.   But you categorized some of the tests as what you called

9    "forced answer."  Wasn't that the phrase?

10   A.   Forced choice, yes.

11   Q.   Forced choice.  That means the test forces them to make

12   a choice, right?

13   A.   Yes.

14   Q.   Well, that doesn't connote a relaxed atmosphere where

15   the person can say whatever they wish, does it?

16   A.   Well, not -- not -- when you're doing testing, no, it's

17   not a time to sit and talk about whatever you want to talk

18   about.

19   Q.   Okay, so, I mean, it's not quite as relaxed an

20   atmosphere, right?

21   A.   Correct.  No.  It's a testing atmosphere.

22   Q.   All right.  Now, the indices, you say that built into

23   these booklet category tests are these indices of perhaps the

24   person not trying their best.  That's what you said, right?

25   A.   I may have said "built in."  If I did, that's somewhat

8b9f5f1d-e7b7-44fe-b017-717d03084 77f

1    of a miscommunication.  They are within it.  They weren't put

2    in there when the test was developed, but through subsequent

3    research, we have found that if somebody performs certain

4    ways on these tests, that's really more indicative of

5    somebody who's not putting forth their best effort than it is

6    indicative of genuine cognitive difficulties.

7    Q.   Okay.  But those indices, those are subject to

8    subjective interpretation, aren't they?

9    A.   Well, there's empirical data out there that has specific

10   cutoffs, and I apply those specific cutoffs.  I don't think

11   that's particularly subjective.

12   Q.   But you have to interpret each of the responses, right?

13   A.   No.  They're either right or wrong.

14        THE COURT:  Okay, I think this is probably a good

15   place to wrap up today because we have to schedule our next

16   meeting, and the Court Reporter and all of us have had a very

17   long day.  So let's figure out, when can you come back?

18        MR. CONNOLLY:  I should tell the Court that I am

19   away the whole second half of the month of April, so I cannot

20   be here then.  Can I check with the doctors?  Are we talking

21   next week, the week after?

22        THE COURT:  I think I'm going to finish this

23   criminal trial on Tuesday, so I was wondering whether

24   Wednesday, Thursday, or Friday of next week was within the

25   range of doable.

1          MR. SHEA:  That's when I leave.

2          THE COURT:  You're away?

3          MR. SHEA:  Yes, Wednesday to the following Monday.

4          THE COURT:  Okay.  We need basically an afternoon,

5    if not more, if not two consecutive afternoons.  We're on

6    trial basically forever, so if we finish our trial next week

7    and then things go -- unless something settles or pleads and

8    I jump for joy, just in the morning I'm dead for months, so

9    we need afternoons.

10         (Discussion off the record.)

11         THE COURT:  So Friday, at least would that be

12   doable for you, or is Good Friday a problem for you?

13         THE WITNESS:  Is that April 6 you're saying?

14         THE COURT:  Yes.

15         THE WITNESS:  I believe it's open.  I'm sorry, I

16   don't have my calendar with me.

17         THE COURT:  How about the weeks of -- because I

18   think I'm not going to be -- that whole week, the week of the

19   17th, 18th, is that when you're gone?

20         MR. CONNOLLY:  Yes.  I'm gone from the 11th through

21   the end of the month.

22         THE COURT:  Where are you going?

23         MR. CONNOLLY:  To Florida.

24         THE COURT:  Fun?

25         MR. CONNOLLY:  Of course.  We coincide it with when

Page 72

1   my parents rent a house

2              (Discussion off the record.)

3              THE COURT:  Right now we'll book the 6th and the

4   9th.  I'll have Robert call e-mail the session and see if we

5   could put whatever you had with Judge Gertner on another day

6   or earlier in the day so it didn't cut the day in two.

7   You're on at what time now?

8              MR. SHEA:  I'm on at 2:30 on the 10th, and I can do

9   the morning if they need me to.

10             THE COURT:  That's where I may be iffy, so --

11             MR. CONNOLLY:  The 6th and the 9th.

12             THE COURT:  We're going to do the 6th and the 9th,

13  and we're going to check with Judge Gertner's session where

14  he's otherwise committed.  Then we could do the 9th and the

15  10th so people don't have to worry about Easter.

16             THE WITNESS:  Then it would be two afternoons, the

17  9th and 10th?

18             THE COURT:  Yes.

19             THE WITNESS:  That would be ideal.

20             (Discussion off the record.)

21             THE COURT:  Mr. Connolly, you'll make sure you get

22  Mr. Shea all the underlying data?

23             MR. CONNOLLY:  Sure.

24             THE COURT:  And Mr. Shea will get you all the

25  underlying data so that people can cross based on something

1    other than just the report.

2            MR. SHEA:  Yes, that's agreed.

3            THE CLERK:  All right, so 2:00 o'clock on the 6th

4    right now, and we'll go from there.

5            (Adjourned, 5:05 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

8b9f5f1d-e7b7-44fe-b017-717d03084771

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON               )

          I, Lee A. Marzilli, Official Court Reporter, do

hereby certify that the foregoing transcript, Pages 1 through

73 inclusive, was recorded by me stenographically at the time

and place aforesaid in Criminal Action No. 05-10074-PBS,

United States of America V. Charles Carrington, and

thereafter by me reduced to typewriting and is a true and

accurate record of the proceedings.

          In witness whereof I have hereunto set my hand this

4th day of June, 2008.


                    /s/ Lee A. Marzilli
          _____
                    LEE A. MARZILLI, RPR, CRR
                    OFFICIAL COURT REPORTER