```
               IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,     )
                              )
               Plaintiff      )
                              )
          -VS-                ) Criminal No. 05-10074-PBS
                              ) Pages 1 - 72
CHARLES CARRINGTON,           )
                              )
               Defendant      )


                    SENTENCING HEARING

          BEFORE THE HONORABLE PATTI B. SARIS
               UNITED STATES DISTRICT JUDGE



A P P E A R A N C E S:

     KENNETH G. SHINE, ESQ. and JAMES F. LANG, ESQ., ESQ.,
Assistant United States Attorneys, Office of the United
States Attorney, 1 Courthouse Way, Boston, Massachusetts,
02210, for the Plaintiff.

     MARK W. SHEA, ESQ., Shea, Laroque & Wood, LLP,
47 Third Street, Suite 201, Cambridge, Massachusetts,
02141-1265, for the Defendant.

ALSO PRESENT:  Denise Rivera, United States Probation

                         United States District Court
                         1 Courthouse Way, Courtroom 19
                         Boston, Massachusetts
                         March 19, 2008, 3:00 p.m.



                    LEE A. MARZILLI
               OFFICIAL COURT REPORTER
               United States District Court
               1 Courthouse Way, Room 3205
                    Boston, MA  02210
                    (617)345-6787
```

Page 2

1                          I N D E X

2    WITNESS                 DIRECT    CROSS    REDIRECT

3    Eric G. Mart              8        20         25

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2          THE CLERK:  The case of the United States V.

3   Charles Carrington, Criminal Action No. 05-10074, will now be

4   heard before this Court.  Will counsel and U.S. Probation

5   please identify themselves for the record.

6          MR. LANG:  Good afternoon, your Honor.  James Lang

7   for the government.

8          MR. SHEA:  Good afternoon.  Mark Shea for

9   Mr. Carrington.

10         MS. RIVERA:  Good afternoon, your Honor.  Denise

11   Rivera for Probation.

12         THE COURT:  Thank you.  All right, so we have a

13   problem because I'm told that Mr. Shine, who is the new AUSA

14   on this case, is delayed in traffic.  Is that it?

15         MR. LANG:  He probably improvidently thought that

16   he could try a couple of OUI cases before Judge Collings in

17   Hyannis today and get back here in time, and I don't know

18   what the delay is, but he called me at ten to 3:00, and he

19   was still in Bourne.

20         THE COURT:  What part of Bourne?

21         MR. LANG:  He didn't say, and I didn't ask.  I

22   asked whether he had the file.  He does, so --

23         THE COURT:  For those of us who actually travel

24   that route a fair amount in the summer, that puts him, at

25   lawful speeds, at ten minutes of 4:00, so --

1    MR. SHEA:  But as a U.S. attorney, he doesn't have

2    to drive at lawful speeds.

3    THE COURT:  Maybe.  And it also depends where.

4    So let me say this:  Normally I would just bump it,

5    except we have a doctor here who took time out of his

6    schedule.  My proposal is that we at least let -- were you

7    planning on calling him as a witness?

8    MR. SHEA:  Yes.

9    THE COURT:  Is he your only witness?

10    MR. SHEA:  Yes.

11    THE COURT:  So I've actually -- this may be the

12    third time I've heard from Dr. Mart.  I've had a long

13    history.  As I'm sure you know by now, there are competency

14    issues.

15    MR. LANG:  Yes, your Honor.

16    THE COURT:  And we did at one point where he was

17    adjudicated incompetent and another point where we found him

18    competent, and, of course, now it's a question of whether

19    there's any kind of diminished capacity.  I'm assuming that's

20    what you're bringing him in for.  So I think what we should

21    do is not delay his testimony and not ask him to stay, let

22    him testify now.  And then we can, if we need to, continue

23    the sentencing until Mr. Shine is back with the file.  I have

24    received no memo from the government, so I don't even have a

25    coherent position.  I think I know what it will be, but I

1   can't ask you to do that.

2         One question is:  Why isn't Mr. Connolly on the

3   case, who knows this case inside out and could probably --

4         MR. LANG:  The problem with that, and it's

5   certainly not -- it's just an internal office thing, but

6   Mr. Connolly left the Major Crimes Unit about two and a half

7   years ago.  He hung onto a number of our cases while he spent

8   all that time in the Drug Unit.  It was always a little bit

9   of a source of contention, particularly those that were

10  fairly time-consuming as this one was.  He's now moved on to

11  yet another unit, Economic Crimes Unit, and it was becoming

12  more and more difficult for me to get my fellow supervisors

13  to allow him to stay on cases two and a half years after he

14  left my unit.

15        THE COURT:  All right, fair enough, but here's our

16  issue:  You know nothing.

17        MR. LANG:  I do -- you know, I've talked to

18  Mr. Connolly and Mr. Shine, you know, over the years and

19  months about the case, so I know something about it.  I was

20  aware of the competency issues.

21        THE COURT:  But here's my issue:  I don't want to

22  make Dr. Mart come back yet again.

23        MR. LANG:  Fair enough.

24        THE COURT:  My suggestion is, we put him on.  He's

25  actually familiar with the court and with this thing.  You're

1    not as much, but I think he'll be straightforward.  I may ask

2    a few questions.  And then if we still don't have Mr. Shine

3    back, we will continue the actual sentencing.  Does that make

4    some sense from your point of view?

5              MR. SHEA:  That's fine.

6              THE COURT:  Unless you want to just defer the whole

7    thing.  I don't want to inconvenience the doctor, that's all.

8              MR. SHEA:  Either way, whatever -- I mean, if it's

9    more fair for Mr. Shine to be here, I'm sure Dr. Mart can

10   come back.

11             THE COURT:  If there's some follow-up question, you

12   guys can order the transcript and decide what you want to do;

13   but I think we should just do this because he's just been

14   here so often.  And also it's a CJA expense.  I mean, we're

15   paying for an afternoon.  We should just put the doctor on,

16   and Mr. Shine can then get the transcript.

17             MR. LANG:  That's fine.  Can I just ask a question

18   that may help inform what I do on cross, if anything?

19             THE COURT:  Yes.

20             MR. LANG:  For some reason it was my understanding

21   that there was a contention that because of the incompetency

22   finding, at least for a period of time during the pendency of

23   this case, that Mr. Shea was arguing that he wasn't competent

24   when he entered guilty pleas many years ago in state

25   proceedings.  The doctor's focus of the testimony isn't on

1   his competency way back when but on the diminished capacity

2   now?

3            THE COURT:  That's a good point.  I actually

4   don't --

5            MR. SHEA:  I was actually going to do both, the

6   diminished capacity he had at the time of the event of this

7   crime, meaning before he went to Missouri and was rendered

8   competent, but also as to his competence back in 1995 and

9   1985 when he had the change --

10           THE COURT:  No, but I'm not going to invalidate the

11  conviction.  You have to go back to those courts.  And I know

12  you've tried a few times unsuccessfully, but --

13           MR. SHEA:  Right.  I'd still like to put some

14  evidence in and make the argument, though.

15           THE COURT:  Sure.

16           MR. SHEA:  But to be up front with Mr. Lang, yes, I

17  do intend to go into that area, not at great length.

18           THE COURT:  Your argument is going to be he was

19  incompetent at those times?

20           MR. SHEA:  Yes.

21           THE COURT:  Because, obviously, when you look at

22  his record -- I had never seen it before until yesterday, and

23  it stands out, so I think it's relevant information as to

24  what was going on at that time.

25           Why don't you call him up.

1          MR. SHEA:  Okay.  Dr. Eric Mart.

2          THE COURT:  Mr. Shine's current status is

3    Braintree.

4                    ERIC MART, M.D.

5    having been first duly sworn, was examined and testified as

6    follows:

7          THE CLERK:  Would you please state your name and

8    spell it for the record.

9          THE WITNESS:  My name is Eric Gaylen Mart, M-a-r-t,

10   Eric with a C.

11         MR. SHEA:  Judge, should I take you back through

12   Dr. Mart's credentials?

13         THE COURT:  No.  He's qualified.

14   DIRECT EXAMINATION BY MR. SHEA:

15   Q.   Doctor, you were first retained in this matter to

16   evaluate Mr. Carrington, correct?

17   A.   That's correct.

18   Q.   And what did you do in evaluating Mr. Carrington?

19   A.   Well, the first time around I evaluated him and I gave

20   him a mental status examination, social history.  I

21   administered the MacArthur Competence Assessment Tool –

22   Criminal Adjudication; the Instruments for Assessing,

23   Understanding & Appreciation of Miranda Rights, the Emotional

24   Problems Scales, self-report inventory, 15-symbol test,

25   Kaufmann Functional Academic Skills Test, Kaufman's Short

1  Neuropsychological Assessment Procedure, and Reynolds

2  Intellectual Assessment Scales.

3  Q.   And in reviewing the results of those test, what

4  conclusions did you reach?

5  A.   Well, overall Mr. Carrington, aside from the issue of --

6  well, number one, I thought that he had some problems with

7  understanding trial procedure and assisting counsel related

8  to competence.  I thought that his IQ was likely to be in the

9  mild range of mental retardation, and that he might have some

10  processing learning disabilities or neuropsychological

11  dysfunction as well.  He had some difficulty with

12  understanding some factual aspects of standing trial, and

13  also had problems with some of the rational aspects as well.

14  Q.   Did you do further competency testing?

15  A.   Well, I did screen him again when he came back after

16  having been in the federal facility.

17  Q.   Okay.  Now, back to the first set of testing.  Did you

18  come to a conclusion about his competence?

19  A.   Yes.  At that time I thought that he did not meet the

20  standards for competence.

21  Q.   And why?

22  A.   Well, he --

23          THE COURT:  Excuse me.  When was that again?

24          THE WITNESS:  That was, I believe, the -- I'll tell

25  you exactly.  That evaluation was done on July of 2005.

1  Q.   And your conclusion that he wasn't competent to stand

2  trial was based on what?

3  A.   Well, he had low scores on the MacArthur, several

4  sections of the MacArthur, what they call the MacCAT-CA

5  competence instrument, and in addition had some problems that

6  were seen on the Instruments for Assessing, Understanding &

7  Appreciation of Miranda.  Even though it wasn't specifically

8  a Miranda issue, he had some problems understanding the

9  nature of his rights in trial.  And I thought that based on

10 the responses he was giving me, that he fell below the cutoff

11 as I understood it.

12 Q.   And did you feel that he was suffering from a mental

13 condition?

14 A.   I thought that he -- yes, I did.

15 Q.   And what was that?

16 A.   I thought that he had several conditions.  One of them

17 was that he had mild retardation, possibly borderline

18 intelligence -- he fell in that range -- and also appeared to

19 have specific learning problems.

20 Q.   And eventually you came to know that Mr. Carrington was

21 evaluated by a Dr. Thomas Gutheil?

22 A.   Yes.

23 Q.   And are you familiar with Dr. Gutheil?

24 A.   Yes, I am.

25 Q.   And how are you familiar with him?

1    A.   Well, I've met him, but also we read his books, you

2    know, back when I was studying forensic psychology initially.

3    Q.   And so would it be fair to say he's well respected in

4    the field?

5    A.   Yes.  He's very well known as a forensic psychiatrist.

6    Q.   And you were made aware of his report that found

7    Mr. Carrington not competent as well?

8    A.   Yes.

9    Q.   And did you review his findings?

10   A.   I did.

11   Q.   And in reviewing his findings and yours, were there

12   differences?  What were the similarities?

13   A.   I think that basically we both saw pretty much the same

14   individual in terms of his intellectual abilities, his

15   emotional state.  I think the only difference of opinion was

16   that he was more confident that Mr. Carrington could be

17   restored to competence with proper training and intervention.

18   Q.   And eventually Mr. Carrington was sent to Missouri?

19   A.   Yes.

20   Q.   And that was to attempt to restore him to competence,

21   correct?

22   A.   Right.

23   Q.   And you met with Mr. Carrington after he returned from

24   Missouri?

25   A.   I did.

1   Q.   And you testified in this court?

2   A.   Yes.

3   Q.   Okay.  And what was your opinion after his return from

4   Missouri?

5   A.   I thought, based on what Dr. Denney and his -- I can't

6   remember the name of his colleague -- were saying --

7   Q.   Dr. Preston?

8   A.   That sounds right -- the results of their testing and

9   their testimony, and also my speaking to Mr. Carrington, that

10  he appeared to understand better.  And it had always been

11  sort of a close call.  You know, he was not -- there was

12  things he understood and things he didn't, and it seemed that

13  what he had experienced at the federal facility had helped

14  with his understanding.

15  Q.   Now --

16       THE COURT:  Now, when was that?  Do you remember

17  when that was when you came and saw him the second time?

18       THE WITNESS:  I'm actually not sure.

19       THE COURT:  I'm sure we can find it.

20       (Witness examining documents.)

21       THE WITNESS:  I actually don't know.

22  Q.   Okay.  In terms of -- getting into the background for

23  Mr. Carrington into the past, since your appearance here in

24  the Federal Court, you've testified in the state court

25  regarding Mr. Carrington's competence?

Page 13

1    A.    That's correct.

2    Q.    And in the state court matter regarding 1995, you

3    testified -- what did you testify regarding his competence?

4    A.    Well, you had -- you had questioned me about whether I

5    thought it was likely that he had been competent at that

6    time, and I testified that I had not evaluated him or even

7    heard of Mr. Carrington at that time, but that I thought it

8    was likely that he was, since the types of things that were

9    rendering him -- that were causing him problems with

10   understanding were not the types of things that would change,

11   and that there was some evidence to suggest that that in fact

12   was true.  In other words, you know, we sometimes have

13   defendants who are psychotic because they go off their

14   medicine or they have some type of break, and they are

15   generally very restorable, and their condition will vary

16   widely.  Somebody who's got serious learning problems and low

17   IQ, that's not very likely to change over the course of their

18   life span.

19   Q.    And so that was a condition you felt would remain

20   static?

21   A.    Right, right.

22   Q.    And did you review medical records of Mr. Carrington?

23   A.    I looked at his medical records, yes.

24   Q.    Okay.  And you also reviewed DYS records and other

25   records from the past?

Page 14

1    A.    Right.

2    Q.    And did any of them reveal kind of any intervening kind

3    of brain injury or anything that would have changed his

4    mental condition between '85 and 2007?

5    A.    No.  You know, I started my career as a school

6    psychologist.  That's what my doctorate is in.  And, you

7    know, one of the things that school psychologists do a lot of

8    is, you look at achievement scores and you look at IQ scores,

9    and they should be roughly commensurate, right?  If they're

10   very different, then the person has a learning disability,

11   so it's very easy to sort of mentally plug in the numbers.

12   And his reading level back when he was looked at by DYS was

13   consistent with what I found, consistent with my estimates

14   and other people's estimates of his intellectual ability.  So

15   that did not appear to change.

16          So there seems to be -- I mean, there's not a

17   tremendous amount of information in the intervening period,

18   but all the things that were done before he had any reason to

19   try to alter his performance were all pretty much consistent,

20   all in the same ballpark.

21   Q.    Just to specify, the DYS assessment found him to be

22   functioning at -- this is when he was seventeen -- to be

23   functioning at the primary school grade level, correct?

24   A.    Right.

25   Q.    And the Department of Correction in their assessment of

a7b05956-2c6a-4be8-a8d5-06be49326475

1    him found him to be reading at the third-grade level; is that

2    right?

3    A.    Yes.

4    Q.    And did you also -- probably at an earlier time you

5    reviewed his educational records from Boston?

6    A.    Yes, or what there was.

7    Q.    What there was.  And that revealed him to be in

8    Chapter 766?

9    A.    Yes.

10   Q.    Which is a special education?

11   A.    Yes.  There's not a lot of detail, but he was involved.

12   He needed extra supports in school.

13   Q.    And were those things relevant to your assessment of his

14   mental abilities back then?

15   A.    Well, it's supportive.  I mean, you know, it would be

16   better if you had the full psycho-educational evaluation from

17   that time.  But what you see here is somebody who was

18   involved in special education from a young age, who when he

19   gets into the youth system has academic scores that are

20   commensurate with IQ scores that I found.  And then his

21   reading level when he's entering corrections is about, once

22   again, commensurate.  If you plotted all of this on a graph,

23   it would all be pretty much in the same ballpark.  It would

24   all be supportive of the high end of the mild mental

25   retardation range to the low end of the borderline IQ range.

a7b05956-2c6a-4be8-a8d5-06be49326475

1  Q.   And with all that in mind, do you have an opinion as to

2  whether he was competent when he changed his plea in the

3  state courts?

4  A.   I don't believe that he was because, you know, when I'm

5  doing a competency evaluation, the analysis is, first, you

6  look to see if the person has deficits in their

7  understanding.  In other words, you look at their ability to

8  answer the questions and do the things needed to stand

9  trial.  Having done that, if you find that there's no

10 problem, you stop.  He's competent, right?  If you do find

11 problems, then you dig a little bit to find out what the

12 cause might be because the court will be interested to know

13 whether the person has mental illness, or whether they have

14 low IQ, or whether they're malingering, what the reason for

15 the whole thing is.

16          And in this case, you know, there were observed

17 deficits in 2005.  The deficits appeared to be related

18 causally to the low IQ and learning process deficits.  And

19 from everything, both in terms of the clinical course of

20 these types of problems and in terms of what information

21 existed at that time, the same things were present at that

22 time.  So I think, you know, it's reasonable to assume that

23 his understanding certainly wouldn't have been any better at

24 that point.  And, further, when I saw him in 2005, he had had

25 the benefit of having gone to court on a number of occasions,

1  which generally improves people's understanding to some

2  extent.

3  Q.    And --

4          THE COURT:  When you saw him in 2005, hadn't he

5  just gone on a crack binge?

6          THE WITNESS:  Well, when he got arrested, that's

7  what he was arrested for.  I think he'd been -- I would not

8  have expected him to still be suffering the effects of that

9  acutely at the time I saw him.

10         THE COURT:  Well, the thing that worries me is, it

11 didn't take much to get him into competence.  He didn't

12 understand a few functions.  As you said, it was a marginal

13 case.

14         THE WITNESS:  Right.

15         THE COURT:  And so when you -- if you had had a

16 defense attorney -- Judge Ball, I notice, said something like

17 there were very experienced people who had looked at him at

18 the time, and, you know, he had experienced defense

19 attorneys.  I mean, it is possible that you go in and out of

20 competency, right?

21         THE WITNESS:  Well, I think it's much --

22         THE COURT:  Actually, you're guessing in a way

23 because you're looking backwards ten years.

24         THE WITNESS:  Well, I am looking backwards, that's

25 for sure.  I think that there are some forms of conditions

1    that are much more likely to vary.  You know, Bridgewater is

2    full of people who go out, you know, do well for a while,

3    stop taking their medicine, get very crazy, come back in, get

4    restored to competence, and are able to stand trial.  I think

5    that the literature and my own experience is that people who

6    have intellectual deficits and have a lifelong pattern of

7    that, that's not likely to change very much.

8            And the other thing you had mentioned was, you

9    know, that did come up in the state case; and the only thing

10   I would say is that, you know, all you have to do to get

11   through the colloquy is to say "yes" a few times.  You know,

12   some judges are very careful about it, some are less

13   involved, but I don't think that that's -- you know, I think

14   that's important information, but I don't think it's

15   equivalent to doing a competency assessment.  Otherwise, no

16   one would ask for them.

17   Q.   In terms of his restoration to competency here, that was

18   far more -- how would you categorize the program in Missouri

19   compared to anything he had had before?

20   A.   Well, I mean, that's part of my thinking in this, that

21   that's one of the premier types of programs for that type of

22   thing.  You know, I was impressed by what they do.  I was

23   impressed by the credentials of the individuals involved.  I

24   mean, that's what they do there.  It's not just like -- they

25   try to do this in New Hampshire sometimes, and somebody sits

Page 19

1    down with the person and tries to explain over and over,

2    right?  They actually have a methodology and a means of

3    assessing that type of thing.  So, you know, that's as

4    sophisticated as those types of programs get.

5    Q.   When you testified at the state court, what was the

6    reception to your testimony?

7    A.   I would say quite negative.

8    Q.   And why?

9    A.   One of the things was --

10         THE COURT:  Is this Judge Ball?

11         MR. SHEA:  Judge McKenna in the BMC.

12   A.   I think that the judge was critical of the fact that I

13   had not spoken to Mr. Carrington's past defense attorneys

14   regarding how they had perceived him, that it was a

15   retrospective analysis of a mental state that was not well

16   received.  You know, and I would certainly agree that it

17   would be -- you know, in terms of how much you can rely on

18   data, it's always better to do an evaluation of the person at

19   that time.  But, you know, many evaluations that forensic

20   psychologists do are retrospective analyses of people's

21   mental state; for example, mental state at the time of

22   defense.  But, you know, look, he's entitled to give my

23   testimony whatever weight he wants to.

24         MR. SHEA:  Nothing further.

25

Page 20

1    CROSS-EXAMINATION BY MR. LANG:

2    Q.    Doctor, obviously I'm less familiar with the entire

3    background of this case than anyone else perhaps in this

4    courtroom, so bear with me, if you would.

5    A.    Sure.

6    Q.    I understand that you made a determination at one point

7    that the defendant was incompetent, which was a determination

8    that was also joined in by Dr. Gutheil, who examined the

9    defendant after you?

10   A.    Yes.

11   Q.    But you indicated that he perhaps saw the defendant as

12   more amenable to being restored to competency than had you?

13   A.    Yes.

14   Q.    And if I understand correctly, he then went off to a

15   Bureau of Prisons medical facility for efforts to be made to

16   restore him to competency, and the doctors there made a

17   determination that they believed they had restored him to

18   competency?

19   A.    Yes.

20   Q.    You indicated that you spoke to the defendant after that

21   and understood that he did appear to have a greater

22   understanding of the court process and proceedings at that

23   point than he had when you originally discussed matters with

24   him?

25   A.    Yes.

1    Q.    You didn't indicate whether you agreed with their

2    determination that he had been restored to competency?

3    A.    I think he had been.

4    Q.    Okay, so you agreed with the judge's subsequent

5    determination that the defendant was in fact now competent?

6    A.    Yes.

7    Q.    All right.  Mr. Shea asked you to go back and take a

8    look at some of these prior convictions that the defendant

9    had and his mental status at that time; is that correct?

10   A.    In a way.  In other words, I didn't actually go back and

11   review -- I want to be clear -- I didn't review transcripts

12   of the trial or of the pleas.  I don't even know if they

13   exist.  But basically he was asking me a general question:

14   "Well, if this is how he is now, do you think he was

15   probably competent or incompetent at that time?"

16   Q.    How many state court proceedings did you testify in with

17   respect to the defendant's mental status, just one, or was

18   there more than one?

19   A.    I only recall one in state court.

20   Q.    And was it your understanding that you were testifying

21   in conjunction or in potential support of a motion by

22   Mr. Shea to vacate that conviction?

23   A.    Yes.

24   Q.    And what was that conviction for?

25   A.    I think there were several.  I think they were related

Page 22

1    to, I think, a robbery.

2    Q.   And that was in front of a single judge that you

3    testified before?

4    A.   Yes.

5    Q.   In the Boston Municipal Court?

6    A.   Yes.

7    Q.   And you indicated that your testimony was not favorably

8    received?

9    A.   That was my clear impression.

10          THE COURT:  There were two larcenies, in May of

11   1995 and March of 1996, one in Boston District Court and one

12   in West Roxbury District Court, is that right?  One of

13   those?

14          THE WITNESS:  That sounds correct.  After having

15   done it, I didn't -- I don't -- I don't recall exactly what

16   they were at this point.

17   Q.   Now, it's fair to say that you are aware that the

18   defendant has a very extensive criminal record?

19   A.   Yes.

20   Q.   And you're aware that he has many convictions on that

21   record?

22   A.   Yes.

23   Q.   And is it also fair to say that, at least based on what

24   you know, at no time prior to the proceedings in this case

25   has a defense attorney who represented the defendant raised

1    an issue of his competency with respect to all those other

2    cases?

3    A.    That's my understanding.

4    Q.    And it's your understanding that no judge before whom

5    the defendant appeared in any of these prior proceedings has

6    on his or her own initiative raised an issue as to the

7    defendant's competency?

8    A.    Not prior to this courtroom.

9    Q.    Were you aware that there was an evaluation of the

10    defendant that was requested by a defense attorney in aid of

11    perhaps sentencing in a case in or about 1997?

12    A.    I don't believe I've ever seen that.

13    Q.    So you weren't aware that an evaluation had been done at

14    the request of a defense counsel?

15    A.    I don't think so.

16    Q.    You weren't aware of it?

17    A.    I believe this is the first I've heard of it.

18    Q.    You're aware that the defendant went through a court

19    proceeding in this very courthouse, or at least in the old

20    federal courthouse, that is?  He was convicted of a federal

21    offense in the late 1990s?

22    A.    That sounds correct, but I'm not -- I don't recall.

23    Q.    Again, with no issue of competency being raised at that

24    time?

25    A.    I -- I don't believe it's been raised before.

Page 24

1   Q.   Is it fair to say that although you have at least

2   entertained some doubts as to whether the defendant was

3   competent at the time that he was convicted of some or all of

4   these prior offenses, you have no reason to doubt that he in

5   fact committed all of the prior criminal offenses for which

6   he stands convicted?

7   A.   I mean, I have no information that would suggest

8   otherwise.

9   Q.   So nothing you say would shed any doubt on his factual

10  guilt of those offenses; is that fair to say?

11  A.   No, I didn't address that, and I don't have any

12  information.

13           MR. LANG:  Nothing further, your Honor.

14           THE COURT:  Well, you've talked to the defendant so

15  many times, and he's always been cooperative in this

16  courtroom.  It took me by surprise how violent his record was

17  as a criminal matter, just because he hasn't really been that

18  way in here.  You've now spoken with him three times, and

19  it's a little beyond what you're talking about, but

20  regardless of whether he was competent or incompetent, it

21  gives me pause for concern, and I didn't know whether you had

22  any insights into that.  I mean, I think there are armed

23  robberies and rapes and a series of disciplinary reports in

24  prisons that make him seem dangerous.  I mean, putting aside

25  competency, I worry that he's a danger to society.

Page 25

1          THE WITNESS:  You know, because of my focus on what

2    I was doing initially, I didn't have a reason to do an

3    exhaustive review of his criminal history, and I've only

4    gotten to know -- and I think at this point I have an

5    incomplete understanding of his criminal history.  I do know

6    that as I spoke to him more and as I got more information,

7    you know, through the various times I talked to him, that I

8    became more aware of his long-term record, and my, you

9    know -- he does have an extensive criminal record.

10          MR. SHEA:  Just a few things.

11   REDIRECT EXAMINATION BY MR. SHEA:

12   Q.  One, back to competency.  When I first retained you for

13   Mr. Carrington's defense, I didn't flag the issue of

14   competency, did I?

15   A.  No, you didn't.  That was something that I raised with

16   you.

17          THE COURT:  Maybe even with the Court.  I remember

18   we stopped the proceeding midway.

19          THE WITNESS:  Right.

20          THE COURT:  So fair enough.

21   Q.  And the other thing, with Mr. Carrington, does he show

22   himself to be anxious to change, amenable to treatment, in

23   your opinion?

24   A.  You know, he's -- when I've spoken to him, and this is

25   just my conversations with him, I recall that he was -- you

1    know, sometimes when I talk to people, I'm doing a competency

2    evaluation, they need to tell their story, you know.  And he

3    was distraught and upset about the fact that he felt that he

4    had a good situation going, you know, prior to the most

5    recent set of charges, and things were working out for him,

6    and that some stressors -- that he had slipped up.  And, you

7    know, he blamed himself, you know, and was, you know, very,

8    very upset about it; you know, was concerned about the effect

9    it had on some of the other people involved; you know,

10   expressed remorse.  You know, and that's just incidentally.

11   I mean, that's what he was telling me about.

12           You know, so I think that he's somebody who wants

13   to talk certainly, you know, who I think, you know, is

14   amenable to developing a therapeutic relationship.  I think

15   that's important.  Above and beyond that, I can't really

16   help.  There's not much information I can give you about

17   that.

18           THE COURT:  Just on a rehabilitative front,

19   regardless of what I do on a term of incarceration, there's a

20   serious problem here.  He's got a long-term history of

21   violence, and he went back on crack.  I heard him in his

22   confession -- I mean, that was my first relationship -- he

23   was just sobbing hysterically, so much so that the government

24   even dropped the confession piece because -- regardless of

25   what I do on the punishment piece, what will keep him safe

Page 27

1    and society safe once I let him out again?

2         THE WITNESS:  Judge, you know, I do some work for

3    the state of New Hampshire on assessing violent predators and

4    people who are -- you know, in assessing recidivism risk and

5    that type of thing, and one of the issues that I think is

6    coming up more and more is the fact that, you know, for men

7    in particular, recidivism drops off rapidly after the age of

8    forty, about -- I think rule of thumb, about three percent

9    per year after the age of forty.

10        THE COURT:  How old is he now?

11        THE WITNESS:  Forty-two, I believe.

12        THE DEFENDANT:  Forty-one.

13        THE COURT:  Is that just sexually or is that --

14   sexual predators or just any form of violence?

15        THE WITNESS:  No.  It's in terms of general

16   criminality.  I mean, I think a lot of things happen.  I

17   mean, there's a lot of reasons why it appears to happen.  One

18   of them is that, you know, hormone levels drop; you know,

19   people are less able to -- you know, you're not as spry as

20   you were, you know, so it makes it hard to be a criminal.

21        THE COURT:  But what do I do, though?  I mean, this

22   happened what, three years ago, so he was thirty-nine when he

23   did this, thirty-eight maybe?

24        THE WITNESS:  You know, I don't know what has -- I

25   could give you a better answer if I knew what had been tried

a7b05956-2c6a-4be8-a8d5-06be49326475

1    with him up to this point, right?  I think that there's no

2    getting around his antisocial personality disorder.  That's

3    been commented on on a number of occasions, and that is

4    something that's tough to work with.  They are making

5    progress with it.  I think that there are cognitive

6    behavioral therapies that are provided in some cases.

7              THE COURT:  There's no easy drug that I can say

8    "Take it"?

9              THE WITNESS:  No.  There's no pill that will do it.

10             THE COURT:  It's not like a schizophrenic.

11             THE WITNESS:  Well, Mr. Carrington is a

12   reasonably -- you know, aside from the characterological

13   issues, is a reasonably well-adjusted individual.  In other

14   words, he doesn't -- well, no, I mean, you know what I mean;

15   he's not horribly depressed, he's not psychotic, he doesn't

16   suffer from any type of bipolar disorder that disinhibits

17   him.  He does have a substance abuse problem.  He does have

18   long-term criminal behavior.

19             But he -- you know, I will say that unlike some

20   other people in this situation I've met, he also -- he brings

21   some personal strengths to his situation.  He is capable of,

22   I think, a certain amount of empathy.  I think he has some

23   awareness of the wrongfulness of his acts, and I think that

24   he does -- he actually does experience remorse.

25             You know, one of the things I do when I work with

1    people I think might be psychopathic is, I ask them, you

2    know, if they've experienced remorse.  And then if they say

3    "yes," I ask them what it feels like, and they don't know

4    because they've never experienced it.  He actually does.

5            So, I mean, you know, I can't give you too far a

6    greater analysis because I haven't done that type of

7    assessment of him, but from my personal contact, I would say

8    that he's getting older; he is somebody who has, I think, at

9    least the ability to have some kind of therapeutic alliance.

10   A lot of people who get sentenced don't.  He does not have

11   underlying --

12           THE COURT:  Has he ever had actual therapy?

13           THE WITNESS:  I don't know.  I didn't see any

14   records of that.  I notice that he was seen at Bridgewater at

15   one point, you know, but I don't know that he's ever been

16   like, for example, in ongoing group therapy with somebody who

17   knew what they were doing.

18           THE COURT:  Do you know?

19           MS. RIVERA:  Not to my knowledge, your Honor.

20           THE COURT:  That might be something on supervised

21   release.

22           THE WITNESS:  Right.  And the other thing is, I

23   think that -- I mean, my sense of him this time around, you

24   know, is that he -- you know, because he is capable of making

25   a good appearance and can be very polite, very charming in

1  many ways -- and I don't think it's just an act like it is

2  with some individuals who are involved with the criminal

3  justice system -- I suspect that he was given a little too

4  much rope when he was let out.  I talked to his lawyer about

5  that.  I think that he, you know, because he was doing so

6  well and wasn't causing a problem, I think that people kind

7  of thought that he was going to be okay.  And I think that he

8  actually needed to be watched more closely in terms of drug

9  use, in particular, because that seems to be a big trigger

10  for him.

11         THE COURT:  Okay, thank you very much.

12         THE WITNESS:  Sure.

13         MR. SHEA:  Thank you.

14         THE COURT:  Well, actually I should ask, does

15  anyone have any questions based on what I just asked?

16         MR. LANG:  No, your Honor.

17         MR. SHEA:  No.

18         (Witness excused.)

19         THE COURT:  All right, so now I leave it up to you

20  attorneys what you want to do.  He's not here.  We could have

21  suspected that.  Mr. Shine was prepared.  I'm happy to

22  reschedule this if you wanted to do that, or I'm happy to

23  just go forward.

24         MR. SHEA:  That's really up to Mr. Lang.

25         MR. LANG:  I think I'd prefer to put it over, your

1    Honor.  While we sat here before you came out, I glanced very

2    quickly through Mr. Shea's motion, and I see that there are

3    both traditional departure grounds and 3553 considerations.

4    And if the Court really wanted to, I could certainly address

5    them, but I haven't had, I think, a fair opportunity to

6    really reflect on any of them.

7            I will say, because your Honor did indicate that we

8    didn't have a sentencing memorandum and you weren't sure what

9    our position was going to be, I can tell you, just so that it

10   informs everybody, that we will be recommending 151, which is

11   low end of the career offender guideline, but arguing very

12   vigorously for it.

13           THE COURT:  Let me ask you this:  My biggest

14   concern, regardless of what I do is, when you look at what he

15   does whenever -- maybe "too much rope" is the right way to

16   describe it -- we've got to create on the supervised release

17   end of it, even though he will be much older, we -- can I

18   possibly do something along the lines of fifteen or twenty

19   years of supervised release?  Am I not allowed to do that?

20           MR. LANG:  I think you can't go above five, your

21   Honor.

22           MS. RIVERA:  Actually, according to the statute,

23   it's not more than three.

24           MR. LANG:  Not more than three, that's right, it is

25   three.  It's a twenty-year felony, so it's capped at three

Page 32

1    years, your Honor.

2         MR. SHEA:  While I'm sure the government and I will

3    disagree and do disagree on the length of the sentence, in

4    terms of the supervised release, we're actually asking for

5    vigorous supervision because Mr. Carrington all along,

6    actually since the day he entered the Federal Court, has

7    wanted treatment programs.  And on supervised release, we're

8    asking for him to be released to a halfway house, but not

9    just like Coolidge House or the standard kind of prerelease

10   halfway house, but to go to a halfway house for substance

11   abuse; to go from that halfway house to a three-quarter-way

12   house which is a substance-abuse-oriented place.  That would

13   get him, you know, hopefully, unless they continue to lessen

14   the length of stay at programs, but that should cover him for

15   close to a year in a structured environment where he's

16   getting support for his drug and alcohol problem, and where

17   he would be allowed to work so he could start to, you know,

18   get back into the community.

19        THE COURT:  I take it he has no family?

20        MR. SHEA:  He has family.  His mother was going to

21   come today, but she's ill.  His mother is pretty much

22   chronically ill, so he doesn't have a lot of support systems

23   out there.

24        THE COURT:  Well, whatever I do on the term of

25   incarceration, it's clear that he needs an intensive program

Page 33

1   on supervision as tight and as close as we can do it.  Am I

2   allowed to make all three years of supervised release in a

3   halfway house?

4           MR. SHEA:  I don't think you can find a halfway

5   house that would keep him that long.

6           MS. RIVERA:  Yes, I was just going to say that may

7   be difficult.

8           THE COURT:  I mean, this is what kills me about our

9   statutory scheme.  I have to keep people forever on drug

10  offenses, where what happens is, if he goes back on crack or

11  just flips out, he uses a gun and he's violent, and I --

12          MR. SHEA:  Well, I think he raised his hand because

13  he did want me to let the Court know he doesn't use a gun.  I

14  mean --

15          THE COURT:  Well, he did for some of these.  He

16  didn't in the most recent one.  I understand that.

17          MR. SHEA:  Well, even in some of the older ones he

18  didn't.  They were charged as armed robberies for his

19  having --

20          THE COURT:  Pretending.

21          MR. SHEA:  -- pretended to have a gun, which is, he

22  understands, fear-inducing, but he does want to make clear he

23  didn't have a weapon.

24          THE COURT:  So you're just saying, of all of these,

25  the one with the bus driver early on with the gun, and then

1    others you're saying were just threats rather than actually

2    having --

3              MR. SHEA:  Yes, and that's back when he was

4    eighteen as opposed to later cases.  While he has a

5    serious -- I don't want to go on if --

6              THE COURT:  Fair enough, fair enough.  Okay, so,

7    all right, it's 4:00 o'clock.  I just think we should just

8    cut it right now if you don't want to do it, so --

9              MR. LANG:  That's my preference, Judge.

10             THE COURT:  We could do it tomorrow morning.  We

11   could do it next week.

12             MR. SHEA:  I can't do it tomorrow morning because

13   I'm flying out tomorrow morning.

14             THE COURT:  I know it's -- is tomorrow -- it's the

15   Easter weekend, I know, so just pick another time, Mr. Alba.

16   I'm eager to get him out of Plymouth.  I'm eager to do this

17   soon, not later.

18             Here he comes.

19             (Mr. Shine enters the courtroom.)

20             THE COURT:  Do you want to take a recess and then

21   see if we can do this?

22             MR. LANG:  I don't see why not, if you give me five

23   minutes just to discuss what's gone on before you proceed, if

24   the Court's willing.

25             THE COURT:  Let's come back around 4:15, does that

Page 35

1    make sense, and we'll just do this?

2            MR. LANG:  I think it does.

3            MR. SHEA:  Yes.

4            THE CLERK:  Court is in recess.

5            (A recess was taken, 4:00 p.m.)

6            (Resumed, 4:20.)

7            MR. SHINE:  Your Honor, I sincerely apologize to

8    you.  I would never -- and on top of everything, my poor

9    daughter has been sitting at the airport for two hours

10   waiting for me.  So I messed up on every front, and I'm in

11   trouble in every possible capacity.

12           THE COURT:  What airport?

13           MR. SHINE:  Just across the bay.

14           THE COURT:  She should just take the cab to here.

15   But, anyway, that's not my problem.

16           MR. SHINE:  Exactly, your Honor.  She's in the

17   building as we speak.

18           THE COURT:  All right.

19           MR. SHINE:  Thank you.

20           THE COURT:  So you've been brought up to speed?

21           MR. SHINE:  I have, your Honor.

22           THE COURT:  All right, so the government's position

23   is?  Well, let me just start with this.  There was a

24   challenge to whether or not bank robbery is a violent crime,

25   and I overrule that challenge, so that's preserved for the

1    record.  I didn't get a memo from you, right?

2              MR. SHINE:  No, you did not, your Honor.

3              THE COURT:  So he's a career offender, 19 and 6;

4    range of incarceration, 151 to 188 months; supervised

5    release, two to three years; $15,000 to $150,000 fine.

6              What's your recommendation?

7              MR. SHINE:  Your Honor, just the low end of the

8    fine range.

9              THE COURT:  Fine?

10             MR. SHINE:  No, I'm sorry.  The 151 months of

11   incarceration.  I'm asking for a low end of the advisory

12   Guidelines.  As a career offender, I'm requesting the low end

13   of the sentencing range, 151 months to serve, with the

14   supervised release to follow, no fine.  And, your Honor, the

15   reason I would state -- I mean, the Court has found and the

16   memos are accurate, and prior to making my recommendation, I

17   will tell you I've spent a tremendous amount of time

18   researching this case.  I went to Suffolk Superior Court.  I

19   pulled every docket from 1984 to current.  I reviewed all of

20   those dockets.  I provided those to Probation and to my

21   brother relative to Mr. Carrington's history and

22   Mr. Carrington's life.

23             Mr. Carrington entered the system in 1983.  He was

24   transferred in 1983 into the adult court for a robbery case.

25   At that time an evaluation of Mr. Carrington was done.  At

1    that time the evaluation indicated that Mr. Carrington was an

2    articulate, intelligent young man who -- and I would quote

3    from it -- this is 1984, his first into the adult system

4    referred to him as "Highly honed manipulative skills, which

5    themselves require a certain amount of intelligence and

6    sensitive readings of others, appear to defend against his

7    deeds and insecurity."  So at eighteen years old he knew what

8    was going on.  He understood the system.  This recommendation

9    from the -- I think it was the Judge Connolly Center, or the

10   (Inaudible) Children's Center, indicated that Mr. Carrington,

11   they thought, knew what he was doing.  Then in '84 --

12           THE COURT:  But he's not highly intelligent.

13           MR. SHINE:  I'm only reading from what the report

14   testifies to.

15           THE COURT:  I know you haven't had a long history

16   in the case, but one thing almost everyone agrees is, he's

17   either high mentally retarded or low functioning normal.

18   He's right on that line.

19           MR. SHINE:  Well, yes, yes.  There were motions

20   filed in state court on both matters, the '86 matter which

21   was heard by Judge Ball and was denied, and a '96 matter

22   which was heard by Judge Brady and I believe was denied, and

23   their reasonings are contained within.

24           And what I wanted to point out most importantly --

25   and this is really important for the Court to review -- in

Page 38

1    1996 Mr. Carrington was represented by Meredith Lobur,

2    Committee for Public Counsel Services.  That's as good as you

3    get.  That's the best public counsel lawyer that there was.

4    And at that time Mr. Carrington was evaluated by the CPCS

5    counselor.  And the version of Mr. Carrington's life, the

6    reason I point out the '84  stuff and the manipulative skills

7    is, the fact pattern Mr. Carrington provided of what his life

8    was like to that point and what has been provided to

9    Probation is as different as night and day.

10            In that time, to the CPCS person, psychologist, he

11   was a high school graduate.  He had a degree or a certificate

12   in culinary skills.  He lived at home.  He had a wonderful

13   home upbringing.  He had a brother that was a firefighter,

14   another brother that was a firefighter, a wonderful

15   structured life.  His mother had remarried to a wonderful

16   man.  I mean, it's in there.  This is a wonderful version or

17   a wonderful story, who got hooked up a little bit with drugs,

18   and his life fell apart from then.

19            So either he was telling the truth then, or he

20   played his market, he played to the person because

21   Mr. Carrington felt at that time maybe there was a chance he

22   would be released.  So, again, he tried to manipulate the

23   system.  He tried to say what Dr. Katz wanted to hear, and

24   that was denied.

25            Mr. Carrington knows what he's doing.  He has not

Page 39

1    been able to conform his actions to comport with the law.

2    The three matters that are before you, they're serious cases.

3    They're violent cases.  He's had the best possible

4    opportunities presented to him, and he's chosen to go in a

5    different direction with all those opportunities.

6           I believe the government's recommendation is --

7    it's actually on the lower side, your Honor.  I think it's a

8    fair recommendation, and I'd ask the Court to impose it.

9           I've reviewed Mr. Shea's request for a departure

10   under 5K2.13.  It just doesn't apply in this case.  At best,

11   at best, there are some 3553(a) rationale that might come

12   into play.  I just don't see where it applies.  He has been

13   through the system.  He has been through the state system.

14   He has been through the federal system.  He continues to go

15   off and do what he chooses to do.  He's a violent young man,

16   and he needs to be incarcerated, and I'm asking the Court to

17   incarcerate him for the 151 months.

18           THE COURT:  Thank you.

19           MR. SHINE:  Thank you, your Honor.

20           THE COURT:  Mr. Shea?

21           MR. SHEA:  A few things directly on point.  The DYS

22   assessment, I believe, was a psychological evaluation that's

23   referenced in Paragraph 105 of the PSR, and in that, "The

24   defendant presented with borderline intellectual performance

25   and was defending against an elevated anxiety level."  He was

Page 40

1  described as "a very needy, dependent, and immature

2  adolescent who was easily disorganized."

3        It was their opinion -- now I'm not quoting --

4  their opinion, I believe, that he shouldn't be treated as an

5  adult, that he should continue in DYS and receive treatment

6  that he needed.  He was in fact treated as an adult, not --

7  their recommendations were not followed.  So he didn't get

8  any of the treatment he needed.  He went directly into a

9  state prison facility, which had about exactly the opposite

10 of what he needed.

11       Now, DYS's assessment had him at a grade school

12 level.  The licensed social worker had him at 766 learning

13 disabled special programs, and another DYS report had,

14 "Charles is a special needs student who is working at the

15 primary grade level."  All of those things are documented in

16 the PSR.  So there is no question of where he stood with DYS

17 or where he stood in terms of intellectual functioning.

18       And it is not a manipulation because

19 Mr. Carrington, he would have had to have manipulated me,

20 without me even knowing I was being manipulated, to send him

21 to go see Dr. Mart for a condition I wasn't even sending him

22 for.  I mean, that would require a level of manipulation

23 that's kind of beyond the imagination, and so I don't believe

24 that that is what is going on here.

25       I will acknowledge that there is one social worker,

1    not doctor, social worker report from CPCS which has the

2    wrong information in it.  You know, it has him as graduating

3    from high school and things like that.  It may have been

4    self-reported by Mr. Carrington.  I don't know.  But what I

5    do know is, if any kind of background or, you know,

6    subpoenaing of the records from his youth had been done, that

7    would have been put to rest rather quickly.

8         Now, in my sentencing memo I asked the Court to

9    adopt some departures.  I take it that those are not being

10   adopted and that we're dealing with 3553 --

11        THE COURT:  I don't even think the departure will

12   fly because of the violence, the bank robbery.  But that

13   doesn't mean I couldn't look at various factors, as you know.

14        MR. SHEA:  All right, well, I'll argue that --

15        THE COURT:  That's why I actually had thought that

16   this was going to be more of a diminished capacity argument

17   than a competency one.

18        MR. SHEA:  Well, it was both.  Well, I dealt with

19   competency partially because -- well, let me stick to an

20   argument which is, first, in terms of violence, to make a

21   record on that -- I know you've ruled -- but this offense was

22   not a violent offense.  It was an offensive offense.  It was

23   something that put someone in fear, who Mr. Carrington

24   regrets having put in fear, but it isn't truly violent in

25   terms of there was no weapon.  There was no pretending that

Page 42

1    there was a weapon.  There was no physical contact with

2    anyone.  There were no verbal threats.

3              THE COURT:  Isn't this the one they usually use?  I

4    mean, every bank robbery I've ever had, regardless of whether

5    there was a gun, has been deemed an act of violence, and I

6    think the prong they look at is, it creates a substantial

7    risk of harm.  Isn't that the prong?

8              MR. SHEA:  Correct.  And to be frank, that's why

9    Mr. Carrington pled guilty.  I mean, we pled guilty to bank

10   robbery, but we do think that there is a difference between

11   that and violence.

12             THE COURT:  What's that definition?

13             MS. RIVERA:  Yes, the threat of -- I don't know the

14   exact wording.

15             THE COURT:  I'm actually embarrassed that I don't

16   remember it right off the top of my head, but --

17             MR. SHEA:  My memory is that it wasn't intent-based

18   in a way as much as the perception of the individual who you

19   were robbing, and if they perceived the threat of a harm,

20   that that was sufficient.  I remember Mr. Shine and I going

21   over this the day of the plea quite a bit and him providing

22   me --

23             MR. SHINE:  Right, it's the perception of the

24   person that is -- I believe, your Honor, one of the issues

25   would be the perception of the person that's being robbed,

1   whether they view it as a violent issue.  And I suggest, how

2   could you not?  A gentleman of Mr. Carrington's stature and

3   size comes in and demands money from you to be taken from a

4   drawer.  There is some discussion about, "I know there's a

5   guard outside with a weapon.  Give me your 100s, 50s, and

6   20s, and hurry up."  I mean, I don't know how I'd feel about

7   that, but that, to me, suggests a level of violence.

8          MR. SHEA:  But I'm just saying that under the

9   Guidelines, it's a somewhat different definition, and that my

10  point is that this isn't necessarily violent.  I mean, look,

11  Mr. Carrington understands the wrongfulness of his actions.

12  He understood the wrongfulness of his actions in the tape

13  that you heard with him confessing, and he understood the

14  wrongfulness of his actions when he asked me to make sure

15  someone from my office went to the bank and apologized to

16  people, and that in itself is an unusual thing for anyone to

17  do.

18         THE COURT:  Do you have the section?

19         MS. RIVERA:  I do.  It's "Other offenses are

20  included as crimes of violence if that offense has as an

21  element the use, attempted use, or threatened use of physical

22  force against the person of another, or the conduct set forth

23  in the count of which the defendant was convicted involved

24  use of explosives, or, by its nature, presented serious

25  potential risk of physical injury to another."

Page 44

1           THE COURT:  Yes, the risk of physical injury is the
2    one they usually go off on, okay, when there's not an actual
3    gun involved.  What were you just reading from?
4           MS. RIVERA:  That was from the definition for Crime
5    of Violence under Guideline Section 4B1.2, Application
6    Note 1.
7           MR. SHEA:  See, that's where I'm drawing a
8    distinction.  I think that there is a distinction between the
9    definition of violence in 4B1 and what's required in a
10   robbery.  And we cited a case that does just that, U.S. V.
11   McVicar in the First Circuit, 1990.  They do hold there that
12   the Guidelines list robbery as a crime of violence, but the
13   First Circuit then went on to analyze the individual facts of
14   the case to see if it in fact was a violent crime.  And I
15   think an analysis of the individual facts of this case
16   doesn't lead one to believe that it was in fact a violent
17   crime.
18          THE COURT:  Thank you.  I overrule that.  Under the
19   definition -- that's what I was looking for, thank you --
20   under 4B1.2(a)(2), I do think that there was both -- well,
21   both (a)(1) and (2), "threatened use of physical force," it's
22   just implicit in what was going on, but also, even if there
23   weren't, "conduct that presents a serious potential risk of
24   physical injury to another."
25                 But, in any event, I actually don't know that I've

1   ever seen a bank robbery that isn't considered a violent

2   crime because of what you have to admit to.  But, anyway,

3   I've made my ruling.

4           MR. SHEA:  As to why I had Dr. Mart testify about

5   competence, partially I had him cover that area because, as

6   you've heard, we have been at times -- we've been

7   unsuccessful in two of our new trial motions in the state

8   court.

9           THE COURT:  I actually didn't know that.  Which

10  two?

11          MR. SHEA:  The two superior court ones, the 1996

12  Suffolk Superior Court armed robberies and the 1985 robbery

13  in Suffolk Superior Court.  A decision is pending on the BMC

14  case.

15          MR. SHINE:  I have copies of those individual

16  decisions, one by Judge Ball and one by Judge Brady, denial

17  of the motions.

18          MR. SHEA:  Judge Ball said that she's willing, in

19  her written decision, said that she's willing to reopen that

20  motion if we can find a doctor who's willing to say he wasn't

21  competent at that time.  And Dr. Mart has testified to that

22  here today and testified to that in the BMC, so we have a

23  shot at reopening it in front of Judge Ball.  But the

24  Judge Brady decision -- and Judge Brady was not the judge who

25  sat on it and did not give us a hearing, and ruled on the

1    papers against Mr. Carrington, despite having in front of him

2    Dr. Gutheil's report, Dr. Mart's report, and an affidavit

3    stating that Mr. Carrington had suffered no intervening

4    injury.

5           Part of why I'm arguing this, Judge, is not just

6    for the sake of talking.  It doesn't seem just or fair to me

7    that this man is being judged as a career criminal based on

8    convictions where he clearly was not competent.  And, you

9    know, in the state courts they want to uphold these

10   convictions as legitimate because in some ways, every time I

11   go before them on Mr. Carrington's motions, what they do is,

12   they get their back up and feel threatened that I'm somehow

13   indicting the entire system.  And you know what?  They're

14   right.  I'm not going there to indict the entire system, but

15   they are correct, because what they have set up is that a

16   lawyer, who doesn't have a lot of time and has a lot of

17   clients, stands before them and tells them that "Yeah, I read

18   the green sheet with him."

19           THE COURT:  What's that, the --

20           MR. SHEA:  It's a change your plea form, a waiver

21   form.  And puts it up before the court.  They put it on the

22   lawyer, "Did you go over the rights with him?"  You know,

23   nine out of ten times, that's back in the lockup with about

24   eight other guys in the cage, and you're going over these

25   rights, and then going out and making a deal.  And you're

1   making the deal because your lawyer has told you it's a good

2   deal.  And I'm not saying they weren't trying to do the best

3   for Mr. Carrington.

4        THE COURT:  But just to back up a minute, I mean,

5   if you get these convictions vacated, I'd revisit this under,

6   I think, United V. Mateo, but I'm not going to vacate the

7   convictions.

8        MR. SHEA:  No, I'm not asking you to vacate them,

9   but I do think that under 3553(a), what's just can be done

10  here.  And to deem him a career criminal for cases that he

11  really was not competent for -- and I'm not saying that you

12  have to find he wasn't competent particularly at the time,

13  but there is no evidence that he was competent, and the clear

14  evidence is that he probably wasn't.  I mean, he suffers from

15  intellectual deficits that have been present and documented

16  since his youth, and they certainly weren't ameliorated by

17  stays in state prison.  So what we have is the state court's

18  essentially upholding Mr. Carrington's prior convictions

19  because they know what they're doing on a daily basis is

20  running through, with little resources, many people who have

21  learning disabilities who have not been spotted, and that is

22  an unfortunate truth about what goes on in the state system.

23  And it doesn't mean that people don't mean well there.  I've

24  practiced there myself.  I still practice there.  But, I

25  mean, I was a bar advocate.  I know how it works.  And when

a7b05956-2c6a-4be8-a8d5-06be49326475

1  your client -- you know, they say, "Wrap it up, make a good

2  deal, get me out of here," you know, you're not hiring expert

3  witnesses to find out if your client is competent to make

4  that decision to get out or to make a deal.  They're just

5  saying, "Get me the least time and get me out of here."

6       And, you know, the courts do not want to deal with

7  it, and what Mr. Carrington presented to those courts was a

8  complex picture.  And they punted so far, and I've been

9  trying to get them to not punt, but that so far is not taking

10 place.  They do not want to do justice to him because they

11 feel it opens the door for others, and I don't feel that he

12 should in justice be found a career criminal based on their

13 intransigence in dealing with the reality.

14       Now, as to other aspects regarding Mr. Carrington,

15 he has had an incredible life experience and not in a good

16 way.  You know, he has witnessed his mother being raped.  He

17 has been raped himself.  Those are unusual, thankfully,

18 unusual circumstances.  Those place him in a different place

19 than almost any defendant.  And when you add to that all of

20 the deficits he's had to deal with, and the fact that in

21 looking, for instance, at his educational record -- you know,

22 we did manage to get two pages of computer printout and two

23 pages of his educational records -- Mr. Carrington dropped

24 out of Dorchester High School, I believe it was in early

25 November of whatever year he was nineteen or something.  It

1    must have been something like 1984 or something like that.

2    He drops out in November of the fall semester.  He had

3    thirty-four absences and seven days of attendance, and the

4    Boston Public Schools gave him Ds in everything but shop.

5    They failed him in shop.  So they passed him through.  They

6    deemed him, a young man who showed up for school seven days,

7    they deemed that passing grades.  And I think that is a

8    shocking and unusual circumstance.  At least I hope it is.

9    And that is his background as well.  And when DYS assessed

10   him and said, "This guy needs some help.  Don't treat him as

11   an adult.  Let's get him some help," he was not given any

12   help but was sent into the state prison system.

13          So when you see his background, his disabilities,

14   and then how the system treated him, that is not just, and

15   that is not, hopefully, the usual circumstance for an

16   individual's life.

17          And after he went into the state system, the PSR

18   lists that he has some D reports, but those D reports, I

19   believe I cited, were very early in his life.

20          THE COURT:  They said 91 --

21          MR. SHEA:  91.

22          THE COURT:  -- disciplinary reports, something like

23   that?

24          MR. SHEA:  Yes, but I went through them and dealt

25   with -- I feel like I dealt with them, and most of them, the

1    last ones -- I believe the last ones we argued were in 19 --

2    he has not received a single D report between 1988 and 2007,

3    except for the two at the Bureau of Prisons out in Missouri

4    which were nothing.

5                THE COURT:  Well, they weren't violence.  Whatever

6    they were, they weren't violent.

7                MR. SHEA:  Well, one was an untidy cell.

8                THE COURT:  But one was threatening someone, and it

9    didn't prove up.

10               MR. SHEA:  And he proved he was not guilty of it.

11   And so, you know, in 1988, at that point he was still only

12   twenty-two years old.  He was early in the system.  And so

13   the D reports, if you believe those are troubling, are way

14   back in his life, early when he's first in the incarceration

15   system and fighting his way through and trying to survive.

16               The other thing that I would point out is that

17   on both of his cases in that earlier time period, he received

18   parole.  And so if he were so violent, if he were so

19   problematic in terms of D reports, it seems unlikely that he

20   would have received parole on both of those cases.  And so,

21   you know, I do think that the D report issue overstates

22   Mr. Carrington's level of violence.

23               In keeping with that, I'm sure the Court is

24   concerned with his criminal record, and you've stated so.

25   And it is a troubling record, and Mr. Carrington acknowledges

1    that.  But we would like to go through that, you know, his

2    more violent events were when he was younger.  The rape,

3    which is an event which has to be dealt with, that one in the

4    context of himself being a victim of rape, in the context of

5    him being a young person, that day they were both using

6    substances together, and of his not understanding things as

7    well as he should have.  And the one mitigating factor, I

8    think, in that case is that Mr. Carrington gave the victim in

9    that case his phone number and name after things were over,

10   and I think that shows his lack of understanding of what he

11   had done at that time, and that he certainly didn't have the

12   intent to traumatize.  Otherwise, he wouldn't have felt that

13   the person would be wanting to contact him in the future.

14          As to the robberies, there is a gun involved early

15   on in '85; but in '95 you start to see, as you pointed out,

16   the BMC in West Roxbury are both larceny cases, so he's just

17   taking property but not with a weapon.  He then goes on to

18   robberies where he pretends to have a weapon but does not

19   have a weapon, and those cases are spelled out.  And I think

20   it's -- I disagreed with Probation on some of the information

21   they included in here in the PSR, but what I was pointing to

22   was that the individual who said that Mr. Carrington had a

23   gun in one of the cases, a Mr. East, they pointed to the fact

24   that "He pled guilty to you, East, stealing the property of

25   Store 24 armed with a handgun."  The thing that's misleading

Page 52

1    about that is, that's the same time that he stole stuff from

2    the Dollar Store.  And he kind of went from one place to the

3    next, and the events at the Dollar Store clearly spelled out

4    that no gun was shown, that he didn't have a gun, he wasn't

5    seen discarding a weapon, and that he in fact just had put

6    his hand in his pocket to act as if he had a weapon.

7          The last bit of his record is the prior federal

8    case here for contempt of court, which actually grew out of

9    the idea that he might have been involved in other bank

10   robberies.  And they said that they had a fingerprint

11   involving another bank robbery, and they wanted him to submit

12   evidence on that.  He was advised, he tells me, by a lawyer

13   not to do so.  Nothing ever grew out of those cases, and the

14   fingerprint never ever came to fruition, and so it appears

15   that he actually didn't have anything to do with those other

16   robberies.

17         And I don't think that's just conjecture on my part

18   because, frankly, Mr. Carrington is one of the most inept

19   criminals I have ever seen.  There is not a single crime on

20   his record where he literally is not caught at the scene.

21         THE COURT:  Red-handed.

22         MR. SHEA:  Red-handed.

23         THE COURT:  That's why when you were talking about

24   the competency piece of it, you may well be right or not

25   right -- I'll leave it up to the state court -- but I read

Page 53

1    them with the theory in mind, well, maybe he was competent,

2    is there was a chance he was innocent?  I'm sure you thought

3    of that too.  As I went through it, there was no chance he

4    was innocent because they caught him at every single scene of

5    the crime.  You're right, they're the least sophisticated

6    crimes I've ever seen, but in a way that makes him -- it's

7    worrisome.  It's not that -- he's not innocent of them, in

8    other words.  There's no chance that he pled because he was

9    snookered.  They had him cold.

10          MR. SHEA:  Right.  Well, I don't disagree.  I would

11   just say, the thing is, though, he pled without ever getting

12   any help.  There never was anything put in place to help.

13   And so if the idea of competency -- for instance, look, to be

14   honest, I feel lucky in that I didn't spot it.  I hired

15   someone to deal with the confession because, I mean, there's

16   something when you listen to that tape that jumps out at you.

17          THE COURT:  Have you heard the confession?

18          MR. SHINE:  Oh, yes, absolutely.

19          MR. SHEA:  So I thought, all right, I've got to

20   have someone look at this.  But I didn't spot the competency

21   right off.  So the idea, though, is that then Mr. Carrington,

22   because of Dr. Mart's work, actually got some help.  And he's

23   wanted help, and I think, you know, his probation officer,

24   Mr. Payne, would acknowledge that Charles actually is anxious

25   to better himself.  He didn't always ask for the help he

1  should have asked for, particularly drug problems, but, you

2  know, he does want to do better.

3          And what I was trying to get at with the record,

4  though, is that, you know, each of his things becomes less

5  serious.  They're not not troubling, and clearly bank robbery

6  is serious, but it's more that it's a bank, right?  I mean,

7  in the sense that if he had done this same act in 7-Eleven or

8  something, it would have come closer to a larceny, and it

9  certainly would not have been in the Federal Court.  It's

10 that the actions didn't put more people at risk.  In fact,

11 the person most at risk with these ridiculous efforts is

12 Mr. Carrington, who's pretending to have a gun with people

13 who do have guns; you know, who's robbing a bank, and by just

14 pure chance, the armed guard was late to work that day.

15          THE COURT:  Is that right?

16          MR. SHEA:  So, you know, these are nonsophisticated

17 crimes that put him at great risk.  And he needs to change,

18 and he understands that.

19          Now, in terms of changing, Mr. Carrington wanted

20 and continues to want substance abuse treatment.  And, now,

21 when he was only merely in the district court, the first

22 thing he did was, he asked his lawyer to go to Bridgewater

23 Treatment Center, and he went for the 30-day treatment

24 program, and he completed that program and did well with it.

25 And they, you know, suggested he get further long-term

Page 55

1  treatment, but obviously that wasn't available.

2          When he went before Judge Dein, I argued for

3  treatment, and she accepted that argument, but unfortunately

4  Pretrial Services wasn't able to place him in treatment.

5          Since he's been at Plymouth -- and this is one of

6  the things we cite as a departure -- you know, there are no

7  programs there.  And in fact -- that's wrong.  There are

8  programs there.  They actively deny federal detainees those

9  programs.

10          THE COURT:  Well, we can give him the 500-hour drug

11  treatment program.

12          MR. SHEA:  Right.  But that's a point I'd like to

13  follow too.  He wants the 500-hour drug treatment program,

14  and he's not even going to benefit from it in terms of any

15  reduction in sentence.  This is what I'm trying to get

16  across:  He really does want to change.

17          THE COURT:  Why won't he?

18          MR. SHEA:  Because of his history, his levels of

19  offense.

20          THE COURT:  But does he still want it?

21          MR. SHEA:  Yes, he still wants it.

22          THE DEFENDANT:  Yes, I do, ma'am.

23          MR. SHEA:  So that's all I mean is, he's at

24  Plymouth, he wants the programs, they won't let him go to the

25  meetings.  He goes out to Missouri, they're dealing with his

1  competence, and he's still going to AA and NA meetings.  He's

2  getting certificates for doing well within the treatment

3  program.  Probation requested those records.  They haven't

4  come yet from Missouri, but those were confirmed by the

5  doctors when they testified here.

6       THE COURT:  We have a slight problem, which is it's

7  almost 5:00 o'clock.  How much longer do you think you'll

8  be?

9       MR. SHEA:  I'll try and wrap it up.

10      THE COURT:  Or we could put it to another day.

11      MR. SHEA:  I'll try and finish in five minutes.

12      THE COURT:  Well, I'm assuming Mr. Carrington might

13  want to say something, and the government might want to say

14  something in response.

15      THE DEFENDANT:  Can I use the bathroom real quick

16  if it's all right, please?  I need to go bad.  It will only

17  take two seconds.

18      THE COURT:  Well, we've got an issue because --

19      THE DEFENDANT:  No problem.  I can wait.

20      THE COURT:  No, no, I'm going to let you go to the

21  bathroom.  The issue is, I could finish it now, or we could

22  put it -- you know, or within five minutes.  I'm just worried

23  you might have a response, and he may want to speak, and he

24  has to go to the bathroom.  What do you want to do?

25      THE DEFENDANT:  I can wait for the bathroom.

Page 57

1          MR. SHINE:  It's your call.

2          MR. SHEA:  I'll try and wrap it up.

3          THE COURT:  See what you can do.

4          MR. SHEA:  So the point I'm trying to make there

5     is, he really does want substance abuse treatment, and he's

6     sought it in places where it wasn't going to inure to his

7     benefit here.  And in fact, if you look at Missouri, that's

8     the kind of thing that shows competence, right?  I mean, the

9     idea is, he supposedly is trying to gain the system or

10    something.  Well, here's this guy out in Missouri, and he's

11    still trying to help himself in a way that shows that he

12    wants to help himself; you know, that shows that he has a

13    desire to change.

14         THE COURT:  Okay.

15         MR. SHEA:  So what I'm asking the Court to do is a

16    couple different things.  Under 3553, just punishment, the

17    seriousness of the offense, unwarranted disparities, in Gall

18    they mention not just unwarranted disparities but unwarranted

19    similarities too in sentencing, and Mr. Carrington does not

20    deserve an unwarranted similarity to two things, either other

21    bank robbers -- and I was reading the paper, and there were

22    some bank robbers sentenced recently in not your court but in

23    the Federal Court here to fifteen to twenty years.  They, you

24    know, had guns, automatic weapons, body armor.  Mr. Carrington

25    should not be in any way considered in that kind of --

1          THE COURT:  The other day, I think they got twenty

2     years?

3          MR. SHINE:  Thirty-five years.

4          MR. SHEA:  Yes, I think one got fifteen.

5          MR. SHINE:  Thirty-five years was Judge --

6          THE COURT:  Judge Wolf's case.

7          MR. SHINE:  Chief Judge Wolf.

8          MR. SHEA:  The point I'm trying to make is, one of

9     the guys got fifteen.  This is in no way similar.  That's a

10    real bank robbery.  What Mr. Carrington did he's guilty of,

11    but it does not -- it falls in terms of conduct at the low

12    end of that kind of conduct.

13         Similarly, for a career criminal, I would ask that

14    you think of unwarranted similarities or dissimilarities.

15    Mr. Carrington really has had a different kind of life in

16    terms of all of the things he's been through, in terms of all

17    of the deficits he's suffered that put him in a position

18    where he should be treated differently, and a just punishment

19    is not to follow the Guidelines of 151 months here.

20         The other things to look for are, we are asking for

21    very strict terms of supervised release.  Part of why the

22    court upheld the Gall decision was, they found that probation

23    is a substantial restriction on freedom; and that one of the

24    things they cited to, particularly with Mr. Gall, was that he

25    was going to have a rigorous drug-testing regime.  And so

Page 59

1   what I would be asking for, and I mentioned before, was

2   Mr. Carrington go to a halfway house, go to a

3   three-quarter-way house, have rigorous probationary

4   supervision, that he have drug testing, and that those three

5   years really be the serious three years of supervised

6   release.  He wants that because he thinks that will help him

7   in the community.  I would ask you to consider that as part

8   of the sentence so that he has less of an incarcerated

9   sentence.

10          The last thing I just want to say is, he was doing

11   well, albeit for a short period of time.  He showed that he

12   doesn't want to be a criminal.  He got a job, he had a

13   girlfriend.  He really was trying to make it, but he was a

14   guy without the skills he needed to do it, and he had a

15   substance abuse history.  And then he ends up in the hospital

16   because he has emphysema, and he ends up readdicted.  You

17   know, that kicks off his addiction cycle, and this crime

18   happens.  What I'm asking is the Court to consider those

19   circumstances and that this is a person who really wants to

20   be headed in the right direction.  He understands he's going

21   to be derailed for some period of time and he's got to pay,

22   but twelve years is far too much for what actually happened

23   here for someone who didn't have the skills and really wants

24   them and wants the ability.

25          THE COURT:  Thank you.  Do you want to say

Page 60

1    anything, Mr. Carrington?

2              MR. SHINE:  I do not, your Honor.  Thank you.

3              THE COURT:  Would you like to speak?

4              THE DEFENDANT:  Yes, I do, ma'am.  Should I go up

5    there?

6              THE COURT:  No.  You can stay right there.

7              THE DEFENDANT:  Okay.  I want to say, first of all,

8    that I'm sorry for everything I have ever done as far as what

9    I did as far as committing the crime that I have committed.

10   And I'm not saying that, ma'am, because I know that my life

11   is in trouble.  And I'm just sick and tired of being sick and

12   tired.  Do you know what I mean?  I don't blame nobody for

13   none of the things that I have done.  I know you never got a

14   chance to talk to me.  I know you people don't know me, and

15   you're going by what's on paper.  And I have no problem with

16   what the DA is saying.  I have no problem with what you

17   people are saying.  You all are doing your job.

18             At a young age I went out there and I done things

19   that I have no business doing, me being under the influence

20   of drugs and going along with a lot of other problems and

21   stuff.  I'm not saying that it makes an excuse for anything,

22   and I'm sorry for what I have done.  And one of the worst

23   things that I still live with to this day, ma'am, is the case

24   when I had got locked up for assault with attempt to rape, do

25   you understand what I'm saying, when I was a kid?  And that

Page 61

1    hurt me because it should never have happened.  I was under

2    the influence of drugs, and me and the person was making

3    out.  I'd never been involved in a relationship.  I'd never

4    been sexually with anybody, and one thing led to another, and

5    me not realizing what the hell I did, I got a little

6    overboard.  And when I realized what the hell I did, I ran.

7              And I've lived with that and I live with that to

8    this day because I was brought up with morals, and I respect

9    any women I've ever been with ever since.  I never put my

10   hands on them.  I never cheat on them.  I never stole from

11   them or anything.  And by twenty something years, even though

12   that I made mistakes and done other things, it's been damn

13   near twenty-five years, and I never repeated a crime like

14   that ever again.  And I'm a Level 2 sex offender, and I'm not

15   proud of that and I'm ashamed of that because I have a mother

16   and I have a sister.  And I'm not going to make an excuse

17   because something happened to me, and I witnessed my mother

18   being raped at knife point and me being raped, where this guy

19   made me perform oral sex on him in front of three people in

20   Bridgewater State Hospital -- I mean Mattapan State grounds.

21   And a lot of times it was me always trying to be nice to

22   people and stuff, and I go do stupid crimes.

23              And I never had a gun, believe it or not, in none

24   of the crimes that I did.  I'll be honest to the Court and

25   say I act like I had a gun.  Like the time with the guy in

a7b05956-2c6a-4be8-a8d5-06be49326475

1    Franklin Park for the two crimes I had committed?  That was a

2    guy that had robbed me for some weed -- I'm not even going to

3    lie -- and that was me getting back at them.  That's

4    something I can honestly say about that.  All the other

5    things I did is because of me being stupid and me being under

6    the influence of drugs and not being able to deal with

7    certain situations, and I tried to get help when I needed it,

8    and I never got it.

9         I will never kill nobody, ma'am.  I will never hurt

10   nobody.  If you ever look, the real violence that I ever done

11   physically to anybody is when I did what I did twenty

12   something years ago, and I never repeated that, and I never

13   would.  And I'm in this court and I'm asking you people to

14   give somebody a chance that wants to help himself.  I'm not

15   sitting here because I know my life was on the line because

16   regardless whatever happens, it's going to happen, and I

17   can't change that.

18        I have never had a chance to talk in front of a

19   court.  I never had a judge that showed consideration for

20   me.  I never had nobody to be able to help me and talk to me,

21   and I'm begging you people to help me.  I asked for help from

22   the beginning.  When I got out of prison this time, I said

23   I'm going to do all right things.  I busted my ass, pounded

24   the pavement trying to find work.  I went to see my probation

25   officer.  I did everything I was supposed to have done.  I

1    got a driver's license.  I got a job.  I was doing the right

2    thing, and my family, everybody was proud of me, and I

3    failed, and I fucking failed, and I feel sorry about that

4    because I really, really tried to make it right.

5         And what happened is that -- what happened with the

6    bank robbery, me and my girlfriend, me and Karen had broke up

7    because of a relationship she had with a married guy.  And I

8    tried going through it.  It was my first Christmas out, my

9    first time being out of prison.  I was trying to do the right

10   thing.  And I didn't know what tough love was.  I didn't know

11   that she left me because she was trying to show me tough

12   love.  I was depressed.  I picked up after getting out of the

13   hospital with the medication.  I'm not saying that makes any

14   excuses.  I'm wrong for everything I ever done.  And I'm

15   begging you people to help me and refuse to give me twenty

16   years there.  I want you all to help me because I never asked

17   for help.  I never asked the court or anybody for any help,

18   and I know if I go out there and I even throw something at a

19   woman, I know, I'm not that crazy enough to know that I would

20   die in jail, and I don't want that.  I love my mother and my

21   family so much, and I love myself.

22        And just because of my size and everything, like,

23   when people say be strong, I'm defending people.  When I went

24   to jail and I picked up that 90 something D reports, that all

25   happened in a matter of a month because of the charges that I

1    came in for.  I know that was wrong for what I did, and I got

2    certain things, but I haven't gotten a D report from 1988 all

3    the way to that time.  And I will do anything that I have to

4    do to make it right.  And I'm not just saying that because

5    I'm in trouble because regardless of what's going to happen,

6    it's going to happen, and I'm going to deal with it.  And I

7    still want to be able to do all those things.

8            And, like, my family and stuff like that, my family

9    has been on drugs and everything like that.  You know, I'm

10   not saying that makes an excuse.  Like, my brother in 1990, I

11   got home from prison after going through all the stuff that I

12   went through.  It was a whole different thing at the time.

13   My mother was using.  My brothers and stuff like that,

14   cousins and stuff was using.  And I got out, and I went in

15   the kitchen and I seen my brother doing it because I used to

16   despise -- I was one of those people, "Oh, I'm not into

17   drugs," and this and that.  I was always into working out and

18   everything like that.  And I went in the kitchen and I seen

19   him doing it, and I snatched it and I tried it.  And when I

20   found what that stuff did do, first, it was for the

21   excitement, and then it was to take away the pain.  And

22   that's what happens.  When I go and do the right thing, I've

23   always -- I realized this time here it was the little things

24   I didn't work on, I think, because I had the job, I got my

25   driver's license.  I was doing all the right things.  I was

1   doing it for all the people that I felt was right to do it

2   for instead of doing it for the person that meant the most is

3   myself, and not realizing that when things go wrong in

4   relationships with guys, that I've still got to keep going

5   on.  I can't go picking up.  I've got to ask for help, and I

6   never really had a chance to really ask for help because I

7   was always pushed away.

8           THE COURT:  Thank you.

9           THE DEFENDANT:  And this is the first time where I

10  have ever been in a court where I was able to talk.  I had

11  attorneys.  They always told me, "Listen, kid, listen, you're

12  facing twenty years."  They sit me in a jail for two or three

13  years.  They come back and they tell me, "Listen, you sign

14  this paper here.  We're going to give you a deal.  You go and

15  tell the judge."  I didn't know what the hell was going on.

16  All's I know is that that was the thing that I had to do.

17  And then when I get in trouble, then I'm charged as a career

18  criminal, or I'm charged as this and that.  And that was the

19  time I never even had a gun.

20          I know what I did was wrong, ma'am, and I'm asking

21  you people to give me one last chance.  I swear I will never

22  hurt nobody.  If you look, I ain't never hurt nobody, put my

23  hands on anybody.  I might have scared people, and that's

24  wrong, and I deserve everything that I have coming to me for

25  what I have done because it was wrong.  Who the hell am I to

1    go out there with what I had?  People don't know what's

2    happening, and it's not right.  Why should society have to

3    deal with what I have to deal with?

4            I'm an older person.  I realize my

5    responsibilities.  I've got disability problems and stuff

6    like that, and I need help.  And I'm begging the Court, and

7    I'm asking you, ma'am, and I'm asking you, DA, and I'm asking

8    anybody that's in here that's willing to help me because I

9    want to help myself.  That's something I want to do.  I know

10   you've heard all kinds of stories from all kinds of people.

11   People say all kinds of things, but the reality, ma'am, I can

12   bullshit anybody else, but in reality I'm bullshitting

13   myself.  I'm sick and tired of being sick and tired.  I don't

14   want to die in jail.  I want to make it.

15           THE COURT:  Thank you.  So I feel as if I've known

16   you for a very long time now.  We've spent more time on this

17   case than many, simply because there have been all sorts of

18   issues of competency, and so therefore we've had, oh, I don't

19   know how many hearings, multiple hearings.  And you've always

20   been respectful in court.  You've always been remorseful.

21           THE DEFENDANT:  Yes, ma'am.

22           THE COURT:  And you've, I think, shown some empathy

23   for others.  I was particularly impressed with the fact that

24   you confessed so that the other guy driving the car, who was

25   totally innocent, wouldn't sit in jail, and that piece I

1   think is on your side of the story.

2          But there's another side too.  When you talk about

3   unwarranted disparity, yours is a terrible criminal record,

4   terrible.  And I actually was surprised when I saw it because

5   you'd always been so respectful in court.  So while I do view

6   you as having hope, I also have to view with what you've done

7   in the past.  And it isn't just the rape.  I'll take your

8   word for it that that was idiosyncratic.  It's just one

9   robbery and one larceny and crack addiction, very serious

10  crimes which give me huge concern about whether you will do

11  it again.

12         You have a crack addiction, and we will try and

13  take care of that.  We will give you support on supervised

14  release.  I think you've also had a horrible childhood, and

15  on behalf of society, if you will, because I sort of

16  represent it, you shouldn't have been raped, your mother

17  shouldn't have been raped, you shouldn't have been brought up

18  in such a horrible way that you were brought up.

19         You are borderline in your intelligence, but

20  actually you're quite an articulate man, and I do find now

21  that you fully understand the different roles of all of us

22  and that program did work in Missouri.

23         As I say, under the 3553(a) factors, I take that

24  into account, but I must admit I am worried about the

25  criminal history, one after another after another, some of

Page 68

1    which was while you were on release from the crime before.

2           I'm going to do the low end of the Guidelines at

3    151 months.  I'm going to give full credit for all time

4    served in Missouri.  And is there any time in a state

5    institution?

6           MR. SHEA:  There might be some.  What I'd ask is if

7    we could have the time to run from the date of the offense

8    because that would be the day he went into custody.

9           MR. SHINE:  That would be fair, your Honor.

10          THE COURT:  Yes, so if we can figure out the time

11   from that, absolutely.  And to the extent that requires a

12   mild departure, I will do that.  I don't know if it does.  In

13   other words, I don't know if that was state custody or not.

14          MS. RIVERA:  He was in state custody on related

15   charges from 12/28/04 to 2/18/05, but I don't think that

16   resulted in a sentence.

17          THE COURT:  So I just want to make sure.

18          MS. RIVERA:  If it wasn't applied to another

19   sentence, he'll get credit for it on this one.

20          THE COURT:  What I will do is, while I view this as

21   the low-end Guideline sentence, I'm going to subtract

22   whatever was spent in state court so that there's no problem

23   with the Bureau of Prisons.  So you'll tell me what that is,

24   all right?  The 500-hour drug treatment program, three years

25   of supervised release, the first six months of which will be

1   in a drug treatment program.  He should get mental health

2   support throughout the three years so that he can deal with

3   these very sad issues that happened during his childhood.

4   The maximum amount of drug testing.

5          I don't know whether it's possible to get a GED

6   while you're in the institution, but if not, he should be

7   able to try and see if there's something that can help him

8   with his profound learning disabilities.  I forget whether

9   you can -- you can read some, right, at a third-grade level?

10  See if we can get him to a point where there's a degree.

11         Did you, by the way -- I forgot to ask you -- did

12  you give the notice of this to the teller in case the teller

13  wanted to --

14         MR. SHINE:  We did.  They were notified, your

15  Honor.  They provided no statements.

16         THE COURT:  Victim witness.  So the only thing I

17  will disagree with the government on is by saying that

18  whoever that woman was from CPCS gave the best possible

19  representation because I do find that Mr. Shea's

20  representation in this case has been exemplary.  I think he's

21  someone who's been your friend.  I think that he's fought

22  this and litigated this effectively and responsibly all the

23  way through.  And if it's possible, if Dr. Mart were willing

24  to serve as his mental health advisor -- I don't know if he

25  does that kind of thing -- when he gets out, I think there's

1    been a relationship that's been forged.  Can we do that?

2         MS. RIVERA:  It would depend if we have a contract

3    with him or whether we'd be able to --

4         THE COURT:  Will you just make that recommendation,

5    at least, to go to him because it would make sense for him.

6         The bad news, Mr. Carrington, is, you've committed

7    so many crimes, you're here in Federal Court.  The good news

8    is, we actually have money, and we will try and help you if

9    you can help yourself.

10        So six months in a drug treatment program when he

11   gets out, supervised release, and outpatient counseling after

12   that and mental health counseling throughout.  No fine,

13   special assessment of whatever it is.

14        MS. RIVERA:  $100.

15        MR. SHINE:  The restitution figure was $10.  We're

16   not asking for restitution.  I'm just indicating there was a

17   restitution figure of $10.

18        THE COURT:  Yes.  I don't see the bank here

19   pressing for it.

20        MR. SHEA:  Any fines?  I don't know about a --

21        THE COURT:  No fines.

22        MR. SHINE:  No, the government is not recommending

23   any fines.

24        THE COURT:  No, nothing.

25        Mr. Carrington, as much as I'm condemning your

Page 71

1    past, some people I don't see hope for, and I hope you

2    continue with your hope.

3              Read the notice of appeal rights.

4              THE WITNESS:  Is there any way I can ask for a

5    court order for the CPAP machine?

6              THE COURT:  Yes, make a recommendation for the

7    sleep apnea.

8              MS. RIVERA:  To the Bureau of Prisons?

9              THE COURT:  Yes.

10             MS. RIVERA:  And also for the 500-hour drug

11   treatment program?

12             THE COURT:  500-hour drug treatment.  Do you want

13   to be near here, a recommendation to be close to New

14   England?

15             MR. SHEA:  Actually, he's more interested in the

16   services, I think, than to be close to New England.

17             THE COURT:  We want somebody who can provide the

18   drug, the GED, maybe some vocational training.

19             MS. RIVERA:  Mental health treatment?

20             THE COURT:  Mental health treatment.  He needs

21   serious help, which I'm not sure he's ever received, okay?

22             MR. SHEA:  Okay, we'll try and work on that.

23             THE COURT:  Notice of appeal.  Anything else?

24             MR. SHINE:  No, your Honor.  Thank you very much.

25             THE CLERK:  Mr. Carrington, will you please stand,

Page  72

1    sir.  Mr. Charles Carrington, the Court hereby notifies you

2    of your right to appeal the sentence.  If you cannot afford

3    the cost of an appeal, you may move to proceed in forma

4    pauperis.  If you cannot afford counsel for an appeal, one

5    will be appointed for you.  You are also notified that the

6    Clerk of Court will file an appeal on your behalf if

7    requested by you to do so.  Any appeal from the sentence must

8    be filed within ten days of entry of judgment on the docket.

9    Do you understand these rights?

10              THE COURT:  Do you understand you have the right to

11   appeal?

12              THE DEFENDANT:  Yes, ma'am.

13              THE COURT:  And what is it, ten days?

14              MR. SHEA:  Ten days from the judgment.

15              THE COURT:  Ten days from the judgment, so your

16   lawyer will help you do that if you want to appeal.  Okay?

17              THE DEFENDANT:  Yes, ma'am.

18              THE COURT:  Okay, great.

19              THE CLERK:  Court is in recess.

20              (Adjourned, 5:20 p.m.)

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7

8          I, Lee A. Marzilli, Official Court Reporter, do

9  hereby certify that the foregoing transcript, Pages 1 through

10 72 inclusive, was recorded by me stenographically at the time

11 and place aforesaid in Criminal Action No. 05-10074-PBS,

12 United States of America V. Charles Carrington, and

13 thereafter by me reduced to typewriting and is a true and

14 accurate record of the proceedings.

15         In witness whereof I have hereunto set my hand this

16 7th day of June, 2008.

17

18

19

20

21
                   /s/ Lee A. Marzilli
22         _____
                   LEE A. MARZILLI, RPR, CRR
23                 OFFICIAL COURT REPORTER

24

25